# EXHIBIT B

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON              6/4/2025
By_____/s/ Anthony Berini_____
Deputy Clerk

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Diane Doolittle (CA Bar No. 142046)
2      dianedoolittle@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
3  Redwood Shores, California 94065
   Telephone:      (650) 801-5000
4  Facsimile:      (650) 801-5100

5    Michael Liftik (CA Bar No. 232430)
      michaelliftik@quinnemanuel.com
6  1300 I Street NW, Suite 900
   Washington, D.C. 20005
7  Telephone:      (202) 538-8000
   Facsimile:      (202) 538-8100

8

9  *Attorneys for Plaintiff Hugh Edmundson*

   SUPERIOR COURT OF THE STATE OF CALIFORNIA
10
   COUNTY OF SAN MATEO
11

12 | HUGH EDMUNDSON, an individual, | **JURY TRIAL DEMANDED** |
   |                                | Case No.   25-CIV-04254  |

                 Plaintiff,

14          vs.

15

16 PAGAYA TECHNOLOGIES LTD.,
   THEOREM TECHNOLOGY, INC.,
17 THEOREM PARTNERS, LLC, and DOES 1-
   100,

18          Defendants.

**COMPLAINT For:**
  1. **Retaliation in Violation of California Labor Code § 1102.5**
  2. **Retaliation in Violation of California Government Code § 12940(h)**
  3. **Aiding and Abetting Retaliation**
  4. **Wrongful Termination in Violation of Public Policy**
  5. **Aiding and Abetting Wrongful Termination**
  6. **Breach of Contract (Employment Agreement)**
  7. **Breach of Implied Covenant of Good Faith and Fair Dealing (Employment Agreement)**
  8. **Breach of Contract (RSU Agreement)**
  9. **Breach of Implied Covenant of Good Faith and Fair Dealing (RSU Agreement)**
  10. **Violation of California Business & Professions Code § 17200 (Unfair Competition Law)**
  11. **Defamation**
  12. **Intentional Infliction of Emotional Distress (IIED)**
  13. **Declaratory Relief**
  14. **Failure to Produce Personnel Records (Cal. Labor Code § 1198.5, and § 432)**
  15. **Failure to Produce Wage Records (Cal. Labor Code § 226)**

---
COMPLAINT

Plaintiff Hugh Edmundson ("Plaintiff"), an individual, by and through his undersigned counsel, brings this Complaint against Defendants Pagaya Technologies Ltd. (NASDAQ: PGY) ("Pagaya"), Theorem Technology, Inc., and Theorem Partners, LLC (collectively, "Theorem") (Pagaya and Theorem are collectively referred to as "Defendants"), and DOES 1-100, and alleges as follows:

**INTRODUCTION**

1.      Plaintiff Hugh Edmundson ("Plaintiff"), the founder, and at various times, the Chief Executive Officer and Chief Investment Officer of Theorem, built this California-based hedge fund from the ground up, transforming it into a leading force in consumer credit investment. Started in 2014 with less than $1 million of assets under management, Theorem quickly became a dominant player in the industry, pioneering machine-learning models to analyze and price consumer loans, evaluate loan origination platforms, and oversee investments for some of the world's largest institutional investors—including endowments, sovereign wealth funds, pensions, healthcare organizations, insurance companies, and family offices. Under Plaintiff's leadership, Theorem successfully managed more than $1.7 billion in assets by 2024, collectively acquired over $10 billion in consumer loans, with $2.6 billion sourced through custom partner integrations, and earned a reputation as one of the most sophisticated fintech platforms in the market.

2.      Plaintiff's contributions extended beyond technical innovations. His strategic vision led to the merger with Pagaya Technologies Ltd. (NASDAQ: PGY), a publicly traded company, which would allow it to expand its AI-driven financial product offerings. The merger, announced in July 2024 and completed in October 2024, was marketed by Pagaya as a strategic union that would preserve Theorem's autonomy and investment process while leveraging Pagaya's resources to expand its fund management business to over $3 billion in capital.

3.      To protect investors, Theorem negotiated critical safeguards into the merger agreement and letter to investors (Investor Letter) dated July 31, 2024. These protections included explicit commitments that:

> Pagaya's intention is for Theorem's current investment committee to maintain control and discretion over the Funds' investment strategy for at least the first year. A material reconstitution or diminution in the scope or authority of the investment committee during

the first year would result in clients having the opportunity to redeem and elect a liquidating trust.

*See* Exhibit I, Form of Transaction Notice (Investor Letter) of the Merger Agreement.

Material reconstitution or diminution of the scope or authority of the TIC (through expansion, removals, material changes in responsibilities or otherwise) that results in the legacy members of the TIC becoming a minority or ceasing collectively to have material control over investment decisions for the Theorem funds.

*See* Theorem Integration and Operating Principles, Schedule 1.1(i) of the Merger Agreement.

4.      These representations were critical to securing client approval and were heavily relied upon by investors in consenting to the merger. The protections ensured Theorem's Investment Committee (Theorem IC), of which Plaintiff was a member since inception, would remain independent in its investment decision-making, that the Theorem research team would continue to apply its quantitative, research-based underwriting process, and that Pagaya would not change the fund's administrator, valuation agent, or valuation processes during the first year.

5.      In reality, the promises Pagaya made to Plaintiff, investors, and regulators were calculated deceptions. Almost immediately after the merger closed, Defendants began systematically dismantling Theorem's independence and strategic decision-making authority. Rather than honoring their commitments, Defendants seized control over Theorem's investment process, drastically curtailed the Theorem IC's ability to invest in 3rd party platforms, pushed out key personnel, and deliberately misled investors about the company's stability and governance structure—all to serve their own financial interests at the expense of Theorem's clients.

6.      Shortly after the merger was finalized, Plaintiff presented the Theorem team with "opportunities" to purchase Pagaya-originated whole loans. Upon conducting thorough analysis, however, the Theorem research team identified concerning increases in losses. Based on this analysis, the team concluded that the expected returns for the Pagaya product did not align with the funds' investment objectives and were less attractive compared to other opportunities from third-party loan origination platforms. Plaintiff communicated these findings to Pagaya and proposed constructive alternatives, but Pagaya failed to provide meaningful responses.

7.      Following the merger, Plaintiff, in his capacity as Chief Investment Officer of Theorem and continuing member of the Theorem IC, attended the inaugural meeting of the Pagaya

Capital Deployment Committee (PCDC). During this meeting, Pagaya announced a stunning directive: the Theorem IC was prohibited from investing in loans from third-party lending platform programs, effectively forcing investments into lesser-performing, Pagaya-sponsored programs only. These included long established programs with lenders such as LendingClub, BestEgg, Sofi, and Upgrade. This directive contradicted the Investor Letter and merger agreement, obliterating the promised independence of Theorem's investment process and undermining the very investment strategy that had been communicated to investors to secure their consent to the merger.

8.      In response to Plaintiff's objections, Pagaya's Chief Executive Officer, Gal Krubiner, explicitly stated that he would not reinstate the third-party platforms. To procure Plaintiff's acquiescence to this flagrantly illegal and improper scheme, Mr. Krubiner offered to modify Plaintiff's deferred compensation, proposing a handsome guaranteed minimum payment on the condition that Plaintiff direct Theorem to purchase $50 million per month of Pagaya-originated loans and bonds over the next 12 months, without regard to performance or clients' best interests. Plaintiff immediately declined this attempted bribe that would have required him to compromise his fiduciary duties to the funds' clients.

9.      When it became clear Defendants could not coerce Plaintiff through incentives, they initiated a pressure campaign. They imposed further restrictions on the Theorem IC's investment independence, prohibited the Theorem funds from issuing new securitizations until the Theorem IC agreed to purchase Pagaya's loans, and violated key terms of the merger agreement by refusing to rebate fees owed to the funds. Defendants also implemented illegal employment agreements containing unenforceable non-compete clauses in violation of California law, despite being informed these provisions were unlawful and sought to gut the Theorem research team that performed the analysis of prospective fund investments.

10.     After exhausting internal remedies, Plaintiff formally reported his concerns to Pagaya's Chief Compliance Officer and, through legal counsel, to Defendants' Chief Legal Officer. His comprehensive report meticulously documented numerous violations, including: (a) Pagaya's unwarranted interference with Theorem's investment decisions; (b) material misrepresentations to investors regarding fund independence; (c) self-dealing that prioritized Pagaya's interests over

investors; (d) improper imposition of unlawful employment agreements containing non-compete clauses prohibited under California law; (e) withholding of required notices and withdrawal options for investors; and (f) deliberate actions to undermine the agreed-upon terms of the Merger Agreement. Plaintiff also filed a detailed whistleblower complaint with the Securities and Exchange Commission, documenting these serious legal and regulatory violations.

11.    Plaintiff's concerns and complaints explicitly identified potential violations of federal securities laws and regulations, including but not limited to: (a) violations of the Investment Advisers Act of 1940, specifically Sections 206(1) and 206(2) prohibiting fraud by investment advisers; (b) violations of Rule 206(4)-8 regarding misleading statements to investors; (c) violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 regarding misleading statements in connection with the purchase or sale of securities; (d) violations of Section 17(a) of the Securities Act regarding misleading statements in the offer or sale of securities; and (e) violations of the books and records and internal control provisions of the federal securities laws for material misrepresentations in public filings. Plaintiff reasonably believed these violations were occurring based on his direct observations of Defendants' conduct.

12.    In direct and calculated retaliation for Plaintiff's protected whistleblowing activities, Defendants orchestrated a systematic campaign to isolate, discredit, and ultimately remove him entirely. After Plaintiff raised his serious concerns, Defendants immediately restricted Plaintiff's access to Theorem's investors, severed key communication channels, and reassigned team members who previously reported to him. When Plaintiff, acting in his capacity as the Chair of the Theorem IC, and consistent with his fiduciary obligations, authorized a lawful return of excess capital to investors from the Theorem funds that could not be deployed consistent with fund objectives due to Pagaya's restrictions, Defendants seized on this proper exercise of his authority as a pretext. In a stunning escalation, they abruptly placed Plaintiff on administrative leave, revoked his system access, made false and defamatory statements to investors, and even contacted his personal banking institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts, leaving him without access to essential funds. Shortly thereafter, Defendants threatened to bring frivolous claims against Plaintiff to hold him liable for all the supposed "losses" to the Theorem

1  funds and simultaneously terminated his employment, despite having no legitimate basis for doing
2  so.

3      13.    Throughout this retaliatory campaign, Defendants waged a coordinated defamation
4  effort designed to destroy Plaintiff's professional reputation. Defendants deliberately made false
5  statements to investors, clients, and third parties, falsely alleging that Plaintiff had engaged in
6  misconduct, unauthorized activities, policy violations, and self-dealing—all while Defendants were
7  actively concealing their own fiduciary breaches. These defamatory statements inflicted substantial
8  reputational damage and were made with actual malice, as Defendants knew these characterizations
9  were false or acted with reckless disregard for their truth. Defendants' actions constituted a
10 deliberate attempt to not only eliminate Plaintiff from the organization he built, but to systematically
11 dismantle his professional credibility and standing in the industry.

12     14.    Defendants' orchestrated campaign of retaliation against Plaintiff for his protected
13 whistleblowing activities constitutes egregious violations of California Labor Code § 1102.5 and
14 California Government Code § 12940(h), wrongful termination in violation of fundamental
15 California public policy, breach of contract, breach of the implied covenant of good faith and fair
16 dealing, defamation, and intentional infliction of emotional distress, among other wrongs. Through
17 this action, Plaintiff seeks to hold Defendants directly accountable for their calculated and unlawful
18 conduct, as well as for aiding and abetting the retaliation and wrongful termination. Plaintiff also
19 seeks declaratory relief regarding his rights under certain of the agreements at issue. The Court
20 should not countenance Defendants' brazen retaliation against a whistleblower who sought to
21 uphold his fiduciary duties and protect investors from ongoing misconduct.

## PARTIES

23     15.    **Plaintiff Hugh Edmundson** is an individual residing in California and an
24 investment professional, widely regarded as a visionary in the financial technology sector. As the
25 founder and, until his recent termination, the Chief Executive Officer and Chief Investment Officer
26 of Theorem (his employer), Plaintiff built a company that revolutionized consumer credit investing,
27 leading a team of PhD researchers and engineers to develop cutting-edge machine-learning models

that transformed risk assessment and investment strategies. Under his leadership, Theorem grew into a billion-dollar enterprise, trusted by the world's most sophisticated institutional investors. Plaintiff's reputation for integrity, strategic foresight, and unparalleled expertise was instrumental in securing Theorem's acquisition by Pagaya. Plaintiff was contractually promised continued leadership post-merger by his employer, Theorem, yet Defendants systematically dismantled his role, disregarded his contractual rights, and ultimately forced him out through a campaign of retaliation and pretextual allegations. Plaintiff is also a limited partner in the Theorem funds, having invested his own personal funds alongside other third party investors.

16.     **Defendant Pagaya Technologies Ltd.** is a publicly traded corporation (NASDAQ: PGY) based in New York City. It operates in the financial technology and investment management sector, overseeing billions in assets through its SEC-registered subsidiaries. Defendants acquired Theorem in 2024, publicly representing the transaction as a strategic expansion while privately orchestrating a scheme to strip Theorem of its independence, misappropriate its assets, and push out its founder under false pretenses. After the acquisition, Pagaya substantially aided and abetted Theorem in fraudulent misrepresentations, breached contractual obligations, and retaliated against Plaintiff for refusing to condone its self-dealing and regulatory violations.

17.     **Defendant Theorem Technology, Inc. and Theorem Partners, LLC** (collectively, "Theorem") was co-founded by Plaintiff and has been an SEC-registered investment adviser since November 2016. Theorem, which served as Plaintiff's employer at all relevant times, has its headquarters and principal place of business is Menlo Park, California. Theorem specializes exclusively in the consumer credit space and has developed sophisticated machine learning models to analyze and price loans and evaluate loan origination platforms. Theorem, acting through its post-merger leadership and under the direction of Pagaya, engaged in fraudulent misrepresentations, breached its contractual obligations to Plaintiff, and retaliated against him for refusing to participate in self-dealing and regulatory violations.

18.     Theorem operated as a single, integrated enterprise with respect to Plaintiff's employment and the investment operations at issue in this complaint. The two Theorem entities shared common ownership, directors, officers, and management personnel; maintained interrelated

operations with centralized control of labor relations; operated from the same physical location; used the same branding and represented themselves to the public as a unified business; shared and commingled financial resources; and made coordinated decisions regarding employment matters, investment operations, and business strategy. Employees, including Plaintiff, performed services for both entities simultaneously without distinction. Throughout Plaintiff's employment, the two Theorem entities functioned as alter egos of one another, with such unity of interest and ownership that the separate corporate personalities of the entities ceased to exist in practice. Accordingly, Theorem Technology, Inc. and Theorem Partners, LLC should be treated as a single employer and/or integrated enterprise for purposes of all claims asserted in this action.

19.    **DOES 1-100** are officers, directors, and senior executives of Defendants who actively participated in the wrongful conduct alleged in this Complaint, as well as other individuals or entities whose identities are currently unknown but who were involved in, or facilitated, the wrongful conduct alleged herein. These individuals exercised direct control over corporate governance, investment decisions, and compliance policies at Defendants, including actions that breached fiduciary duties, misrepresented financial information, and retaliated against Plaintiff for engaging in protected whistleblowing activities. These Defendants personally approved, facilitated, or failed to prevent the misconduct described herein.

20.    Plaintiff will amend this Complaint to identify these Defendants as their identities become known through discovery.

## JURISDICTION AND VENUE

21.    The Superior Court of California for the County of San Mateo has subject matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution. Plaintiff asserts claims arising under California law, including, but not limited to, claims for retaliation, wrongful termination, breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, intentional infliction of emotional distress, and declaratory relief.

22.    The Superior Court of California for the County of San Mateo has personal jurisdiction over Defendants because Defendants conduct substantial business in California, including maintaining operations, employing personnel, and managing financial transactions within

the state. Defendants purposefully availed itself of California's laws and protections by acquiring Theorem, a California-based company, and engaging in tortious and employment-related conduct directed at Plaintiff while he was working in California.

23.    Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 because a substantial portion of the wrongful acts and omissions giving rise to this action occurred in California. Plaintiff worked in California throughout the course of his employment with Theorem, including during and after the merger with Defendants. Additionally, key decisions affecting Plaintiff's employment status, access to Theorem's operations, and Defendants' retaliatory actions were carried out within California, impacting Plaintiff and Theorem's stakeholders in the state.

24.    Defendants' misconduct, including the wrongful termination, defamatory statements and retaliatory actions against Plaintiff, had a direct and substantial impact in California. The improper removal of Plaintiff from his executive role, the mismanagement of Theorem's investment funds, and the fraudulent misrepresentations made to investors all directly affected California-based employees, investors, and business operations. Given these substantial connections to the state, California courts have a strong interest in adjudicating this dispute and ensuring that California's laws protecting executives, employees, and investors from corporate misconduct are upheld.

25.    Plaintiff has exhausted his administrative remedies under the California Fair Employment and Housing Act. On May 30, 2025, the California Civil Rights Department issued Plaintiff a Notice of Case Closure and Right to Sue (CRD Matter No. 202505-29623630), attached hereto as **Exhibit A**. This Complaint is being filed within one year of the issuance of that Notice.

## FACTUAL ALLEGATIONS

### Pre-Merger Representations and Inducements

26.    Defendant Pagaya actively pursued Theorem for a potential merger over the course of several years, initiating multiple outreach efforts between 2019 and 2024. During this time, Defendant Pagaya persistently sought to persuade Plaintiff and the broader Theorem team to consider combining efforts, while also attempting to recruit senior members of Theorem's leadership team as early as 2019.

27.     On July 30, 2024, Pagaya issued a press release announcing its agreement to acquire Theorem Technology, Inc. (which owned Theorem), stating that "Theorem has powered billions of dollars of credit investments across its network since its founding in 2014 with stable, long-term capital, utilizing its proprietary technology." The Pagaya press release highlighted that the "combination brings Theorem's consumer credit funds as well as its engineering and data science expertise under the Pagaya umbrella. This strategic transaction solidifies Pagaya's overall mission to serve its partners, their customers and investors by expanding access to credit across the lending ecosystem."

28.     Pagaya's press release contained two key representations that Pagaya had no intention of following and thus were false: First, the press release made clear that after the merger there would be an expansion of the Theorem funds' investment options while still including the investment options Theorem had historically used: "**In addition to its existing investment opportunities**, investors in Theorem's credit funds will now have access to credit assets generated by Pagaya's network of 30 of the top lenders in the US, including over $180 billion of application volume per quarter." (Emphasis added.) In retrospect, Pagaya had a clear motive to make this representation as it would impact (i) Theorem fund investors approving the merger, and (ii) Pagaya shareholders' belief that Theorem would continue to be successful consistent with its prior performance.

29.     Second, the press release made clear that part of the value of the merger to Pagaya was Theorem's employees. In particular, Mr. Gal Krubiner (Chief Executive Officer of Pagaya) was quoted as saying "We are very excited about Theorem and its amazing employees **becoming a part of Pagaya**, . . ." (Emphasis added.) "I believe that their institutional fund management expertise will sharpen Pagaya's already market-leading capabilities." Pagaya had a clear motive to make this representation for the same reasons. The merger agreement contained explicit provisions designed to ensure the continuity of Theorem's operations, including its staff, and preserve its investment independence. Among these, Defendants committed that Theorem's investment decision-making authority would remain intact, particularly through the Theorem IC, which had earned the trust of institutional investors over years of successful fund management. Defendants also made express

representations to Plaintiff, Theorem investors, and regulators that Plaintiff would continue as CIO, retaining full authority over investment strategies and fund management post-merger.

30.    Shortly after announcing the merger on July 30, 2024, a letter was sent to Theorem fund investors seeking their approval of the merger. *See* Exhibit A ("Investor Letter"). Pagaya reviewed and approved the Investor Letter and required, as a term of the merger agreement, that Theorem send the Investor Letter to Theorem fund investors to obtain their consent to the merger. The Investor Letter stated that "Theorem structured important terms in seeking to maintain continuity, client focus and eliminate conflicts." Among these included that: a. "Pagaya's intention is for Theorem's current investment committee to maintain control and discretion over the Funds' investment strategy for at least the first year. A material reconstitution or diminution in the scope or authority of the investment committee during the first year would result in clients having the opportunity to redeem and elect a liquidating trust." b. "Theorem's IC will maintain discretion to execute the investment strategy and to select (or reject) any loans sourced from Pagaya network partners. Pagaya will offset any origination or similar fees it receives on whole loans purchased by Theorem funds either through a rebate or a purchase price adjustment, and for products other than whole loans, Theorem funds will not bear any such fees other than securitization costs unless a third-party investor would also bear such fees as part of an arms' length transaction."

31.    The Investor Letter also included a section on "Key Investor Protections" that emphasized that "Theorem is focused on fund performance, relying on the management and incentive fees it generates from the funds. As it relates to the funds, the only stakeholders who matter are you, our Investors." The letter further stated that "the Theorem Investment Committee will continue to be in charge of the strategy for the Theorem funds," and that "Theorem's IC will remain in charge of selecting assets to purchase in its discretion, taking into account criteria it sees fit." It also assured investors that "Pagaya will either (i) adjust the purchase price [of whole loans] such that it is reduced by an amount corresponding to the net fees realized by Pagaya or (ii) if not so adjusted, rebate any such unadjusted net fees realized to Theorem funds."

32.    The Investor Letter further outlined strategic advantages for Pagaya, again emphasizing the value of Theorem personnel, stating that: "Pagaya sees this combination benefiting

them in a number of ways, including the ability to bring in a world-class team to extend the competitive moat it has already built in the consumer credit space."

33.     On October 28, 2024, Pagaya filed a Form 8-K with the SEC, accompanied by a press release announcing the completion of its merger with Theorem on October 22, 2024.[1] The press release claimed that "[f]und investors are expected to gain access to credit assets generated by Pagaya's network of 31 of the top lenders in the U.S., creating **more** growth opportunities across the lending ecosystem." (Emphasis added.) Mr. Krubiner specifically stated: "Our **combined** capabilities will enable us to better meet unprecedented institutional demand for consumer credit, while also diversifying our funding sources and improving our capital efficiency." (Emphasis added.)

34.     Around October 31, 2024, Theorem filed an updated Form ADV with the SEC to reflect post-merger changes. The filing detailed Theorem's business operations, investment methodologies, and conflict-of-interest management practices—each of which was subsequently undermined by Pagaya's conduct.  These business operations included: a. *Theorem's Proprietary Models*. "Theorem develops proprietary models that characterize the risk of consumer credit assets as well as asset backed securities ("ABS"). The Firm uses these models to evaluate investment opportunities such as pro-rata and custom whole loan forward flow arrangements with financial institutions, secondary whole loan pool sales, active marketplace lending loans, primary issuance ABS deals, secondary market ABS transactions, and other credit deals based on consumer loans." b. *Theorem's Employees*. "Theorem's team responsible for analyzing individual loans and constructing portfolios has expertise in advanced statistics, physics, computer science, machine learning, and mathematics. Theorem also works with domain experts in the field of credit analytics to understand market microstructure and other qualitative sources of return generation."

35.     The ADV also discussed potential conflicts of interest due to Pagaya: "These activities of Pagaya Tech and its affiliates may give rise to conflicts of interest with the activities of

---

[1]   *See* https://content.edgar-online.com/ExternalLink/EDGAR/0001883085-24-000173.html?hash=231813891a8c227c541e6c76f615823f71c10b4d775c2da1c431c91de2bd6d1e&dest=pgy-20241022_htm#pgy-20241022_htm.

Theorem and the Funds. Conflicts of interest that arise between a Fund and Pagaya Tech and its affiliates will be evaluated in order to determine the appropriate course of conduct, which, depending on the circumstances, may include consultation with or approval by the board of directors, a limited partner advisory committee, or another governing body or independent representative on behalf of a Fund. Any such evaluation will take into consideration the interests of the relevant parties and the circumstances giving rise to the conflict."

36.    In contravention of the promises to investors and representations to its regulators, Pagaya seized control over the key aspects of the investments and employees at Theorem almost immediately after the merger, making decisions for Pagaya's financial benefit at the expense of the Theorem funds. There were no meaningful efforts by Pagaya to address any of these conflicts of interest, which prevented Theorem from deploying capital.  Had it succumbed to Pagaya's undue pressure, Theorem would have been investing its funds in conflicted and/or underperforming assets that were inconsistent with the funds' investment objectives.

**Defendants' Immediate Post-Merger Misconduct**

37.    The merger between Theorem and Pagaya closed in October 2024. The ink had barely dried on the merger agreement when Defendants began systematically dismantling the very independence, governance structures, and strategic decision-making that had made Theorem valuable and was essential to securing client approval for the merger.

38.    Shortly after the merger was finalized, Plaintiff presented the Theorem team with "opportunities" to purchase Pagaya-originated whole loans. Upon conducting a thorough analysis of the performance of recent Pagaya-originated loans, the Theorem research team identified a concerning increase in losses.  Based on this analysis, the team concluded that the expected returns from these loans did not align with the funds' investment objectives and were less attractive compared to other opportunities available from third-party loan origination platforms. The Theorem team communicated these findings to Pagaya and, in an effort to propose constructive solutions, suggested alternatives such as a larger risk-sharing arrangement or a price discount to align the performance of the loans with the funds' investment objectives. Despite these efforts, Pagaya failed to provide a meaningful response to the proposed alternatives.

39.     Also following the merger, Plaintiff, in his capacity as CIO of Theorem, and a member of the Theorem IC which directed Theorem's investments, attended the inaugural meeting of the Pagaya Capital Deployment Committee (PCDC), ostensibly created to address potential allocation conflicts. During this meeting, Pagaya announced a stunning directive: the Theorem IC was prohibited from investing in loans from third-party lending platforms' standard loan programs, and was required to shutter all of its custom "second look" loan programs, effectively forcing investments into lesser performing, Pagaya-sponsored programs only. This restriction was not merely unexpected—it fundamentally sabotaged Theorem's independence and its core investment strategy that had been promised to investors and upon which they had based their consent to the merger.

40.     Plaintiff traveled to New York City to meet with several members of Pagaya's senior executive team in an effort to address the legal and practical issues stemming from the imposed restrictions. During one of these meetings, Pagaya's Chief Executive Officer, Gal Krubiner, explicitly stated that he would not reinstate the third-party platforms. This statement was particularly troubling, as the PCDC was designed to function independently of Pagaya's CEO, who was not a member because his involvement presented a clear conflict of interest.

41.     In response to Plaintiff's objections to shutting off access to all third-party platforms for investment, Mr. Krubiner proposed a "side deal" with Plaintiff. Mr. Krubiner offered to enhance the terms of Plaintiff's deferred compensation associated with the merger agreement, proposing instead a guaranteed minimum payment to Plaintiff on the condition that Plaintiff have Theorem purchase $50 million per month of Pagaya-originated loans and bonds over the next 12 months, without regard to performance or the clients' best interests. Plaintiff immediately declined this offer that would have him compromise his fiduciary duties to the funds' clients. Mr. Krubiner's attempted bribe of Plaintiff was troubling for a separate and independent reason, namely, the PCDC was designed to function independently of Pagaya's CEO, whose involvement presented a clear conflict of interest, and the Theorem IC, with Plaintiff serving as its Chairman, was also designed to function independently.

42.     In the same conversation, Mr. Krubiner informed Plaintiff that Pagaya's Chief Risk Officer, Raj Singh, had been ordered *not* to speak or interact with Plaintiff in any capacity. Despite Plaintiff's repeated efforts over the course of several months—including emails, meeting requests, and internal escalations—Plaintiff was consistently stonewalled and denied any meaningful access to Mr. Singh. Plaintiff had sought access to Mr. Singh to discuss the troubling pressure being placed upon the Theorem IC, among other things, but was stymied by Mr. Krubiner's interference. Plaintiff was ultimately only ever able to speak directly with Mr. Singh once, and even that occurred only after Plaintiff pointed out the absurdity of the situation, remarking that it was unacceptable for the Chief Investment Officer to be unable to reach the Chief Risk Officer after months of attempting to do so in the ordinary course of their responsibilities.

43.     Through persistent efforts, Plaintiff successfully persuaded Pagaya to re-approve a limited number of third-party platforms for deployment. However, these approvals were restricted to a few smaller platforms, accounting for fewer than 5 out of nearly 20 historical platforms, whose collective volume represented less than a third of the funds' target deployment. Buying Pagaya's loans thus remained the only alternative provided to fill the gap to deploy available Theorem fund capital. Plaintiff believes these selective re-approvals were largely driven by Pagaya's specific business development goals with those platforms and an attempt to make the effort to divert deal volume to Pagaya less overt. This was a blatant breach of Pagaya's fiduciary duty to serve the best interests of Theorem Fund clients.

**Defendants' Escalating Pressure Campaign**

44.     When it became clear they could not coerce Plaintiff through incentives, Defendants initiated a pressure campaign to force Plaintiff and the Theorem IC to purchase Pagaya-program personal loan and auto loan assets. This campaign included further restrictions on the Theorem IC's investment independence, such as prohibiting the Theorem funds from issuing a new securitization until the Theorem IC agreed to purchase Pagaya's loans and collateral. Additionally, Defendants violated key terms of the merger agreement by refusing to rebate fees owed to the funds for a structured transaction entered into with Pagaya—a clear contractual obligation. While the fees in

question were not significant, this refusal underscored the extent of Pagaya's desperation for additional capital and its willingness to disregard its fiduciary duties.

45.     Around this time, Pagaya also sought to implement employment agreements for Theorem employees containing non-compete clauses and other restrictive covenants that were neither lawful nor enforceable under California law, where Theorem primarily operated. Despite being informed by Plaintiff and senior members of the Theorem team that such provisions violated state law, Defendants insisted on their inclusion. This approach jeopardized the retention of key personnel, as the affected employees were widely aware of the agreements' legal deficiencies. While Defendants initially agreed to remove these provisions during the post-merger transition, they reintroduced them after the Theorem IC declined to purchase underperforming collateral from the Pagaya personal loan program.

46.     Notably, Defendants demonstrated inconsistency by selectively waiving these restrictive provisions for certain individuals they sought to retain. Pagaya's Chief Legal Officer further exacerbated the situation by making generalized claims to Theorem employees that the agreements complied with applicable laws, while simultaneously acknowledging to certain select employees that specific terms were unenforceable under California law. This contradictory conduct undermined Pagaya's credibility and raised concerns about the ethical standards guiding their employment practices.

47.     Gal Krubiner, Pagaya President Sanjiv Das, and Pagaya's COO sought to damage Plaintiff's reputation by circumventing him and ordering one of his direct reports to communicate directly with partner loan originators, falsely attributing the program shutdowns solely to the Theorem IC and Plaintiff, while portraying Pagaya as entirely uninvolved. This directive was issued despite Defendants' full awareness that the sudden termination of longstanding programs would tarnish reputations and create widespread fallout. The employee, recognizing the inaccuracy of the directive and its potential harm, refused to carry out the instructions to disseminate false information.

48.     Despite significant challenges by reason of Pagaya's improper interference, Plaintiff sought to fulfill his fiduciary responsibilities by deploying available capital within the limited

investment options provided. At the same time, Plaintiff repeatedly advocated to Pagaya that the restrictions imposed on the Theorem IC were not only violations of the merger agreement and Investor Letter, but also detrimental to the growth and success of an institutional asset management business. The Theorem team proactively delivered detailed and comprehensive underwriting analyses for all proposed investment platforms on multiple occasions. However, Pagaya never provided substantive feedback or comments on these analyses.

49.     Defendants made further repeated efforts to pressure Plaintiff and the Theorem IC to purchase the underperforming Pagaya loans. During a conversation with Pagaya's Chief Operating Officer and nominal Head of the PCDC, Ralph Leung, Mr. Leung acknowledged to Plaintiff that the restrictions imposed on Theorem were directives from Pagaya's CEO. The COO proposed that Plaintiff commit to purchasing $30 million of Pagaya whole loans per month, $20–$30 million of Pagaya bonds per month, as well as Pagaya auto loan products. These were the exact products that that Theorem team had carefully evaluated and concluded were likely to underperform. He further suggested that if this pattern was maintained for a six-month period, Pagaya's CEO *might* consider reducing or lifting some of the imposed restrictions on Theorem's investments.

50.     During the one conversation Plaintiff was finally able to have with Pagaya's Chief Risk Officer, Raj Singh, important information came to light. Mr. Singh disclosed that *none* of the platform restrictions originated from him or his team. He admitted that he was unaware of the details of many restrictions being imposed on the Theorem IC and stated that, while he had provided general frameworks and data, all specific decisions regarding platform restrictions on Theorem were made by Pagaya's COO Ralph Leung and CEO Gal Krubiner. This revelation underscores Defendants' disregard for their fiduciary obligations and their failure to fulfill key responsibilities under the Merger Agreement and Investor Letter.

**Key Employee Departures and Plaintiff's Protected Whistleblowing Activities**

51.     In late January 2025, Theorem's then Head of Research and another Theorem IC member, Nico Salzetta, notified Plaintiff and Theorem of his constructive dismissal caused by Pagaya's actions. Defendants attempted to compel Mr. Salzetta into signing an unlawful employment agreement containing restrictive covenants such as a non-compete that Pagaya insisted

upon as a condition of his continued employment. His departure alone triggered the right to a liquidation trust and redemption for the funds' limited partners, as it constituted a material change to the Theorem IC. However, despite removing Mr. Salzetta from its payroll, Defendants falsely characterized his departure as voluntary in written communications with the funds' clients, seemingly to obscure the event's implications and avoid revealing the triggering of the trust liquidation option.

52.    After exhausting efforts to address the situation internally, Plaintiff reported his concerns to Pagaya's CCO and, through legal counsel, to the Chief Legal Officer of Pagaya. In this communication, Plaintiff highlighted numerous issues, including:

a.    The conflicts of interest and breaches of fiduciary duty stemming from the curtailing of the Theorem IC's authority. This included the abrupt termination of Theorem's third-party forward flow loan purchasing arrangements, the shutdown of custom loan purchasing programs, the failure to adhere to allocation policies required by regulatory mandates, and the obstruction of the Theorem IC's ability to issue securitizations. These actions constituted potential violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, which prohibit investment advisers from engaging in fraudulent, deceptive, or manipulative practices, and breach of fiduciary duties owed to clients.

b.    Pagaya's refusal to rebate fees associated with a private securitization, contradicting commitments made during the merger agreement, assurances provided to clients, and applicable regulatory standards. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8, which prohibits investment advisers from making false or misleading statements to investors or prospective investors.

c.    The improper imposition of employment agreements on Theorem's employees containing non-compete and non-solicitation clauses, which contravened state laws. *See e.g.,* Cal. Bus. & Prof. Code §§ 16600, 16600.5 (as amended by SB 699, effective Jan. 1, 2024) (barring employers from entering into or enforcing non-compete agreements, even if signed and the employment was out of state); Cal. Lab. Code § 432.5 (prohibiting employers from requiring employees to agree to terms they know are unlawful).

d.      The lack of timely notification to Theorem's fund investors concerning the departure of key personnel, resulting in a violation of commitments under the fund agreements and misleading stakeholders. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8.

e.      Pagaya's deliberate withholding of notices and withdrawal options for Theorem fund investors. These actions breached promises made during the merger to secure investors' approval and violated the terms of the merger agreement, which required notice and withdrawal options in the event of significant changes to Theorem IC's authority or structure. This breach was further underscored by both the restrictive measures imposed on the Theorem IC and the circumstances surrounding the departure of a critical team member. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8.

f.      Actions taken by Pagaya that undermined the agreed-upon terms of the merger agreement, including intentional efforts to limit the potential for the contingent consideration to be realized. These actions included restricting the Theorem IC's ability to pursue more favorable investment opportunities while exerting pressure to prioritize Pagaya's collateral over higher-performing third-party alternatives.

53.     On or about February 3, 2025, Plaintiff sent a formal email to Pagaya's CCO documenting his concerns about Pagaya's misconduct. That same day, Plaintiff, through his legal counsel, sent a comprehensive letter to Pagaya's CLO detailing Pagaya's numerous violations of securities laws and other legal requirements. These communications explicitly identified the ongoing breaches of fiduciary duties, misrepresentations to investors, and unlawful business practices that threatened investor interests.

54.     On or about February 12, 2025, Plaintiff filed a formal and detailed whistleblower complaint with the Securities and Exchange Commission, submitting documentary evidence of Pagaya's regulatory violations. The whistleblower complaint specifically detailed how Pagaya had (1) systematically dismantled Theorem's independence in violation of representations made to investors; (2) attempted to force the Theorem IC to purchase underperforming Pagaya-originated assets; (3) improperly valued assets in Pagaya-sponsored funds; and (4) made material

misrepresentations in SEC filings regarding the maintenance of Theorem's investment independence following the merger.

54. Plaintiff's whistleblower complaints to Pagaya's CCO, CLO, and the SEC constituted protected activity under multiple federal and state statutes, including Section 21F of the Securities Exchange Act as amended by the Dodd-Frank Act, Section 806 of the Sarbanes-Oxley Act, and California Labor Code § 1102.5. Plaintiff reasonably believed the conduct he reported concerned violations of the federal securities laws and regulations and was harmful to investors. Plaintiff engaged in this protected activity with the explicit purpose of preventing ongoing violations of securities laws and protecting investors from fraud and misrepresentation.

56. When Plaintiff raised objections—both internally and through protected whistleblower actions—Defendants retaliated with increasing intensity. They systematically sought to undermine Plaintiff's authority, diminish his role, tarnish his reputation, and ultimately force him out of the very company he had built over the course of a decade. Following his whistleblower disclosures, Defendants immediately restricted Plaintiff's access to Theorem's investors, severed key communication channels, and reassigned team members who previously reported to him, despite being warned repeatedly that such actions against a whistleblower are unlawful.

57. Key decision-makers at Defendants, including CEO Gal Krubiner, COO Ralph Leung, and members of Pagaya's legal department, were aware of Plaintiff's whistleblower complaints and the specific regulatory violations he had identified. This awareness is evidenced by direct communications, including emails acknowledging receipt of his concerns, meetings where these issues were discussed, and the abrupt change in Defendants' treatment of Plaintiff immediately following his protected disclosures. The temporal proximity between Plaintiff's protected whistleblowing activities and Defendants' adverse actions—including restricting his access, reassigning his team members, and ultimately placing him on administrative leave and later firing and threatening to sue him on frivolous claims—establishes a clear causal connection between his protected activity and the retaliation he experienced.

58. Plaintiff also discovered the following additional violations by Defendants:

a.    Pagaya's improper valuation practices of assets in the Pagaya Opportunities Fund, including the failure to properly update valuations of equity tranche securities and junior bond tranches in PGY securitizations to reflect current market conditions and interest rates, resulting in inflated net asset value calculations and excessive management fees charged to fund investors. These valuation practices potentially violated GAAP principles and SEC regulations regarding fair valuation practices, including ASC 820.

b.    Pagaya's attempts to manipulate the structure of payments and recognition of revenue around its securitization sponsor activities to inflate topline revenue figures in its SEC filings, including the use of arrangements that appeared to involve roundtripping revenue with limited or no actual risk transfer. This conduct potentially violated SEC financial reporting requirements and constituted material misrepresentations in violation of securities laws.

c.    Pagaya's misleading and potentially fraudulent statements to investors regarding the Pagaya funds' purchase of junior tranches of Pagaya-originated securitizations, particularly their concentration in high-risk B-rated bonds, and the failure to accurately disclose the true risk exposure of the funds to these securities.

d.    Pagaya's manipulation of discount rates used for valuation of securities to create the appearance of compliance with Regulation RR (which requires retention of a 5% horizontal or vertical slice of securitizations), as documented through independent third-party valuation analysis.

e.    Pagaya's misrepresentation of facts in SEC filings regarding the maintenance of Theorem's investment independence following the merger, despite Pagaya's behind-the-scenes systematic dismantling of that independence.

**Defendants' Retaliation and Pretextual Investigation**

59.    Rather than addressing the serious issues raised in Plaintiff's whistleblower report, Defendants ignored the concerns entirely or sought to cover them up. The investment and platform restrictions remained unchanged, and no effort was made to inform clients about the critical issues brought forward by Plaintiff. Meanwhile, significant members of the Theorem team were forced out through coercive employment practices. Defendants bypassed legal mechanisms by presenting

severance packages to key personnel, enticing them to resign while evading contractual obligations under the merger agreement that restricted their ability to terminate these employees. Pagaya's Chief Strategy Officer acknowledged this strategy as a way to sidestep the merger provisions prohibiting them from directly firing essential staff.

60.     As a result, Theorem was rapidly depleted of the skilled team and resources necessary to execute its investment program as outlined in the Investor Letter. At the time of the merger announcement, Theorem employed a team of over 50 people. Upon information and belief, currently fewer than 5 remain, leaving the firm unable to function as originally promised to clients and stakeholders.

61.     Shortly after Plaintiff's whistleblower complaint, a report by Iceberg Research was publicly released, highlighting significant concerns about Defendants' conduct.[2] The report alleged that Defendants engaged in systemic practices that violated fiduciary responsibilities, including the misuse of the Pagaya Opportunity Fund. According to the report, the Pagaya Opportunity Fund, managed by Pagaya's Chief Investment Officer, Ed Mallon, was allegedly used to offload risky and unsellable securities from PGY securitizations onto fund investors, thereby shifting potential losses off Pagaya's balance sheet. These actions represented a clear breach of fiduciary duty and echo the concerns Plaintiff raised to Defendants.

62.     During this time, Plaintiff participated in a call with Mr. Mallon and a Theorem client, during which Mr. Mallon made misleading statements regarding the involvement of the Pagaya funds in purchasing Pagaya securities. Mr. Mallon claimed that the Pagaya funds accounted for less than 5% of the purchasing within Pagaya's securitizations. However, this statement failed to disclose a critical detail: the Pagaya funds were primarily buying the junior tranches of the securitizations, particularly the most vulnerable B-rated bonds. In many cases, these transactions made Pagaya the majority, if not sole, purchaser of these high-risk bond classes, which were essential for closing the deals. Mr. Mallon's statements falsely implied that the Pagaya funds were

---

[2]   *See* Pagaya: Using Other People's Money to Hide Massive Losses – Iceberg Research available at https://iceberg-research.com/2025/02/11/pagaya-using-other-peoples-money-to-hide-massive-losses/.

1   insignificant participants purchasing securities akin to those acquired by institutional investors,

2   concealing the reality of their disproportionate and concentrated exposure to risk.

3       63.    Plaintiff raised concerns about Mr. Mallon's misleading statements with a

4   compliance officer, but to his knowledge, no action was taken to address the matter. The Iceberg

5   report, titled "Pagaya: Using Other People's Money to Hide Massive Losses," further alleged that

6   as the capacity of the Pagaya Opportunity Fund diminished, Defendants began to implement similar

7   practices with the Theorem funds, exposing them to substantial risk while prioritizing Pagaya's

8   financial interests. Plaintiff came to believe and continues to believe that the concerns articulated in

9   the Iceberg report reflect broader patterns of misconduct by Defendants.

10      64.    The pattern of systematic misconduct exhibited by Defendants constitutes unlawful,

11  unfair, and fraudulent business practices that extend beyond private contractual violations and into

12  the realm of market-wide competitive harm. By maintaining a business model that prioritized their

13  own financial interests through deceptive means—such as misrepresenting fund independence,

14  manipulating asset valuations, and imposing unlawful employment provisions on California

15  employees—Defendants gained improper competitive advantages in the marketplace and deprived

16  competitors who operated lawfully of business opportunities. These practices not only violated

17  specific statutory provisions but also contravened the public policy of fair competition enshrined in

18  California law.

19  **Plaintiff's Capital Return Decision and Defendants' Escalating Retaliation**

20      65.    After weeks of inaction by Defendants and with only minimal progress made in

21  addressing Plaintiff's concerns—such as the delayed notice to Theorem fund clients regarding

22  several senior departures—Plaintiff, in his capacity as Chair of the Theorem IC, determined that the

23  only course of action to fulfill his fiduciary duties to the funds' clients was to explore options for

24  returning capital to investors, which had been accumulating in the funds over the past several

25  months. Pagaya had limited Theorem's investment options to products that Theorem's team had

26  evaluated as underperforming and inconsistent with the funds' investment objectives and

27  representations to investors. Thus, investing in those limited vehicles would breach Theorem's

28  fiduciary duties. But having the funds continue to hold cash (as opposed to deploying it into

1  investments) was also not an option, as it was both inconsistent with the stated purpose of the funds

2  and would result in clients paying significant management fees on cash, as opposed to investments.

3      66.    Faced with this dilemma, the Theorem IC had no choice but to reduce its deployment,

4  rather than compromise the funds' mandate, and ultimately return capital to clients.

5      67.    To ensure clarity regarding his responsibilities and authority, Plaintiff consulted with

6  members of Theorem's internal team. Upon review of the funds' Limited Partnership Agreements

7  and the merger agreement, it was evident that the Theorem IC held the authority to manage cash

8  and facilitate the return of capital to investors. Additionally, Theorem's officer signature resolutions

9  confirmed that, as CEO and CIO, Plaintiff had the necessary authority to execute transactions on all

10  relevant bank accounts.

11      68.    Plaintiff collaborated with Theorem's operations, investor relations, and compliance

12  teams, along with the external CFO and Fund Administrator, to plan the process. The team adhered

13  to established protocols, ensuring the returns would align with the same procedures used for normal

14  monthly redemptions, both before and after the merger, and not interfere with existing capital returns

15  from investor redemption requests. This approach ensured the return of capital would be efficient,

16  accurate, and consistent with prior practices.

17      69.    In a February meeting of the Theorem IC, Plaintiff expressed his views to the

18  Theorem team and Pagaya's appointed Theorem IC observer, as part of the monthly capital

19  allocation review process, that he had no choice consistent with his fiduciary duties but to return

20  capital to Theorem funds' investors.  At this point, Plaintiff was the sole remaining member of the

21  Theorem IC and served as its Chair.   During this discussion, Pagaya's appointed observer

22  acknowledged that no changes were planned to the employee offer letters, the letters that included

23  illegal restrictive covenants. Furthermore, Pagaya's observer disclosed that the upcoming PCDC

24  meeting—a forum where Plaintiff's concerns about allocation restrictions could have been

25  addressed—had been canceled without explanation. This context bolstered the conclusion that

26  returning capital was not only highly appropriate, but also the only responsible option given

27  Plaintiff's fiduciary obligations.

28

70.     On or about February 20, 2025, following the investment committee meeting, in his capacity as Chair of the Theorem IC, Plaintiff authorized the transfer of funds to return approximately $120 million of capital on a pro rata basis to all Theorem fund investors. This was executed through the funds' third-party administrator, US Bank, in full compliance with the standard signatory authorizations and dual approval procedures established by Theorem, both prior to and after the merger. These protocols, which had regularly governed redemption payments post-merger, were followed to ensure the integrity of the process. In light of Defendants' ongoing breaches of fiduciary duties, conflicts of interest, and the risk of potential fraud, Plaintiff determined that expediting the return of capital—while adhering strictly to proper procedures—was the most prudent course of action. There was no reasonable prospect of deploying the accumulated uninvested capital in appropriate investments due to Pagaya's unlawful restrictions, yet investors continued to be charged management fees on these idle funds. The capital return was implemented efficiently and appropriately to safeguard investor interests.

71.     Shockingly, during the process of returning capital to Theorem Main Fund investors, Defendants intervened and abruptly halted the return without providing any justification or explanation for their actions. Worse, Defendants contacted each of Theorem's Prime Fund investors who had received the return of capital and represented to them that the capital return was unauthorized, an error, and/or perpetrated by a rogue employee who was engaged in self-dealing. Defendants demanded that the investors send all of the capital that had been returned back to the Theorem funds.

72.     Following this, Defendants revoked Plaintiff's access to all Theorem systems, effectively barring him from managing the portfolio. At this point, Plaintiff was the sole legacy remaining member of the Theorem IC, meaning that there was no one managing the funds at all, let alone any of the persons in whom Theorem's investors had reposed their trust. Plaintiff believes these actions constitute yet further breaches of Defendants' fiduciary duties to Theorem clients and constitute further retaliation for Plaintiff's repeated complaints of and refusal to go along with Defendants' illegal scheme.

73.     On or about February 20, 2025, within hours of learning about Plaintiff's return of capital to fund investors, Defendants sent Plaintiff's counsel a letter falsely characterizing Plaintiff's actions as 'fraudulent, deceitful and unauthorized,' despite Plaintiff having clear authority to take such actions under the company's signature resolutions. On or about the same day, Defendants immediately revoked Plaintiff's access to all Theorem systems, including email, calendar, risk systems, portfolio management platforms, and all client communications, effectively preventing him from performing his duties as CIO and head of the Theorem IC.

74.     On or about February 21-23, 2025, Defendants attempted to coerce Plaintiff into appointing Pagaya officers to the Theorem IC, despite this directly contradicting representations made to fund investors. Specifically, Defendants demanded that Plaintiff appoint at least two of four Pagaya-selected individuals within arbitrary 24-hour deadlines. When Plaintiff refused, citing his fiduciary obligations to the funds, his concern for investors, and the terms of the merger agreement requiring the independence of the Theorem IC from Pagaya, Defendants threatened to deem his silence as consent and proceed with appointing their own officers regardless of Plaintiff's objections.

75.     Defendants' interference with the return of capital to investors and their false statements to investors about this process were direct retaliatory actions taken in response to Plaintiff's protected whistleblowing activities. Indeed, Defendants took these actions within approximately eight days of learning about Plaintiff's whistleblower complaint to the SEC. This capital return was not only proper under the fund agreements but also aligned with Plaintiff's fiduciary duties to investors in light of the investment restrictions Defendants had improperly imposed—the very restrictions Plaintiff had identified as potential securities law violations in his protected communications.

76.     Plaintiff was and remains of the view that Defendants prioritized retaining the capital (and demanding that all returned investor capital be sent back to Defendants) to secure management fees and repurpose the funds into Pagaya-originated collateral, rather than acting in the best interests of investors. Plaintiff further contends that any management fees collected by Defendants on the withheld capital represent a breach of trust and a disservice to the funds' investors.

**Administrative Leave, Defamation, and Termination**

77.      Over the course of the following weekend, Defendants engaged in multiple actions designed to intimidate Plaintiff. They issued a threatening letter demanding that Plaintiff appoint a new majority of Pagaya employees to the Theorem IC, a demand that directly violated the terms of the Investor Letter. Alarmingly, the proposed candidates put forth by Pagaya were either unqualified, conflicted, or both. Among the candidates was Mr. Mallon, who had been implicated in non-fiduciary conduct in a recent report, and Pagaya's Chief Strategy Officer, whose investment experience was limited to less than six months of observing Theorem IC meetings without any decision-making authority. The remaining two candidates were entirely unfamiliar to Plaintiff, presented only by name, title, and with no evidence of their qualifications or suitability to serve.

78.      Defendants issued a demand late on a Friday evening, asserting—without any basis in the Limited Partnership Agreement, merger agreement, or client correspondence—that Plaintiff must respond within 24 hours or face the unilateral appointment of two Pagaya representatives to the Theorem IC, bypassing Plaintiff's consent. This demand blatantly violated the explicit terms of the Merger Agreement and the Investor Letter. Plaintiff refused to acquiesce to the improper placement of Pagaya employees on the Theorem IC. However, Plaintiff proposed a reasonable alternative: appointing experienced members of the Theorem team to the committee or consenting to Pagaya's appointees if Pagaya secured proper client approvals in advance. Rather than engaging in constructive dialogue or considering these viable compromises, Defendants abandoned the issue entirely, resorting instead to disparaging remarks about the Theorem team members suggested by Plaintiff.

79.      Shortly thereafter, Pagaya informed Plaintiff that he was being placed on administrative leave pending an investigation. In a troubling escalation, Defendants sent a communication to Theorem fund investors falsely accusing Plaintiff of policy violations and misconduct—this before any investigation had even commenced. Defendants further alleged that the investigation would be overseen by "independent counsel" from Proskauer Rose. In reality, Proskauer Rose was anything but independent. As one of Pagaya's primary outside legal counsel, Proskauer had advised Defendants on numerous matters, including subjects central to Plaintiff's

whistleblower complaints, and had also served as Defendants' legal representative in finalizing the Theorem/Pagaya merger. Defendants and Proskauer failed to disclose these glaring and material conflicts of interest to Theorem fund clients, further calling into question the credibility and impartiality of the so-called "investigation."

80.    On or about February 25, 2025, Defendants sent a communication to Theorem fund investors falsely stating that Plaintiff's return of capital 'was not approved internally and did not comply with internal protocols,' despite Plaintiff having full authority to execute such transactions as Theorem's CEO, according to a process that had been in effect for dozens of transactions, including other capital payments to investors, since the close of the merger. This communication deliberately mischaracterized Plaintiff's proper exercise of his fiduciary duties as misconduct and damaged his professional reputation. Pagaya also concealed from investors that Defendants had effectively left the Theorem funds with no one managing investment decisions by placing Plaintiff on leave and revoking his access to all systems.

81.    At the same time that Defendants were explicitly or implicitly telling investors that Plaintiff's action to return capital to them was unauthorized and violated company policies, Defendants refused to identify the specific policies Plaintiff was alleged to have violated. Defendants offered a generic copy of the Pagaya Code of Ethics and other unrelated policies without pointing to any particular provision, none of which applied or Plaintiff violated. Notably, one of the provided policies—the September 2024 Cash Management Policy—explicitly delegates responsibility for managing and overseeing cash balances to the Theorem Financial Operations team, which Plaintiff led as CEO of Theorem. This policy unequivocally affirmed the propriety of Plaintiff's actions, directly contradicting Defendants' claims.

82.    Defendants thereafter escalated their actions by launching a deliberate and malicious campaign aimed at tarnishing Plaintiff's reputation. They made false and defamatory statements, openly accusing Plaintiff of fraudulent conduct and self-dealing, and misrepresenting the reasons for his removal to investors and other third parties. These defamatory claims went so far as to suggest to his personal banking institution that Plaintiff had engaged in a fraudulent scheme where

1    Defendants were the victims, which led to the freezing of his personal bank accounts, leaving him
2    without access to essential funds, including those for basic living expenses such as rent.

3        83.    Additionally, Defendants verbally disseminated false and misleading allegations to
4    Theorem fund investors. Specifically, they implied that Plaintiff had authorized the return of capital
5    from the Theorem Prime+ Yield Fund LP to improperly access his own investment in the fund,
6    placing his interests above those of other investors. This accusation was entirely unfounded.  In
7    truth, Plaintiff had authorized the return of capital across both relevant funds, including the fund in
8    which he held no personal investment. Of the over $100 million distributed, Plaintiff received only
9    a nominal amount—approximately $60,000—and, once he realized that the return of capital to all
10   investors would also include him, he immediately took steps to return this entire sum to the fund in
11   question to preclude even the appearance of a potential conflict of interest. Plaintiff was not
12   motivated to return capital to benefit himself financially, nor has he actually benefitted financially
13   in any way from the capital return.  Further, Plaintiff's *return* of $60,000 of his personal investment
14   in one of the Theorem funds occurred well before Pagaya could have spoken to any investor.
15   Plaintiff and his legal team have repeatedly requested that Defendants retract these baseless and
16   damaging statements, but Defendants have failed to even acknowledge or respond to these demands.

17       84.    Instead, Defendants continued to weave together a false and misleading narrative for
18   internal and external audiences, alleging that Plaintiff was placed on leave due to inadequate risk
19   management involving an unrelated partner loan originator, Tally. They claimed Plaintiff continued
20   purchasing new loans from Tally up until just prior to Tally's bankruptcy. These allegations are not
21   only baseless, but intentionally deceptive. First, the Theorem IC had ceased purchasing new Tally
22   loans more than a year before Tally's bankruptcy, focusing solely on managing the winddown of
23   the remaining portfolio. Second, Defendants themselves had purchased a significant volume of Tally
24   loans, which were also undergoing winddown at the time of Tally's bankruptcy. Third, several of
25   Defendants' other loan originators had declared bankruptcy in prior years, while the Theorem team
26   experienced only a single bankruptcy among a similar number of counterparties—demonstrating
27   Theorem's superior counterparty risk management practices. Lastly, Tally's bankruptcy occurred in
28   August 2024, prior to the merger's closing, a fact Defendants knew well. In fact, Pagaya

collaborated closely with Theorem's team to address the aftermath of Tally's bankruptcy and manage the transition of portfolios to a backup servicer. The Theorem team willingly facilitated this process, even before the merger was completed. Defendants' statements on this matter are therefore defamatory and intentionally misleading.

85.    Defendants also made materially misleading statements to public investors by promoting Theorem's investment independence in communications, including filings with the SEC, while deliberately concealing their behind-the-scenes actions to undermine the autonomy of Theorem's IC. These actions included tightly restricting the investment universe and failing to disclose that, following Plaintiff's placement on administrative leave, no authorized members of the Theorem IC were actively managing the funds.

86.    Defendants have further retaliated by neglecting their financial commitments to Plaintiff. They withheld the release of  company stock owed to Plaintiff and other Theorem stakeholders, as required under the merger agreement, delaying their distribution without explanation. Additionally, when Plaintiff submitted a written redemption request for his limited partner interests in the Prime+ fund and elected a liquidating trust in accordance with the terms of the merger agreement, Defendants failed to even acknowledge, let alone process the request. To date, they have provided no response to Plaintiff's valid redemption request. The same is true with respect to Plaintiff's requests that Pagaya cease and remediate the false and defamatory statements made about him to investors and others. As with the redemption request, Defendants did not bother to even acknowledge receipt of these requests to withdraw the defamatory statements, let alone act on them. This blatant disregard for the contractual obligations governing the fund and legal obligations appears to be an intentional effort to exert financial pressure on Plaintiff by unlawfully retaining his capital and intimidating him through its campaign of publishing false and harmful statements about him.

87.    At the time of the events that give rise to the various causes of action, the corporate structure and related entities involved in Plaintiff's termination was as follows. While Theorem  was Plaintiff's direct employer, Pagaya acted as the controlling parent company that directed and authorized all significant decisions after the merger, including Plaintiff's ultimate termination.

Throughout the course of events leading to Plaintiff's termination, executives from Pagaya, including CEO Gal Krubiner, COO Ralph Leung, and other senior management directly involved themselves in matters relating to Theorem's operations and personnel decisions. These executives not only knew about the planned termination but actively directed it, with full knowledge that Plaintiff was being terminated for his protected whistleblowing activities and refusal to participate in practices he reasonably believed violated securities laws. Email communications, meeting minutes, and contemporaneous notes demonstrate that Pagaya executives deliberately circumvented proper corporate channels, bypassed Theorem's established policies, and directed subordinate entities to terminate Plaintiff. Pagaya substantially assisted in the wrongful termination by providing the pretextual justifications, drafting communications related to the termination, and instructing Theorem management on execution of the termination. This direct involvement and substantial assistance from the parent entity in orchestrating Plaintiff's wrongful termination constitutes aiding and abetting of the unlawful employment action.

**Whistleblower System Failures and Board Notification**

88.    As these events were unfolding, on two separate occasions, Plaintiff attempted to file complaints with Pagaya's corporate whistleblower system for employees, only to discover that the system was nonfunctional. Pagaya's corporate whistleblower policy claimed to use an independent third-party service, Convercent, to handle whistleblower submissions. However, when Plaintiff attempted to file a complaint through Convercent, he found that Pagaya was not listed as a client. Upon contacting Convercent's whistleblower hotline, the representative confirmed that Pagaya did not appear in their system as a client and could not assist Plaintiff.

89.    Plaintiff made another attempt to file a whistleblower complaint, hoping to escalate the matter directly to Pagaya's board of directors. Once again, he found that Pagaya was not listed in the whistleblower system. Furthermore, the emails sent to the board members' email addresses in the company's directory were all returned as being sent to nonexistent recipients, effectively cutting the board off from all internal communication. As a result, Plaintiff directly emailed two members of Pagaya's board, Avi Zeevi and Dan Petrozzo, describing many of the illegal and improper actions by Defendants, offering to provide additional information, urging an independent

investigation, and notifying them that the whistleblower system was not operational. Within hours of sending this email, Defendants' counsel accused Plaintiff of acting inappropriately by attempting to contact the board and falsely asserting that the whistleblower system had been operational at all times. This response not only dismissed Plaintiff's concerns but further emphasized the lack of a functional and transparent process for addressing whistleblower complaints within the company. To date, no Board member has responded to Plaintiff in any way, nor expressed any concerns about the troubling conduct reported in his email.

90.    Image 1 below shows that when Plaintiff initially tried to file a whistleblower complaint, Pagaya wasn't listed as a company in the Convercent system. This supports his allegation that the whistleblower system was nonfunctional, despite company policy stating they used Convercent.



91.    Image 2 below shows that other companies were visible in the Convercent system, proving the system itself was working, but Pagaya specifically wasn't registered or listed.



92.    Image 3 below shows Pagaya suddenly appearing as an option in the Convercent whistleblower system after Plaintiff's board letter, directly contradicting Defendants' assertion about continuous system functionality.



93.     Plaintiff had previously documented evidence of Pagaya's name being absent from Convercent's whistleblower system, capturing screenshots that clearly displayed other companies while omitting Pagaya. After receiving Defendants' threatening response, Plaintiff checked Convercent's system again and found that Pagaya's name had suddenly appeared. This abrupt change directly contradicts Defendants' counsel's assertion that the whistleblower system had been operational at all times. The evidence demonstrates that the system was nonfunctional until it was reinstated following Plaintiff's email.

**Termination and Ongoing Harm**

94.     On March 28, 2025, Pagaya, improperly purporting to act on behalf of Theorem (Plaintiff's actual employer), without providing any legal basis or citing specific company policies that Plaintiff purportedly violated, notified Plaintiff of their decision to terminate his employment, supposedly for "cause," effective April 27, unless a resolution could be reached, an obvious reference to a legal settlement. Defendants further attempted to pressure Plaintiff to either walk away or take a modest amount in settlement with the threat of initiating numerous vague and unspecified investigations and making frivolous multi-million dollar claims against Plaintiff based upon his returning capital to investors consistent with his fiduciary duties and in the course and scope of his employment. These actions were in obvious bad faith as Defendants know well that actions taken by an employee in the course and scope of employment, even that may cause an employer to lose money, do not give rise to a cause of action against the employee, except in extremely limited circumstances that do not apply. As Defendants well knew, they were the ones who created the untenable position for the Theorem IC by restricting the products into which it could invest, and forcing it to return capital to fulfill its fiduciary duties. Defendants also knew that any litigation against Plaintiff would trigger an absolute right of indemnification in favor of Plaintiff, meaning that Defendants could sue him, but it would be required to pay for all of Plaintiff's defense costs and any judgment against him, were it able to procure one, which, given the frivolous nature of the threatened claims, was all but impossible. Defendants' cynical threats were further acts of retaliation in response to Plaintiff's repeated concerns raised about Defendants' illegal conduct as outlined above.

95.    During this time, Defendants continued to "manage" the Theorem funds without the involvement of Plaintiff or any members of the original Theorem team—a blatant breach of the commitments made to Theorem fund investors regarding the independence of fund management as outlined in the Investor Letter, while apparently taking the position that any losses suffered by the funds were caused by Plaintiff and would have to be covered by Plaintiff.

96.    In late April 2025, while Plaintiff remained on administrative leave, Defendants appointed Pagaya's Ed Mallon and two new individuals to the Theorem IC, without obtaining Plaintiff's consent or consulting anyone from Theorem, as required by the merger agreement.

97.    Defendants subsequently issued a communication to Theorem fund investors, further defaming Plaintiff by insinuating his involvement in inappropriate activities. Pagaya called Plaintiff's actions "unforeseen circumstances," suggesting Plaintiff engaged in misconduct and breached company policies, and made assurances that "this situation will not be repeated." These false insinuations, implying wrongdoing, impropriety, or fraudulent activity by Plaintiff, particularly on the heels of earlier disparaging remarks, were intended to harm his standing and legitimacy among investors. Additionally, Defendants referred to the fact that Plaintiff would "no longer be with the firm" after an "investigation" was conducted further compound the defamation by insinuating highly improper, unethical or illegal conduct by Plaintiff.

98.    Defendants' multi-faceted misconduct has not just harmed Plaintiff individually, but has also impacted the broader market through a pattern of unfair competition. By systematically engaging in unlawful practices—such as imposing illegal non-compete provisions on California employees, misrepresenting material information to investors, manipulating asset valuations to inflate fees, and retaliating against whistleblowers—Defendants have operated their business in a manner that gives them improper competitive advantages over law-abiding market participants. These business practices directly contradict California's strong public policy of ensuring fair competition and protecting both consumers and employees from unfair, unlawful, and fraudulent business conduct. The harm resulting from these practices extends beyond the parties to this action and affects the integrity of the investment management marketplace, particularly in the California business community where many of these unfair practices were implemented and executed.

**Summary of Defendants' Pattern of Misconduct**

99.     Overall, the events of the preceding months reveal a calculated series of actions defined by obfuscation and ruthless self-interest. What ensued was a deliberate and increasingly aggressive campaign involving breaches of fiduciary duty, acts of retaliation, and efforts to damage Plaintiff's reputation:

100.     **Breached Fiduciary Duties** — Immediately following the merger, Defendants systematically disregarded the governance provisions outlined in the Merger Agreement and violated their fiduciary responsibilities, as well as clear commitments made to their clients. These actions were taken to prioritize Defendants' short-term need for external capital to fund their lending operations, at the expense of their obligations to clients.

101.     **Disregard for Regulatory Standards** — In pursuit of their own interests, Defendants engaged in practices that violated multiple regulatory guidelines. This included misrepresenting the independence of the Theorem IC to clients and investors, as well as disregarding both SEC requirements and internal allocation policies. These violations were designed to eliminate several Theorem investment programs, thereby creating additional volume to support securitization activities that benefited Defendants.

102.     **Undermined Plaintiff's Authority** — Despite contractual assurances guaranteeing his continued leadership, Defendants immediately began overriding Plaintiff's investment decisions, blocking him from key meetings, and directing Theorem's assets toward Defendants-affiliated originations in clear violation of fiduciary obligations and representations made in the merger process. Defendants' executives, who had no prior expertise in Theorem's core business, inserted themselves into investment decisions, disregarded established risk models,  thereby jeopardizing the financial stability of Theorem's managed funds. All the while, they continued to represent externally that the Theorem IC was independent and had the same investment opportunities as before the merger.

103.     **Created a Pretext for Termination and Retaliated Against Plaintiff** — When Plaintiff objected to Defendants' illegal activity, ranging from false and misleading statements to investors, securities law violations, and illegal restrictive employment covenants, Defendants

retaliated. They began constructing a false narrative of alleged performance concerns, despite Plaintiff's unblemished track record, stellar reputation, and critical role in Theorem's growth. They manufactured false claims of "policy violations" as a pretext to terminate his employment "for cause." They savaged his professional integrity, his competency, his ethics and his reputation with investors. They threatened to file frivolous claims against him for tens of millions of dollars based on false allegations of workplace misconduct.

104.    **Orchestrated a Retaliatory Smear Campaign** — Defendants deliberately sought to erode Plaintiff's credibility with investors and internal stakeholders, falsely stating that he had perpetrated a fraud, breached company protocols and thus his authority had been reduced due to legitimate business concerns. Defendants imposed arbitrary and unprecedented restrictions on Plaintiff's ability to communicate with investors, directly contradicting prior assurances that he would retain oversight of investor relations. This was a blatant and calculated act of retaliation designed to isolate Plaintiff and force him into a position where he could no longer effectively perform his duties.

105.    **Manufactured a Crisis to Justify His Removal** — In a final and desperate attempt to force Plaintiff out, Defendants decided on an appropriate and lawful capital distribution to investors—one that Plaintiff executed in accordance with his fiduciary obligations. Lacking any internal policies prohibiting such actions, Defendants retroactively labeled the distribution "unauthorized" and falsely accused Plaintiff of misconduct. Within days, Defendants placed Plaintiff on administrative leave, severing his access to internal systems, investor communications, and key decision-making processes, as part of a concerted effort to engineer his removal under a fabricated pretext. Mere weeks later, Defendants invoked this pretext as the basis to unlawfully terminate Plaintiff's employment.

106.    **Launched a Campaign of Defamation to Discredit Plaintiff —** Throughout this period, Defendants repeatedly made false and disparaging statements to employees, investors, clients, and third parties, wrongly accusing Plaintiff of misconduct and unethical behavior. Defendants' calculated smear campaign further damaged Plaintiff's professional reputation and falsely portrayed him as untrustworthy to justify its predetermined decision to remove him.

107.    **Failed to comply with legal obligations under Califronia law —** Plaintiff formally requested access to policies, records, and documentation that Defendants, as the employers, were legally obligated to maintain and provide. In response, Defendants disregarded these requirements and only provided partial documentation, such as pay stubs and the employment agreement, while withholding essential employment records and policies necessary for Plaintiff to fully understand and exercise his rights. This failure to comply with their legal obligations hindered Plaintiff's ability to address employment-related concerns and demonstrated a failure on Defendants' part to uphold their responsibilities under the law.

108.    **Failed to provide clients with contractually required liquidating trust —** Upon Plaintiff's termination, Defendants failed to fulfill its contractual duty to provide notice regarding the redemption and liquidating trust option explicitly outlined in the agreement. Despite ongoing inquiries from both Plaintiff and several clients aware of the issue as referenced in the Investor Letter, Defendants refused to address or honor this obligation. This deliberate inaction constitutes a clear breach of Defendant's contractual commitments, causing harm not only to Plaintiff but also to fund investors who relied on these terms in approving the merger.

109.    Defendants' actions were not just an orchestrated corporate retaliation and post-merger betrayal—they were a textbook case of wrongful termination in violation of California law. Plaintiff was not simply an executive—he was a fiduciary, an equity holder, and a whistleblower. Defendants eliminated him not for cause, but for standing up to clear breaches of duty and protecting investors from mismanagement. Plaintiff was an essential figure in the company's success and was contractually promised a leadership role in the merged entity. Instead, Defendants executed a deliberate, calculated plan to eliminate him in retaliation for standing up for his fiduciary obligations and refusing to participate in Defendants' unlawful and self-serving conduct.

110.    Defendants' misconduct was not limited to isolated instances; rather, it constituted a pattern of unfair, unlawful, and fraudulent business practices that harmed both Plaintiff and the broader marketplace. By systematically restricting investment options, imposing illegal employment terms, misrepresenting fund independence to investors, and manipulating valuations— all while portraying Theorem funds as operating under the same investment principles that had

attracted investors pre-merger—Defendants engaged in a deceptive scheme that distorted market competition and deprived investors of the investment management services they were promised. These unfair business practices not only violated multiple California statutes but were fundamentally contrary to established public policy that protects market participants from deceptive business conduct. Defendants' actions undermined fair competition in the fund management space by obtaining competitive advantages through deception rather than superior products, service, or ethical business operations.

**Plaintiff's Ongoing Concerns Regarding Fund Management and Investor Risk**

111.    Under Plaintiff's leadership, Theorem transformed from an asset manager with under $1 million in assets under management into a multi-billion-dollar firm, consistently focusing on delivering exceptional value to its clients. This success was driven by assembling a high-caliber research and engineering team that exceeded 20 members at its peak, and by developing a robust operational framework widely regarded for its quality. The firm's infrastructure earned strong praise from several leading operational due diligence auditors, even during its early days when managing less than $250 million in assets. Theorem also fostered a culture centered on compliance and accountability, collaborating with esteemed risk advisors and consultants, including Charles River and Deloitte, to ensure adherence to the highest industry standards. Notably, Theorem proactively implemented an SR 11-7 compliance program based on the auditing requirements of major banking partners, reflecting its forward-thinking approach. Additionally, Plaintiff is proud of Theorem's pre-merger achievements in underwriting governance: in its first bank model governance disparate lending assessment, a premier third-party auditor specializing in disparate impact analysis identified no material deficiencies in Theorem's underwriting model.

112.    Before the merger, Plaintiff and Theorem earned a strong reputation within the institutional investor community for their commitment to transparency and integrity, even during challenging periods such as the inflation-driven economic downturn of 2022-2023, which impacted performance across the industry. This reputation enabled Plaintiff to cultivate and retain a prestigious client base comprising some of the largest and most respected institutional investors globally—clients that Defendants had never been able to secure independently.

113.    Now, based on his direct experience at Pagaya and his observations during and after the merger, Plaintiff has serious concerns regarding the ongoing management of the funds and the risks posed to investors. These concerns were furthered by a letter sent by Ed Mallon to the Theorem Fund clients that radically and materially changed the structure of the Theorem Funds, while refusing to honor the Merger Agreement requirements for independence, a liquidating trust, or the rebate of fees. These concerns include, but are not limited to, the following:

a.    **Use of the Funds to Support Pagaya's Origination Business at Investor Expense**: Plaintiff is concerned that Pagaya will use the funds primarily to absorb and offload its own origination volume, in a similar manner to that described in the Iceberg Research report, rather than to pursue independent, risk-adjusted investment strategies in the best interest of investors. This was affirmed by Mr. Mallon's letter, which states that going forward the funds will only buy loans for the Pagaya Loan Network.

b.    **Highly Leveraged Equity Tranches**: Plaintiff is specifically concerned that Pagaya will begin allocating residual or equity tranches of its own highly leveraged deals— leveraged at 10–25x—into the funds. These instruments pose significant credit and structural risk to investors, particularly in adverse market conditions. This was affirmed by Mr. Mallon's letter, in which he described a plan to securitize and lever the existing and new Pagaya-only purchased loans in the funds, despite the fact that over 90% of investors have requested redemptions.

c.    **Inclusion of Risky, Non-Market-Clearing Bonds**: Plaintiff is also concerned that Pagaya will introduce junior ABS securities from Pagaya's securitizations (e.g., B-rated bonds) into the funds. These bonds are not typically priced in a market-clearing manner, often with the only buyer being Pagaya's other fund vehicle, the Pagaya Opportunity Fund and, in Plaintiff's view, pose serious and unnecessary principal risk. There is also so little subordination provided to these bonds that significant risk of principal is extremely high. While Pagaya previously offered an informal promise to cover principal losses if B-rated bonds underperformed, Plaintiff believes this "guarantee" is inadequate, as correlated failures across these securities is quite high and correlated losses would easily exceed Defendants' financial resources. This concern was reaffirmed in Mr. Mallon's letter, in which he stated that the Theorem Main Fund would deploy a

majority of its assets into ABS securities. Based on Plaintiff's understanding of the Pagaya Opportunity Fund's ABS deployment, this means that Defendants are likely to purchase a majority – if not solely – ABS assets from Pagaya. This is exactly the thesis the Iceberg Research report warned about.

d.    **Dumping of Unsold Pagaya Assets**: Plaintiff is concerned that Pagaya may allocate its own unsold personal loan, auto loan products and similar products into the funds simply because it lacks external buyers, without proper regard for risk, suitability, or performance.

e.    **Failure to Honor Pricing Rebates**: Under the merger agreement, Defendant was obligated to rebate origination fees on whole loan and customized structured products to the funds. However, during Plaintiff's tenure, Defendant failed to comply with this requirement, refusing to extend loans to the funds on the agreed terms and neglecting to provide the required fee rebates. Mr. Mallon's letter notably fails to make any mention of efforts by Pagaya to honor this contractual promise, despite his simultaneous decision to focus the funds almost entirely on Pagaya-program loan assets and ABS securities.

f.    **Failure to Acquire Attractive Third-Party Collateral**: Plaintiff believes the funds are unlikely to pursue attractive collateral from unaffiliated partners—opportunities that previously produced strong, diversified returns—due to shifting internal incentives to fund as much Pagaya originations as possible and a lack of personnel capacity. This was also affirmed by Mr. Mallon in his letter, which stated that the funds would only invest in Pagaya Loan Network assets going forward

g.    **Depletion of Key Personnel**: At the time of Plaintiff's departure, more than 80% of the original Theorem team had exited. Plaintiff does not believe the remaining personnel have the expertise or resources necessary to manage the funds in accordance with the standards and representations made in the Investor Letter. Pagaya has also failed to communicate to investors the high level of attrition due to Pagaya's actions to investors.

h.    **Potential Regulatory Exposure**: Plaintiff is deeply concerned about the impact  on investors of potential regulatory actions or investigations against Pagaya, based on its

governance practices, related-party transactions, and internal compliance failures he observed before his termination.

       i.    **Misalignment of Interests in a Downturn**: Plaintiff is particularly concerned that in the event of a market downturn or recession, Pagaya will use the funds primarily to support its own balance sheet and origination revenue, rather than protecting fund investors. This could include allocating suboptimal or distressed collateral into the funds for Pagaya's benefit at the expense of investor capital.

       j.    **The improper use of leverage**: Plaintiff is deeply concerned that Defendant may significantly increase the amount of leverage applied to the funds, primarily to facilitate the inclusion of additional Pagaya-originated loan collateral. While such actions could generate higher origination fee revenues for the Defendant, they would disproportionally expose the fund's investors to increased risks of loss, particularly in a high-interest-rate environment where underperformance of the collateral is more likely. This was affirmed in Mr. Mallon's letter, which detailed plans to securitize new and existing fund assets, presumably to create more liquidity to fund even more Pagaya collateral. This action, taken despite the high level of investor redemptions, is an enormous breach of fiduciary duty.

       k.    **Failure to Follow Investment Process**: Defendant failed to uphold its commitment to utilize an independent, data-driven investment process supported by Theorem's research team, as initially stated in the Investor Letter. Due to the disruption and dismantling of this team, resulting from Pagaya's improper employment practices, Defendant can no longer fulfill this essential obligation. This was also affirmed by Mr. Mallon's letter, which admitted that going forward the funds would no longer independently price collateral, and only diversify by factors such as term, vintage, and loan servicer.

114.    These concerns reflect Plaintiff's good-faith belief, based on his direct experience and fiduciary responsibilities prior to his removal, that the funds are no longer being managed in alignment with investor interests or in accordance with Pagaya's representations to investors.

115.    At the time of the merger announcement, the net asset value (NAV) of the Theorem funds was approximately $900 million, which would have entitled Plaintiff to approximately $43

million of the earn-out consideration (approximately $26 million in stock and $17.5 million in cash). By December 2024, just months after the merger closed, Defendants' interference had already reduced the NAV to approximately $550 million, significantly below the thresholds required for Plaintiff to receive most of the earn-out consideration. Under this artificially suppressed NAV, Plaintiff's potential earn-out was reduced to merely $8 million, representing less than 20% of what he would have received had Defendants honored their contractual obligations.

## CAUSES OF ACTION

### First Cause of Action:
### Retaliation in Violation of California Labor Code § 1102.5
(Against Theorem Defendants)

116.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

117.    California Labor Code § 1102.5 prohibits an employer from retaliating against an employee for disclosing information that the employee reasonably believes constitutes a violation of a state or federal law, rule, or regulation, including federal securities laws, to a person with authority over the employee or to a government agency.

118.    Plaintiff engaged in protected whistleblowing activity by formally reporting Defendants' violations of federal securities laws, breaches of fiduciary duty, investor misrepresentations, and financial misconduct. Specifically, on or about February 3, 2025, Plaintiff sent a formal email to Pagaya's Chief Compliance Officers documenting his concerns and, through legal counsel, sent a comprehensive letter to Pagaya's Chief Legal Officer detailing Pagaya's numerous violations. On or about February 12, 2025, Plaintiff filed a formal whistleblower complaint with the Securities and Exchange Commission documenting these serious legal and regulatory violations.

119.    Plaintiff's protected disclosures included, but were not limited to:

a.    Defendants' violations of the Investment Advisers Act of 1940, specifically Sections 206(1) and 206(2) prohibiting fraud by investment advisers, through their interference with Theorem's investment decision-making processes and imposition of investment limitations that

benefited Pagaya at the expense of Theorem fund investors and by prioritizing Pagaya's financial interests over those of Theorem fund investors;

       b.      Defendants' violations of Rule 206(4)-8 of the Investment Advisers Act regarding misleading statements to investors, by misrepresenting the independence of the Theorem IC and failing to disclose Pagaya's efforts to force the purchase of underperforming Pagaya-originated assets;

       c.      Defendants' violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 regarding misleading statements in connection with the purchase or sale of securities transactions, through public statements misrepresenting Theorem's post-merger independence;

       d.      Defendants' violations of Section 17(a) of the Securities Act through material misrepresentations in offering documents;

       e.      Defendants' violations of the SEC's books and records and internal control provisions of the federal securities laws governing material misrepresentations in public filings about the maintenance of Theorem's investment independence;

       f.      Defendants' violations of the financial reporting standards of the federal securities laws based on improper valuation practices in the Pagaya Opportunities Fund, including failure to properly update valuations of securities to reflect market conditions, resulting in inflated NAV calculations and excessive management fees;

       g.      Defendants' manipulation of discount rates used for valuation of securities to create the appearance of compliance with Regulation RR;

       h.      Defendants' imposing of illegal employment agreements containing non-compete clauses in violation of California law, despite being informed these provisions were unlawful under Cal. Bus. & Prof. Code §§ 16600, 16600.5 and Cal. Lab. Code § 432.5.

       i.      Defendants' other violations of state and federal laws and regulations.

120.    In direct retaliation for Plaintiff's protected disclosures, Defendants engaged in a calculated campaign to isolate and discredit him, ultimately leading to his termination. Defendants' retaliatory actions began shortly after Plaintiff's initial February 3, 2025 internal complaints and included, but were not limited to:

a.      In early February 2025, immediately following Plaintiff's internal complaints, systematically undermining Plaintiff's authority by restricting his access to Theorem's investors and severing key communication channels;

b.      Reassigning team members who previously reported to Plaintiff;

c.      Continuing the retaliation campaign following Plaintiff's SEC whistleblower complaint on February 12, 2025, with increasingly severe measures;

d.      On or about February 20, 2025, falsely characterizing Plaintiff's authorized return of capital to investors as "fraudulent, deceitful and unauthorized";

e.      On or about February 20, 2025, revoking Plaintiff's access to all Theorem systems, including email, calendar, risk systems, portfolio management platforms, and client communications, preventing him from performing his duties as CIO;

f.      Between February 21-23, 2025, attempting to coerce Plaintiff into appointing Pagaya officers to the Theorem IC, setting arbitrary 24-hour deadlines outside normal business hours;

g.      On or about February 25, 2025, sending a communication to Theorem fund investors falsely stating that Plaintiff's return of capital "was not approved internally and did not comply with internal protocols";

h.      Contacting Plaintiff's financial institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts;

i.      Creating an intolerable work environment designed to coerce Plaintiff's resignation;

j.      On March 27, 2025, terminating Plaintiff's employment purportedly "for cause," without providing any legal basis or citing specific company policies that Plaintiff purportedly violated;

k.      Maliciously characterizing his termination as being "for cause" as a basis to deny him his substantial earn-out and other benefits due under the merger agreement, despite the fact that even had he done what he is alleged to have done—violated corporate policy by authorizing a return of capital—such actions would not constitute "cause" under his employment agreement;

l.      Threatening to bring frivolous multi-million dollar claims against him for alleged workplace misconduct for authorizing the return of capital, and seeking to hold him personally liable for millions of dollars in damages.

121.    Defendants' retaliation against Plaintiff was willful, malicious, and undertaken with the intent to punish him for exposing unlawful conduct, in violation of California Labor Code § 1102.5.  The close temporal proximity between Plaintiff's protected whistleblowing activities and Defendants' retaliatory actions demonstrates the clear causal connection between his protected activity and the adverse employment actions.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial economic and reputational harm, including loss of income, denial of his earned deferred compensation from the merger, damage to his career prospects and professional reputation in the investment industry, and severe emotional distress. Plaintiff has also suffered non-economic damages including humiliation, anxiety, and mental anguish as a result of Defendants' retaliatory campaign.

123.    Defendants' retaliatory conduct was willful, malicious, and carried out in conscious disregard of Plaintiff's protected rights, as evidenced by their systematic campaign to discredit him through false and defamatory allegations to investors and third parties, their efforts to freeze his personal bank accounts, their attempts to coerce compliance through threats of frivolous multi-million dollar lawsuits, and their deliberate efforts to prevent him from fulfilling his fiduciary duties to investors. The coordinated nature of these actions across multiple executives and entities demonstrates the intentional and calculated nature of Defendants' retaliation. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

**Second Cause of Action:**
**Retaliation in Violation of California Government Code § 12940(h)**
(Against Theorem Defendants)

124.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

125.    California Government Code § 12940(h) prohibits an employer from retaliating against any person because that person has opposed practices forbidden under the Fair Employment

and Housing Act (FEHA) or filed a complaint, testified, or assisted in any proceeding related to FEHA.

126.    Plaintiff engaged in protected activity under § 12940(h) by opposing Defendants' unlawful employment practices, including but not limited to:

a.    Objecting to and refusing to implement Defendants' illegal employment agreements containing non-compete and non-solicitation clauses prohibited under California law;

b.    Advocating on behalf of Theorem employees who were being coerced to sign these unlawful agreements as a condition of continued employment;

c.    Informing Defendants that their employment practices violated California law, including Bus. & Prof. Code §§ 16600, 16600.5, and Cal. Lab. Code § 432.5;

d.    Opposing Defendants' selective enforcement of these illegal provisions, wherein they waived restrictive covenants for certain employees while enforcing them against others;

e.    Opposing Defendants' constructive termination of Theorem employees who refused to sign these illegal agreements, including Nico Salzetta, Theorem's Head of Research.

127.    Plaintiff reasonably believed that Defendants' employment practices were unlawful under California law and violated the rights of Theorem employees, including those protected by FEHA, and he communicated these concerns to Defendants.

128.    Defendants were aware of Plaintiff's protected activities, as evidenced by:

a.    On or about February 3, 2025, Plaintiff's formal complaints to Pagaya's Chief Compliance Officers and Chief Legal Officer explicitly identified the illegal employment agreements as violations of California law;

b.    Multiple verbal communications between Plaintiff and Pagaya executives in which Plaintiff objected to these unlawful employment practices;

c.    Plaintiff's refusal to implement or enforce these illegal provisions against employees who reported to him.

129.    In retaliation for Plaintiff's protected opposition to unlawful employment practices, Defendants subjected him to adverse employment actions, including but not limited to:

1          a.     Restricting his authority over employment matters and personnel decisions;

2          b.     Isolating him from decision-making processes related to employment

3    policies;

4          c.     Creating a hostile work environment intended to force his resignation;

5          d.     Placing him on administrative leave on false pretenses;

6          e.     Revoking his access to company systems and communications;

7          f.     Terminating his employment on March 27, 2025, purportedly "for cause"

8    despite the absence of any legitimate basis.

9        130.    There is a clear causal connection between Plaintiff's protected activities and the

10    adverse employment actions taken against him, as evidenced by:

11          a.     The temporal proximity between his opposition to the unlawful employment

12    practices and the retaliatory actions;

13          b.     The escalating pattern of adverse actions following his protected activities;

14          c.     Defendants' statements and communications indicating animus toward

15    Plaintiff for his opposition to their employment practices.

16        131.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has

17    suffered substantial harm, including:

18          a.     Loss of employment and compensation;

19          b.     Denial of earn-out consideration;

20          c.     Damage to his professional reputation;

21          d.     Emotional distress, humiliation, and mental suffering.

22        132.    Defendants' retaliatory conduct was willful, malicious, and carried out with

23    conscious disregard for Plaintiff's rights under California law. Their coordinated campaign against

24    Plaintiff after he opposed their unlawful employment practices demonstrates the intentional nature

25    of their violations. Plaintiff therefore seeks punitive damages pursuant to Civil Code § 3294.

26

27

28

COMPLAINT

### Third Cause of Action:
### Aiding and Abetting Retaliation
(Against Pagaya)

133.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

134.    Under California law, a defendant who knowingly provides substantial assistance to another person or entity in committing a wrongful act may be held liable for aiding and abetting that wrongful conduct.

135.    Pagaya, as the parent company and controlling entity of Theorem, knowingly provided substantial assistance to and directed, authorized, and participated in the retaliatory actions taken against Plaintiff in violation of California Labor Code § 1102.5 and Government Code § 12940(h).

136.    Theorem, acting under the direction and control of Pagaya after the merger, executed the retaliatory actions against Plaintiff while knowing that such actions violated California law prohibiting retaliation against whistleblowers.

137.    Each Defendant substantially assisted the other Defendants in the retaliatory conduct by:

    a.    Pagaya executives, including CEO Gal Krubiner and COO Ralph Leung, directly participating in decisions to restrict Plaintiff's access to information, investors, and personnel following his protected disclosures;

    b.    Pagaya providing the pretextual justifications for Plaintiff's administrative leave and eventual termination, which were then executed through Theorem;

    c.    Pagaya drafting and directing the dissemination of false and defamatory communications to investors regarding Plaintiff's return of capital to investors;

    d.    Theorem implementing the directives from Pagaya to revoke Plaintiff's system access, limit his authority, and effectuate his administrative leave and termination;

    e.    Pagaya executives directing Theorem personnel to falsely characterize Plaintiff's authorized actions as unauthorized and fraudulent;

f.      The Defendants collectively coordinating to circumvent proper corporate channels and established policies to expedite retaliatory actions against Plaintiff.

138.    Each Defendant knew that retaliating against Plaintiff for his protected whistleblowing activities was wrongful and unlawful, yet each provided substantial assistance to the other Defendants in carrying out this unlawful conduct.

139.    Email communications, meeting minutes, and contemporaneous notes demonstrate that executives from Pagaya deliberately circumvented proper corporate channels, bypassed Theorem's established policies, and directed subordinate entities to take retaliatory actions against Plaintiff.

140.    The coordinated nature of the retaliatory actions, involving executives and personnel across all Defendant entities, demonstrates the substantial assistance that each Defendant provided to the others in executing the unlawful retaliation campaign against Plaintiff.

141.    As a result of Defendants' aiding and abetting of retaliation, Plaintiff has suffered the same damages as alleged in the First and Second Causes of Action, including substantial economic loss, reputational damage, and emotional distress.

142.    Defendants' conduct in aiding and abetting retaliation against Plaintiff was willful, malicious, and carried out in conscious disregard of Plaintiff's protected rights. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

**Fourth Cause of Action:**
**Wrongful Termination in Violation of Public Policy**
(Against Theorem Defendants)

143.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

144.    Under California law, it is unlawful for an employer to terminate an employee in violation of fundamental public policies embodied in state and federal statutes and regulations. A claim for wrongful termination in violation of public policy arises when an employer terminates an employee for engaging in legally protected activity, such as reporting corporate misconduct, refusing to engage in unlawful conduct, or exercising statutory rights.

145. Defendants terminated Plaintiff's employment on or about March 27, 2025, purportedly "for cause," but in reality, because of his protected whistleblowing activities and his refusal to participate in or facilitate Defendants' unlawful conduct.

146. Plaintiff's termination violated well-established, fundamental public policies that are embodied in constitutional or statutory provisions and inure to the benefit of the public, including but not limited to:

      a.     The public policy protecting whistleblowers who report suspected violations of state and federal law, as embodied in California Labor Code § 1102.5;

      b.     The public policy protecting employees who oppose unlawful employment practices, as embodied in California Government Code § 12940(h);

      c.     The public policy promoting corporate transparency and protecting investors from securities fraud, as embodied in the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a et seq.);

      d.     The public policy establishing fiduciary duties for investment advisers and prohibiting fraud in investment advisory relationships, as embodied in the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.);

      e.     The public policy prohibiting retaliation against employees who report suspected violations of securities laws, as embodied in the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A);

      f.     The public policy prohibiting fraud in the offer and sale of securities, as embodied in the Securities Act of 1933 (15 U.S.C. §§ 77a et seq.);

      g.     The public policy against illegal non-compete agreements, as embodied in California Business and Professions Code §§ 16600 and 16600.5;

      h.     California's strong public policy of fair business competition and honest corporate governance.

147. Plaintiff engaged in protected activities in furtherance of these public policies, including:

a. Reporting Defendants' violations of federal securities laws to Pagaya's Chief Compliance Officer and Chief Legal Officer;

b. Filing a formal whistleblower complaint with the Securities and Exchange Commission;

c. Refusing to purchase underperforming Pagaya-originated loans and bonds when doing so would have violated his fiduciary duties to fund investors;

d. Declining Defendants' offer to modify his deferred compensation in exchange for directing fund investments into Pagaya products regardless of performance;

e. Objecting to Defendants' imposition of illegal employment agreements on California employees;

f. Fulfilling his fiduciary duties by returning excess capital to fund investors when it could not be deployed consistent with fund objectives due to Defendants' restrictions.

148. Defendants were aware of Plaintiff's protected activities, and these activities were substantial motivating factors in Defendants' decision to terminate his employment, as evidenced by:

a. The temporal proximity between his protected activities and his termination;

b. The pattern of increasingly hostile treatment following his protected disclosures;

c. The fabrication of pretextual reasons for termination related directly to his protected activities;

d. Direct statements by Defendants' executives demonstrating animus toward Plaintiff for his refusal to compromise his fiduciary duties.

149. No legitimate business reason existed for Plaintiff's termination. Defendants' claimed basis for termination—that Plaintiff improperly authorized the return of capital to investors—was pretextual, as Plaintiff had full authority to execute these transactions as the Chair of the Theorem IC and Chief Investment Officer, and was acting in accordance with his fiduciary duties to fund investors.

150.    As a direct and proximate result of Defendants' wrongful termination in violation of public policy, Plaintiff has suffered substantial harm, including:

      a.    Loss of past and future income and employment benefits;

      b.    Loss of earn-out consideration that he would have received but for Defendants' manipulation of fund NAV;

      c.    Severe damage to his professional reputation in the investment industry;

      d.    Emotional distress, including anxiety, humiliation, and mental suffering.

151.    Defendants' conduct in wrongfully terminating Plaintiff was willful, malicious, fraudulent, and oppressive, and carried out with conscious disregard of his protected rights under California law. Specifically, Defendants knew that terminating Plaintiff for his whistleblowing activities violated California law, yet proceeded with the termination and attempted to disguise their retaliatory motive through false accusations of misconduct. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

### Fifth Cause of Action:
### Aiding and Abetting Wrongful Termination
#### (Against Pagaya)

152.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

153.    Under California law, a defendant who knowingly provides substantial assistance to another person or entity in wrongfully terminating an employee in violation of public policy may be held liable for aiding and abetting that wrongful termination.

154.    Pagaya, as the parent company and controlling entity of Theorem following the merger, knowingly provided substantial assistance to and directed, authorized, and participated in the wrongful termination of Plaintiff's employment in violation of fundamental public policies.

155.    Theorem, acting under the direction and control of Pagaya after the merger, executed Plaintiff's wrongful termination while knowing that such termination violated California public policy prohibiting termination of employees for whistleblowing activities and refusing to engage in unlawful conduct.

156. Each Defendant substantially assisted the other Defendants in the wrongful termination by:

a. Pagaya executives, including CEO Gal Krubiner, making the ultimate decision to terminate Plaintiff's employment and communicating this decision to Theorem for implementation;

b. Pagaya creating the pretextual justification for termination based on Plaintiff's lawful return of capital to fund investors;

c. Pagaya drafting the termination notice and dictating the false "for cause" designation to deny Plaintiff his contractual rights to deferred compensation;

d. Theorem implementing the termination decision made by Pagaya despite knowing the true retaliatory motivation;

e. Theorem processing the paperwork and carrying out the administrative actions necessary to effectuate the termination;

f. Pagaya executives directing Theorem personnel to communicate false information about the basis for Plaintiff's termination to investors and others in the industry.

157. Each Defendant knew that terminating Plaintiff for his protected whistleblowing activities and refusal to violate his fiduciary duties violated fundamental public policies established by California and federal law, yet each provided substantial assistance to the other Defendants in carrying out this unlawful termination.

158. Email communications, meeting minutes, and other documentary evidence demonstrate that executives from Pagaya deliberately circumvented proper corporate channels, bypassed established termination procedures, and directed Theorem to terminate Plaintiff with the explicit knowledge that the termination was retaliatory.

159. The termination process required the coordinated action of all Defendants, with Pagaya providing the directive and justification, while Theorem, as Plaintiff's nominal employer, executed the formal termination, processed the necessary documentation, and communicated the termination decision.

160.    As a result of Defendants' aiding and abetting of wrongful termination, Plaintiff has suffered the same damages as alleged in the Fourth Cause of Action, including substantial economic loss, denial of earn-out consideration, reputational damage, and emotional distress.

161.    Defendants' conduct in aiding and abetting the wrongful termination of Plaintiff was willful, malicious, and carried out in conscious disregard of California's fundamental public policies protecting employees. The coordinated nature of their actions, involving senior executives across all Defendant entities, demonstrates the intentional and calculated nature of their wrongful conduct. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

### Sixth Cause of Action:
### Breach of Contract (Employment Agreement)
### (Against Theorem Defendants)

162.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

163.    Plaintiff was a party to a valid and enforceable Employment Agreement with the Theorem Defendants.

164.    Plaintiff performed all conditions, covenants, and promises required on his part to be performed under these agreements, including fulfilling his duties as Chief Investment Officer and Chairman of the Theorem IC, applying his professional expertise to evaluate investment opportunities, and making investment decisions in the best interests of Theorem fund investors.

165.    Under the terms of the Employment Agreement, the Theorem Defendants made the following binding commitments to Plaintiff:

a.    Plaintiff would serve as Chief Investment Officer of Theorem with the authority to oversee investment decisions;

b.    Plaintiff could only be terminated "for Cause" as specifically defined in the Employment Agreement, which required both specific misconduct falling within enumerated categories and, for certain categories, written notice describing the events "in reasonable detail" with "not less than thirty (30) days to cure."

166.    The Theorem Defendants materially breached these contractual obligations in multiple ways, including but not limited to:

a.      Theorem Defendants terminated Plaintiff purportedly "for cause" without identifying any policy violations that would constitute "Cause" under the applicable agreements, without providing the required written notice describing the alleged basis for Cause in reasonable detail, and without affording Plaintiff the opportunity to cure as required.

b.      Terminating Plaintiff purportedly "for cause" when his return of capital to fund investors, as Chair of the Theorem IC, did not constitute "Cause" as defined in the Employment Agreement;

c.      Failing to provide written notice describing the alleged basis for Cause "in reasonable detail" and failing to afford Plaintiff the required 30-day opportunity to cure as explicitly required in the Employment Agreement;

d.      Stripping Plaintiff of his authority as Chief Investment Officer by restricting his investment authority and ultimately revoking his access to all Theorem systems, preventing him from performing his duties;

e.      Materially breaching the Employment Agreement by placing Plaintiff on administrative leave without proper cause and restricting his ability to perform his contractual duties;

f.      Failing to pay Plaintiff the compensation and benefits he would have been entitled to had he been properly terminated without cause.

167.    Theorem Defendants' wrongful termination of Plaintiff "for cause" was pretextual and done in bad faith, as the conduct cited by Defendants—Plaintiff's authorized return of capital to fund investors in the exercise of his fiduciary duties—did not meet any of the enumerated grounds constituting "Cause" under the applicable agreements.

168.    Theorem Defendants' intentional interference with Plaintiff's ability to perform his contractual duties—by restricting his investment authority, limiting fund options, and ultimately revoking his system access—constitutes prevention of performance, which excuses any alleged nonperformance by Plaintiff.

169.    Theorem Defendants' breaches were willful, deliberate, and undertaken in bad faith with the intent to deprive Plaintiff of the benefits of his contractual rights, particularly the substantial

earn-out payments that would have been due had Defendants not artificially depressed fund performance.

170.    As a direct and proximate result of Theorem Defendants' breaches of the Employment Agreement, Plaintiff has suffered substantial economic harm, including:

     a.    Lost compensation and benefits to which he would have been entitled but for Theorem Defendants' breach;

     b.    Loss of equity interests that would have vested had his employment continued; and

     c.    Other consequential damages to be proven at trial.

171.    Plaintiff has been required to retain attorneys to prosecute this action and is entitled to recover reasonable attorneys' fees and costs incurred in this action.

**Seventh Cause of Action:**
**Breach of Implied Covenant of Good Faith and Fair Dealing (Employment Agreement)**
(Against Theorem Defendants)

172.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

173.    Under California law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

174.    Plaintiff entered into a valid and enforceable Employment Agreement with the Theorem Defendants. This Employment Agreement contained an implied covenant of good faith and fair dealing.

175.    The implied covenant imposed on the Theorem Defendants a duty to act fairly and in good faith in carrying out their contractual obligations, including an obligation not to engage in conduct that would deprive Plaintiff of the benefits of the Employment Agreement .

176.    Theorem Defendants violated the implied covenant of good faith and fair dealing by engaging in a course of conduct designed to frustrate the purpose of the Employment Agreement and deprive Plaintiff of the benefits he reasonably expected to receive, including but not limited to:

a.  **Making false representations to induce the Employment Agreement** – Theorem Defendants represented to Plaintiff that he would serve as CIO with meaningful authority and could only be terminated for specific "Cause" reasons with appropriate notice and opportunity to cure, while secretly intending to manufacture pretextual grounds for a "for cause" termination and limit his authority;

b.  **Constructively discharging key Theorem personnel** – Theorem Defendants coerced the resignation of essential Theorem staff through unlawful employment agreements while falsely representing to investors that these departures were voluntary, all with the intent to undermine Plaintiff's ability to perform his duties as CIO;

c.  **Preventing Plaintiff from performing his duties** – Theorem Defendants systematically obstructed Plaintiff's ability to perform his contractual obligations by restricting his access to information, isolating him from investors, and ultimately revoking his system access, while still holding him responsible for fund performance;

d.  **Fabricating pretextual grounds for termination** – Theorem Defendants manufactured allegations of policy violations against Plaintiff for his entirely proper return of capital to investors, in order to create a pretext for terminating him "for cause" and denying him the contractual benefits he would otherwise receive under the Employment Agreement;

e.  **Concealing material information** – Theorem Defendants withheld critical information about their intentions and actions that directly impacted Plaintiff's ability to receive the benefits of his Employment Agreement;

f.  **Acting with the intent to harm Plaintiff's interests** – Theorem Defendants' coordinated campaign to undermine Plaintiff's authority, reputation, and compensation was carried out with conscious disregard for his contractual rights and with the specific intent to deprive him of the benefits of his Employment Agreement.

177.    Theorem Defendants' actions were not only inconsistent with the express terms of the Employment Agreement but were calculated to frustrate the purpose of that agreement and to deprive Plaintiff of the fruits of his bargain.

178.     Theorem Defendants acted in bad faith by presenting a false façade of compliance with contractual terms while simultaneously taking undisclosed actions designed to deprive Plaintiff of the value of those terms, including manufacturing grounds for a "for cause" termination to avoid paying him the benefits he would be entitled to but for Theorem Defendants' wrongful conduct.  As a direct and proximate result of Theorem Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of the benefits of his Employment Agreement, including:

a.     The career continuation and job security he reasonably expected;

b.     The professional authority and autonomy promised in the Employment Agreement;

c.     The financial compensation he would have received had Theorem Defendants acted in good faith;

d.     The continued employment and compensation guaranteed under his Employment Agreement;

e.     Reputational benefits associated with continued successful management of the Theorem funds; and

f.     Other consequential damages to be proven at trial.

179.     Theorem Defendants' conduct in breaching the implied covenant of good faith and fair dealing was willful, malicious, oppressive, and fraudulent, as it was undertaken with the deliberate intent to deprive Plaintiff of his contractual rights and benefits. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

**Eight Cause of Action:**
**Breach of Contract (RSU Award Agreement)**
**(Against Pagaya)**

180.     Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

181.     Plaintiff was a party to a valid and enforceable Restricted Stock Unit (RSU) Award Agreement with Pagaya, executed in connection with the merger between Pagaya and Theorem.

182.  Plaintiff performed all conditions, covenants, and promises required on his part to be performed under the RSU Award Agreement, including continuing his employment with Theorem post-merger and fulfilling his duties as Chief Investment Officer.

183.  Under the terms of the RSU Award Agreement, Pagaya made the following binding commitments to Plaintiff:

a.  Grant of restricted stock units that would vest according to a specified schedule;

b.  Accelerated vesting of all unvested RSUs if Plaintiff's employment was terminated without Cause, as specifically defined in the agreement;

c.  Specific protections against arbitrary termination that would result in forfeiture of RSUs.

184.  Pagaya materially breached these contractual obligations in multiple ways, including but not limited to:

a.  Using its control over Theorem to orchestrate Plaintiff's termination purportedly "for cause" when no "Cause" as defined in the agreement existed;

b.  Refusing to vest Plaintiff's RSUs following his termination, despite the fact that the termination was without legitimate cause;

c.  Withholding the release of company stock owed to Plaintiff and other Theorem stakeholders as required under the merger agreement and RSU Award Agreement;

d.  Failing to honor the terms of the RSU Award Agreement by improperly classifying Plaintiff's termination to avoid contractual obligations to vest his equity.

185.  Pagaya's breach of the RSU Award Agreement was a calculated effort to deprive Plaintiff of his substantial equity compensation, which represented a significant portion of the consideration he would receive for the merger.

186.  Pagaya's wrongful classification of Plaintiff's termination as being "for cause" was pretextual and done in bad faith, as the conduct cited—Plaintiff's authorized return of capital to fund investors in the exercise of his fiduciary duties—did not meet any of the enumerated grounds constituting "Cause" under the applicable agreements.

187.    As a direct and proximate result of Pagaya's breaches of the RSU Award Agreement, Plaintiff has suffered substantial economic harm, including:

a.    Loss of valuable equity compensation that should have vested upon his termination;

b.    Loss of future appreciation of Pagaya stock that would have accrued to his benefit had his RSUs properly vested; and

c.    Other consequential damages to be proven at trial.

188.    Plaintiff has been required to retain attorneys to prosecute this action and is entitled to recover reasonable attorneys' fees and costs incurred in this action.

**Ninth Cause of Action:**
**Breach of Implied Covenant of Good Faith and Fair Dealing (RSU Award Agreement**
(Against Pagaya)

189.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

190.    Under California law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

191.    Plaintiff entered into a valid and enforceable RSU Award Agreement with Pagaya. This RSU Award Agreement contained an implied covenant of good faith and fair dealing.

192.    The implied covenant imposed on Pagaya a duty to act fairly and in good faith in carrying out its obligations under the RSU Award Agreement, including an obligation not to engage in conduct that would deprive Plaintiff of the benefits of the RSU Award Agreement.

193.    Pagaya violated the implied covenant of good faith and fair dealing by engaging in a course of conduct designed to frustrate the purpose of the RSU Award Agreement and deprive Plaintiff of the benefits he reasonably expected to receive, including but not limited to:

a.    Using its control over Theorem to engineer a pretextual "for cause" termination specifically designed to trigger forfeiture provisions in the RSU Award Agreement;

b.    Coordinating with Theorem to create a false narrative of policy violations to justify denying Plaintiff his earned equity compensation;

      c.      Manipulating corporate governance to manufacture a basis for avoiding its obligations under the RSU Award Agreement;

      d.      Deliberately mischaracterizing Plaintiff's proper return of capital to fund investors as misconduct to create a pretext for denying his vested and unvested equity compensation;

      e.      Acting with the specific intent to deprive Plaintiff of the substantial equity compensation he had earned as part of the merger transaction.

194.     Pagaya's actions were not only inconsistent with the express terms of the RSU Award Agreement but were calculated to frustrate the purposes of that agreement and to deprive Plaintiff of the fruits of his bargain.

195.     Pagaya acted in bad faith by presenting a false façade of compliance with contractual terms while simultaneously taking undisclosed actions designed to deprive Plaintiff of the value of those terms, including manufacturing grounds for a "for cause" termination to avoid vesting his RSUs.

196.     As a direct and proximate result of Pagaya's breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of the benefits of the RSU Award Agreement, including:

      a.      The equity compensation that would have vested upon proper classification of his termination;

      b.      The appreciation of Pagaya stock value over time that would have accrued to his benefit;

      c.      The security and financial benefits associated with the equity component of his merger compensation; and

      d.      Other consequential damages to be proven at trial.

197.     Pagaya's conduct in breaching the implied covenant of good faith and fair dealing was willful, malicious, oppressive, and fraudulent, as it was undertaken with the deliberate intent to deprive Plaintiff of his contractual rights and benefits. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

**Tenth Cause of Action:**
**Violation of California Business & Professions Code § 17200 (Unfair Competition Law)**
(Against all Defendants)

198.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

199.    California Business & Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair, or fraudulent business acts or practices. The UCL establishes three separate and distinct theories of liability: (1) unlawful business acts or practices, (2) unfair business acts or practices, and (3) fraudulent business acts or practices.

200.    Defendants have violated the "unlawful" prong of the UCL by engaging in numerous business practices that violate specific statutory provisions, including but not limited to:

    a.    Violating California Labor Code § 1102.5 by retaliating against Plaintiff for reporting violations of state and federal securities laws;

    b.    Violating California Labor Code § 432.5 by requiring employees to agree to terms and conditions of employment that they knew were prohibited by law;

    c.    Violating California Business & Professions Code §§ 16600 and 16600.5 by imposing and attempting to enforce illegal non-compete and non-solicitation provisions in employment agreements with California employees;

    d.    Violating Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 by engaging in fraudulent, deceptive, and manipulative practices as investment advisers;

    e.    Violating Rule 206(4)-8 of the Investment Advisers Act by making false and misleading statements to investors regarding fund investment independence and performance;

    f.    Violating Section 10(b) of the Securities Exchange Act and Rule 10b-5 by making material misrepresentations in connection with the purchase or sale of securities.

    g.    Violating Section 17(a) of the Securities Act by making misrepresentations in the offer or sale of securities.

201.    Defendants have violated the "unfair" prong of the UCL by engaging in business practices that offend established public policies, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to market participants, including but not limited to:

a.    Deliberately undermining Theorem's promised investment independence after making contrary representations to secure investor consent to the merger;

b.    Using illegal employment practices to drive away Theorem's skilled team members, undermining the firm's capabilities while maintaining the public facade that Theorem remained fully operational;

c.    Manipulating fund performance to artificially suppress earn-out payments owed to Plaintiff and other Theorem executives, while simultaneously withholding this material information from investors and the market;

d.    Leveraging their market power to force smaller partners and service providers to redirect business from competitive market channels to Pagaya-controlled channels, harming market competition;

e.    Charging management fees on uninvested capital while simultaneously preventing the capital from being properly invested or returned to investors.

202.    Defendants have violated the "fraudulent" prong of the UCL by engaging in business practices that were likely to deceive investors, market participants, and the public, including but not limited to:

a.    Misrepresenting to Theorem fund investors that the Theorem IC would maintain independence and investment discretion post-merger, when Defendants had no intention of honoring these commitments;

b.    Making material misrepresentations in SEC filings regarding the maintenance of Theorem's investment independence following the merger;

c.    Falsely representing to investors that Theorem would have expanded investment options post-merger, while secretly planning to restrict investment opportunities;

d.    Misrepresenting the value of assets in Pagaya-sponsored funds through improper valuation practices, inflating NAV calculations and enabling excessive management fees;

e.    Manipulating discount rates used for valuation of securities to create the false appearance of compliance with regulatory requirements.

203.    These unfair, unlawful, and fraudulent business practices have harmed Plaintiff in his capacity as an employee, a fund manager, and as a marketplace participant, and have distorted competition in the investment management marketplace. These harmful impacts include but are not limited to:

a.    Economic injury to Plaintiff through lost compensation, lost earn-out payments, and damaged career prospects;

b.    Harm to Plaintiff's ability to compete fairly in the investment management marketplace due to Defendants' defamatory statements and unfair business practices;

c.    Harm to competition in the fund management space by Defendants obtaining improper competitive advantages through deception rather than superior products, service, or ethical business operations;

d.    Creation of an unlevel playing field where competitors who operate lawfully are disadvantaged compared to Defendants who use unfair, unlawful, and fraudulent business practices.

204.    Defendants' business practices constitute continuous and ongoing violations of the UCL that threaten future harm to Plaintiff and the competitive marketplace unless enjoined.

205.    As a result of Defendants' violations of the UCL, Plaintiff is entitled to restitution, disgorgement of Defendants' ill-gotten gains, and injunctive relief restraining Defendants from continuing to engage in the unfair, unlawful, and fraudulent business practices described herein.

206.    Plaintiff has suffered injury in fact and has lost money or property as a direct result of Defendants' unfair competition, including but not limited to lost compensation, lost earn-out consideration, and other financial losses, and therefore has standing to bring this claim under Business and Professions Code § 17204.

**Eleventh Cause of Action:**
**Defamation**
(Against all Defendants)

207.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

208.    Defendants made false and defamatory statements about Plaintiff to investors, industry peers, financial institutions, and internal stakeholders with the intent to damage his reputation, undermine his credibility, and create a pretext for his termination while deflecting attention from Defendants' own misconduct. These statements were knowingly false or made with reckless disregard for the truth.

209.    Defendants' defamatory statements included, but were not limited to:

a.    **False Allegations of Unauthorized Fund Transfers** — On or about February 20, 2025, Defendants falsely characterized Plaintiff's return of capital to fund investors as "fraudulent, deceitful and unauthorized," despite Plaintiff acting fully within his fiduciary authority and in accordance with company procedures.

b.    **Defamatory Communications to Investors** — On or about February 25, 2025, Defendants sent a communication to Theorem fund investors falsely stating that Plaintiff's return of capital "was not approved internally and did not comply with internal protocols," despite being unable to identify any specific policy violation when repeatedly asked to do so.

c.    **False Allegations to Financial Institutions** — Defendants made false allegations to Plaintiff's financial institution that he had engaged in a fraudulent scheme, resulting in the freezing of his personal bank accounts, leaving him without access to essential funds for basic living expenses.

d.    **False Allegations of Self-Dealing** — Defendants verbally circulated false and misleading allegations to Theorem fund clients, implying that Plaintiff had authorized the return of capital to improperly access his own investment in the fund and place his interests above those of other investors, when in fact Plaintiff had authorized the return of capital across both relevant funds, including the fund in which he held no personal investment.

e.    **False Statements about Risk Management** — Defendants falsely claimed to internal and external audiences that Plaintiff was placed on leave due to inadequate risk management involving a loan originator called Tally, falsely alleging that Plaintiff continued purchasing new Tally loans up until just prior to Tally's bankruptcy, when in fact the Theorem IC had ceased purchasing new Tally loans more than a year before Tally's bankruptcy.

f.      **Defamatory Statements Implying Misconduct** — On or about April 23, 2025, Defendants communicated to investors that Plaintiff's departure was due to "unforeseen circumstances" and assured them that "this situation will not be repeated," falsely implying that Plaintiff engaged in misconduct, impropriety, or fraudulent activity.

g.      **Suggesting Termination for Cause** — Defendants referred to Plaintiff's departure following an "investigation" and in connection with "the matter of return of the capital to investors," falsely suggesting Plaintiff's involvement in improper or criminal conduct warranting termination.

210.    Defendants knew these statements were false when made or acted with reckless disregard for their truth, as evidenced by:

a.      Defendants' inability, when repeatedly asked, to identify any company policy that Plaintiff supposedly violated;

b.      Defendants' own admission that they needed to "determine the facts" surrounding the transfer, while simultaneously making definitive accusations of misconduct;

c.      Defendants' knowledge that Plaintiff had proper authority to authorize the capital return as Chair of the Theorem IC and pursuant to his documented signature authority as Chief Investment Officer;

d.      Defendants' internal knowledge of the true circumstances regarding the Tally situation, contrary to their public statements.

211.    Plaintiff, through counsel, demanded retractions of these defamatory statements in letters sent on February 21, February 26, March 10, and April 25, 2025. Defendants ignored these demands, compounding the harm and demonstrating malice.

212.    Defendants' false statements were communicated to third parties, including Theorem investors, financial institutions, and industry professionals, causing irreparable harm to Plaintiff's professional and personal reputation.

213.    Defendants' defamatory conduct was malicious, oppressive, and despicable, intended to discredit Plaintiff publicly, damage his career and professional relationships, and to

falsely portray his termination as the result of misconduct rather than retaliation for his protected whistleblowing activities.

214.    As a direct and proximate result of Defendants' defamation, Plaintiff has suffered substantial damages, including:

      a.    Severe damage to his professional reputation in the investment management industry, impeding future employment, investment opportunities, and business relationships;

      b.    Loss of trust and confidence among Theorem investors, clients, and other industry stakeholders;

      c.    Economic damages from the immediate freezing of his personal bank accounts based on Defendants' false statements;

      d.    Emotional distress, humiliation, and anxiety caused by Defendants' deliberate public smear campaign targeting his professional integrity and ethical conduct.

215.    Defendants made defamatory statements with actual malice, knowing they were false or with reckless disregard for their truth, as demonstrated by their coordinated campaign to disparage Plaintiff across multiple forums and their refusal to retract statements even when confronted with evidence of their falsity. Plaintiff therefore seeks punitive damages under Civil Code § 3294.

**Twelfth Cause of Action:**
**Intentional Infliction of Emotional Distress (IIED)**
(Against all Defendants)

216.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

217.    Defendants engaged in extreme and outrageous conduct with the intent to cause Plaintiff severe emotional distress, or with reckless disregard for the likelihood that such distress would result.

218.    Defendants' conduct went far beyond mere workplace disputes or adverse employment actions; it constituted a malicious, coordinated, and retaliatory campaign designed to humiliate, isolate, and destroy Plaintiff both professionally and personally. Defendants' egregious and calculated actions included:

a.     Immediately following Plaintiff's protected whistleblowing activities, systematically isolating him professionally by revoking his access to all Theorem systems, email, calendar, risk systems, portfolio management platforms, and client communications, effectively rendering him unable to perform basic functions of his job;

b.     Falsely accusing Plaintiff of "fraudulent, deceitful and unauthorized" conduct regarding the return of capital to fund investors, despite knowing he was acting within his authority and in fulfillment of his fiduciary duties;

c.     Contacting Plaintiff's financial institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts, deliberately leaving him without access to essential funds for basic living expenses such as rent, a particularly vindictive action designed to inflict maximum personal hardship;

d.     Sending false communications to Theorem fund investors and other industry professionals specifically designed to destroy Plaintiff's professional reputation and career prospects in the investment management industry;

e.     Conducting a pretextual "investigation" while simultaneously disseminating predetermined conclusions of misconduct to investors before any investigation had even commenced;

f.     Threatening to bring frivolous multi-million dollar claims against Plaintiff based on his proper exercise of fiduciary duties, specifically designed to cause severe anxiety and distress;

g.     Maintaining a campaign of public humiliation spanning months, with escalating actions specifically timed to maximize Plaintiff's emotional suffering;

h.     Attempting to coerce Plaintiff into accepting responsibility for improper conduct he did not commit, including setting unreasonable deadlines and making demands that violated his fiduciary obligations.

219.    Defendants' conduct was deliberate, coordinated at the highest levels of the organization, and specifically designed to inflict maximum emotional distress on Plaintiff as

punishment for his protected whistleblowing activities. Their actions exceeded all bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized society.

220.    As a direct and foreseeable result of Defendants' outrageous and vindictive conduct, Plaintiff has suffered:

      a.    Severe emotional distress, including acute anxiety, depression, humiliation, and ongoing psychological trauma;

      b.    Physical manifestations of emotional distress, including insomnia, weight loss, and stress-related health issues;

      c.    Financial insecurity and acute distress from being unable to access his own funds for basic living expenses;

      d.    Social isolation and reputational harm within his professional community;

      e.    Significant damage to his professional reputation, severely impairing his ability to work in the investment management industry;

      f.    Ongoing fear, anxiety, and emotional trauma stemming from the threatened litigation and false allegations of fraud.

221.    Defendants knew their conduct would cause severe emotional distress to Plaintiff or acted with reckless disregard of this probability. Their deliberate campaign to destroy both his professional standing and personal financial stability demonstrates the intentionally harmful nature of their actions.

222.    Defendants' conduct was intentional, reckless, malicious, and carried out with conscious disregard for Plaintiff's rights and emotional well-being. The coordinated nature of these actions across multiple executives and entities demonstrates the calculated intent to inflict maximum emotional harm. Plaintiff therefore seeks substantial compensatory and punitive damages to deter such behavior in the future, pursuant to California Civil Code § 3294.

### Thirteenth Cause of Action:
### Declaratory Relief
### (Against all Defendants)

223.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

224.    An actual and justiciable controversy exists between Plaintiff and Defendants regarding the validity and enforceability of multiple provisions of the merger agreement, Plaintiff's employment terms, and Defendants' post-merger conduct.

225.    Plaintiff seeks a judicial determination of his rights and obligations with respect to Defendants under the relevant agreements, including but not limited to:

   a.    A declaration that no "cause" existed for Plaintiff's termination as defined under Plaintiff's applicable employment agreement, as Plaintiff's return of capital to fund investors was a proper exercise of his fiduciary duties and authority as Chair of the Theorem IC and Chief Investment Officer;

   b.    A declaration that Defendants' unclean hands and retaliation against Plaintiff for protected whistleblowing activities and wrongful termination void any post-employment obligations Plaintiff might otherwise have had under his employment agreement;

   c.    A declaration that Defendants had no legal right to terminate, suspend, or revoke Plaintiff's investment authority and access to Theorem systems in retaliation for his protected whistleblowing activity;

   d.    A declaration that Defendants' statements regarding Plaintiff—including but not limited to characterizations of his authorized return of capital as "fraudulent, deceitful and unauthorized," claims that his actions were "not approved internally and did not comply with internal protocols," allegations to financial institutions that he engaged in a fraudulent scheme, implications that he engaged in self-dealing, statements regarding his risk management practices relating to Tally, and communications to investors referring to his departure as resulting from "unforeseen circumstances" and assurances that "this situation will not be repeated"—were false, defamatory, and made with actual malice, with knowledge of their falsity or reckless disregard for the truth.

226.    A declaratory judgment is necessary and appropriate at this time to clarify and determine Plaintiff's rights under the relevant agreements. Defendants have refused to acknowledge or respond to Plaintiff's demands for recognition of his legal rights, including his written redemption

1    request for his limited partner interests and election of a liquidating trust, creating an actual

2    controversy requiring judicial resolution.

3        227.    Defendants have repeatedly ignored Plaintiff's requests regarding his contractual and

4    legal rights, demonstrated shifting justifications for their actions, and failed to provide clarity

5    regarding Plaintiff's status, all while continuing to make defamatory statements about him to third

6    parties and investors.

7        228.    Without a declaration from this Court, Plaintiff will continue to suffer ongoing harm

8    from uncertainty regarding his legal rights and obligations, particularly given Defendants' continued

9    refusal to honor his contractual rights or acknowledge his legitimate requests.

10        229.    Plaintiff has no adequate remedy at law to resolve these disputes other than through

11    a judicial declaration of the parties' rights and obligations.

**Fourteenth Cause of Action:**
**Failure to Produce Personnel Records (Cal. Labor Code § 1198.5, and § 432)**
(Against all Defendants)

14        230.    Plaintiff reasserts and incorporates by reference all preceding paragraphs as if fully

15    set forth here, excepting those allegations that are inconsistent with this cause of action.

16        231.    California Labor Code §1198.5 provides that upon written request, every former

17    employee, or his representative, has the right to receive a copy of the employee's personnel records

18    that the employer maintained relating to the employee's performance or to any grievance concerning

19    the employee. The employer is required to provide the records to a former employee within thirty

20    (30) calendar days from the date the employer receives written request from the employee or his

21    representative for the records.

22        232.    California law further provides that if an employer fails to provide the former

23    employee with his personnel records, then the former employee may recover a penalty of $750 from

24    the employer, and bring an action for injunctive relief to obtain compliance with §1198.5, and

25    recover costs and reasonable attorney's fees in such an action. Cal. Labor Code §1198.5(k), (l).

26        233.    Similarly, California Labor Code §432 requires employers to provide employees

27    copies of any instrument the employee signed relating to the obtaining or holding of employment.

28

234.    Plaintiff, by and through his authorized representative, made written requests for his personnel records to Defendants on March 7, 2025. Defendants responded on March 27, 2025, with a woefully incomplete production that failed to include, among other things:

        a.     any performance evaluations or reviews conducted during Plaintiff's employment;

        b.     documentation reflecting any grants, vesting schedules, or valuations of equity awards;

        c.     all documents and communications concerning Defendants' decision to place Plaintiff on administrative leave;

        d.     internal communications among HR, legal, or management referencing Plaintiff's status, performance, or separation; and

        e.     documents relating to the calculation or classification of final wages, severance, or other compensation owed.

235.    On April 8, 2025, Plaintiff's counsel renewed the request for complete personnel records, including documents relating to Defendants' March 28, 2025 communication of their intention to terminate Plaintiff. Defendants failed to provide the requested records. 216.

236.    Plaintiff is entitled to recover a $750 penalty from Defendants for their willful violation of Labor Code §1198.5.

237.    Further, Plaintiff hereby seeks injunctive relief and Defendants' compliance with the statute to provide him his personnel records, which Defendants are required by law to maintain.

238.    Plaintiff is further entitled to his costs of suit and reasonable attorney's fees in obtaining such injunctive relief and Defendants' compliance with statute

**Fifteenth Cause of Action:**
**Failure to Produce Wage Records (Cal. Labor Code §226)**
(Against all Defendants)

239.    Plaintiff reasserts and incorporates by reference all preceding paragraphs as if fully set forth here.

240.    California Labor Code § 226(b) requires employers to provide payroll records to a former employee within 21 days of a written or oral request from the former employee. California

Labor Code § 226(c) states, in relevant part: "An employer who receives a written or oral request to inspect or copy records pursuant to subdivision (b) pertaining to a current or former employee shall comply with the request as soon as practicable, but no later than 21 calendar days from the date of the request." Failure to provide the requested copies within the 21-day period entitles the employee to a penalty of $750. (Cal. Labor Code § 226(f).)

241.    Plaintiff requested copies of his employment records by written request dated March 7, 2025. Despite producing limited employment documents on March 27, 2025, Defendants failed to provide complete wage records, including but not limited to records relating to the calculation of equity compensation, bonuses, deferred compensation, and any other forms of compensation beyond basic salary.

242.    Plaintiff, through counsel, reiterated his request for complete wage records on April 8, 2025. Defendants failed to provide the requested records.

243.    Pursuant to California Labor Code § 226(f), Plaintiff is entitled to recover a $750.00 penalty from Defendants.

244.    Further, Plaintiff hereby seeks injunctive relief and compliance from Defendants with Labor Code § 226.

245.    Plaintiff is entitled to recover his reasonable attorney's fees and costs in obtaining injunctive relief and Defendants' compliance under §226. (Cal. Labor Code §226(h).)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hugh Edmundson respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and grant the following relief:

1.  Reinstatement to his position as Chief Investment Officer of Theorem and Chairman of the Theorem IC, with full restoration of all duties, responsibilities, authority, and access to systems and information necessary to perform his role;

2.  In the alternative to reinstatement, if the Court determines that the relationship between Plaintiff and Defendants has been so damaged by Defendants' conduct that reinstatement is not feasible, then damages in the form of back and front pay in lieu of reinstatement in an amount to be determined at trial;

3.  Compensatory damages for lost wages, benefits, bonuses, and other compensation, including the full amount of his lost earn-out consideration;

4.  General damages for emotional distress, reputational harm, loss of professional standing, and other non-economic losses;

5.  Special damages for costs incurred as a result of Defendants' unlawful conduct;

6.  Punitive and exemplary damages in an amount sufficient to punish Defendants for their willful, malicious, and oppressive conduct and to deter similar conduct in the future;

7.  Restitution and disgorgement of Defendants' ill-gotten gains resulting from their unfair, unlawful, and fraudulent business practices in violation of Business & Professions Code § 17200 et seq.;

8.  Injunctive relief to prevent further retaliation, defamation, unfair competition, and unlawful conduct, including an order requiring Defendants to issue a retraction of their defamatory statements;

9.  Pre-judgment and post-judgment interest as provided by law;

10. Reasonable attorneys' fees and costs as permitted by law, including but not limited to Government Code § 12965(b), Labor Code § 1102.5, Labor Code § 1198.5(l), and Labor Code § 226(h);

11. Declaratory relief as set forth in the Eleventh Cause of Action;

12. Penalties under the Labor Code in the amount of $750 for failure to produce personnel records under Labor Code § 1198.5 and $750 for failure to produce wage records under Labor Code § 226;

13. Injunctive relief ordering Defendants to comply with their obligations under California Labor Code §§ 226, 432, and 1198.5 by providing complete copies of all personnel and wage records; and

14. Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial consistent with Section 16 of Article I of the California Constitution and California Code of Civil Procedure section 631.

DATED:  June 4, 2025                QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP


By  *Diane M. Doolittle*
                                    Diane M. Doolittle
                                    *Attorneys for Plaintiff*

# EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

Diane Doolittle
555 Twin Dolphin Drive, 5th Floor
Redwood City, CA 94065

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202505-29623630
Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

Dear Diane Doolittle:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

RE:     **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202505-29623630
Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil
Rights Department (CRD) in accordance with Government Code section 12960. This
constitutes service of the complaint pursuant to Government Code section 12962. The
complainant has requested an authorization to file a lawsuit. A copy of the Notice of
Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation
Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave
(Government Code sections 12945.2, 12945.6, or 12945.7) has the right to
participate in CRD's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in CRD's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation.  The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. You may
contact CRD's Small Employer Family Leave Mediation Pilot Program by
emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter
number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their
contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

Hugh Edmundson
573 Banks St.
San Francisco, CA 94110

RE:    **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202505-29623630
Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

Dear Hugh Edmundson:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective May 30, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

# COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Hugh Edmundson                                                    CRD No. 202505-29623630

                              Complainant,

vs.

Pagaya Technologies Ltd.
90 Park Avenue
New York, CA 10016

Theorem Technology Inc.
400 Concar Drive
San Mateo, CA 94402

Theorem Partners, LLC
400 Concar Drive
San Mateo, CA 94402

                              Respondents

_____

**1.** Respondent **Pagaya Technologies Ltd.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**.Complainant is naming **Theorem Technology Inc.** business as Co-Respondent(s). Complainant is naming **Theorem Partners, LLC** business as Co-Respondent(s).

**3**. Complainant **Hugh Edmundson**, resides in the City of **San Francisco,** State of **CA.**

**4**. Complainant alleges that on or about **April 27, 2025**, respondent took the following adverse actions:

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, suspended, denied any employment benefit or privilege, other.

Date Filed: May 30, 2025

CRD-ENF 80 RS (Revised 2025/02)

**Additional Complaint Details:** Hugh Edmundson was the founder and Chief Investment Officer of Theorem Technology, Inc. and Theorem Partners, LLC, which he built from less than $1 million in assets under management in 2014 into a leading consumer credit investment firm managing over $1.7 billion in assets by 2024. Theorem developed sophisticated machine-learning models to analyze consumer loans and managed investments for institutional investors including endowments, sovereign wealth funds, and pension funds.

In July 2024, Pagaya Technologies Ltd. announced its acquisition of Theorem, with the merger completing in October 2024. The merger agreement explicitly promised that Theorem's Investment Committee would maintain control and discretion over the funds' investment strategy for at least the first year.

Immediately following the merger, Pagaya systematically violated these commitments by restricting Theorem from investing in historically successful third-party lending platforms, effectively forcing investments into Pagaya-sponsored programs. Pagaya also imposed illegal non-compete clauses in employment agreements for California employees.

On February 3, 2025, Plaintiff formally reported these violations to Pagaya's compliance and legal teams, documenting breaches of fiduciary duty, violations of federal securities laws regarding misleading investor statements, and California employment law violations. On February 12, 2025, Plaintiff filed a whistleblower complaint with the SEC.

In direct retaliation, and among other retaliatory actions, Pagaya placed Plaintiff on administrative leave in February 2025 under false allegations while refusing to identify specific policies allegedly violated. Pagaya revoked his system access, made false statements to investors and his financial institution claiming he committed fraud, conducted a sham investigation by Pagaya's own counsel, and terminated his employment effective April 27, 2025. The termination claimed to be "for cause" despite failing to meet contractual requirements and not providing the required written notice and cure period. Plaintiff's termination was in direct retaliation for his protected whistleblowing activities in violation of California Labor Code Section 1102.5 and California Government Code Section 12940(h).

*Complaint – CRD No. 202505-29623630*

Date Filed: May 30, 2025

CRD-ENF 80 RS (Revised 2025/02)

VERIFICATION

I, **Diane Doolittle**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On May 30, 2025, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Redwood City, CA**

-3-
*Complaint – CRD No. 202505-29623630*

Date Filed: May 30, 2025