# EXHIBIT 1



July 27, 2024

**RE: Compensation Letter Agreement**

Dear Hugh,

As you are aware, Theorem Technology, Inc. (the "Company") and Pagaya Technologies US LLC ("Pagaya"), and/or certain of their respective affiliates, have entered into that certain Agreement and Plan of Merger dated as of July 27, 2024 (the "Merger Agreement").

This letter agreement (this "Letter") sets forth certain terms and conditions of your employment with the Company (or its successor) upon the closing of the transactions contemplated by the Merger Agreement (the "Closing") and shall become effective upon the Closing. For purposes of this Letter, the date on which the Closing occurs is referred to herein as the "Closing Date".

If the Closing does not occur on or before December 2, 2024, then this Letter and the compensation opportunities described herein shall be void *ab initio*.

    I.    **<u>Key Terms and Conditions</u>**.

1. **Title.** Chief Investment Officer of Theorem

2. **Reporting Relationship.** The position will initially report to the Chief Executive Officer of the Company, Gal Krubiner, or his successor, but the Company may change your reporting relationship to the Company's President or Chief Financial Officer in the Company's discretion.

3. **Work Location**: You will work remotely from your personal residence, subject to travel from time to time for business purposes.

4. **Base Salary; Bonus**. Effective as of the Closing Date, your annual base salary will be paid in cash and equal to $400,000, subject to applicable withholdings and deductions, and paid in accordance with the Company Group's regular payroll practices (the "<u>Base Salary</u>"). In addition, you will have a target annual bonus opportunity, which will be paid in a combination of cash and equity of Pagaya Ltd (as defined below) determined by Pagaya in its sole discretion and be equal to $400,000 subject to the terms and conditions of the applicable annual bonus program, and you must be employed by the Company on the payment date of the bonus to receive the bonus (if any). For purposes of this Letter, "<u>Company Group</u>" means, collectively, the Company, Pagaya and their respective parents and subsidiaries.

146045719v5

5. **Equity**. You will be eligible to receive an equity grant subject to approval by the Board of Directors of Pagaya Technologies Ltd ("Pagaya Ltd") (the "Equity Grant"). The Equity Grant will be subject to the terms and conditions of the Pagaya Technologies Ltd 2022 Share Incentive Plan, and will be evidenced by an award agreement, substantially in the form of Exhibit A attached hereto.

6. **Release Requirement**.  Notwithstanding anything in this Letter to the contrary, as a condition precedent to your right to receive any portion of the Equity Grant, you must first execute and deliver to the Company an effective general release of all claims in favor of the Company, Pagaya and each of their respective affiliates, substantially in the form attached hereto as Exhibit B, within 60 days following the date on which you are presented with such release.

7. **Start Date**.  Subject to fulfillment of any conditions imposed by this letter and satisfactory completion of a background check, your employment with the Company Group will begin on the Closing Date. Note, you must produce documentation evidencing your identity and eligibility to work in the U.S. within three (3) business days of your start date.

II.     **Additional Terms and Conditions.**

1. **Confidentiality and Restrictive Covenant Agreement.**  Execution of the Confidentiality, Non-Competition, Non-Interference, Non-Solicitation and Invention Assignment Agreement attached hereto as Exhibit C (the "Restrictive Covenant Agreement"), is a condition of employment and must be signed prior to your start date.

2. **Flexible Vacation.** In addition to 10 days of paid sick time off, you are eligible to take flexible vacation time, consistent with our Flexible Vacation Policy, which will be provided to you under separate cover. This generally means that rather than accruing vacation time during your employment, you may take vacation as needed or desired, so long as you seek and obtain approval for such time off in advance from your manager and otherwise comply with the Flexible Vacation Policy. Please note that we rely on your good judgment and discretion in requesting and taking flexible vacation, so that such time does not negatively impact our expectations of high-quality work, meeting deadlines and availability for real-time collaboration.  Failure to obtain advance approval for flexible vacation time, or our business or staffing challenges at the time of the request, may result in denial of the request.  For avoidance of doubt, please note that subject to applicable law, because flexible vacation time does not accrue it may not be "carried over" from one year into the next, nor will employees have any accrued, unused vacation balance to be paid upon termination of employment (for any reason).

3. **Expenses**. Normal and reasonable expenses will be reimbursed on a monthly basis per Company Group policy and upon completion of the appropriate expense request form, subject to the terms of the Company Group's applicable policies. For the avoidance of doubt, you will not be reimbursed for commuting-related expenses.

4. **Benefits**. You will be eligible to participate in all medical, health or disability insurance, fringe benefit and retirement plans or other benefits offered to regular, full-time employees of the Company Group from time to time, subject to all eligibility requirements, terms and other conditions set forth by any formal plan documents governing those benefits plans. All Company Group benefits are subject to change, modification, or discontinuance by the Company Group in its sole discretion, in accordance with applicable law.

5. **At-Will Employment**. Your employment is at-will, meaning that either party can terminate the employment relationship at any time, for any reason, subject to the other provisions contained herein. Although your employment duties, title, compensation and benefits may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Chief Executive Officer of the Company.

6. **Notice**. Notwithstanding the foregoing, you shall provide at least 90 days' prior written notice in advance of any resignation of your employment with the Company Group.

7. **No Conflicting Obligations.** You hereby represent and warrant that you are not subject to any confidentiality, non-competition, or other agreement that restricts your employment activities on behalf of the Company or that may affect your ability to devote your full time and attention to your work with the Company Group. You represent and warrant that, by accepting this offer of employment, your performance will not breach any other agreement to which you are a party and that you have not, and will not, during the term of your employment with the Company Group, engage in any conduct that violates any such agreement or enter into any oral or written agreement in conflict with any of the provisions of this offer letter or the Company Group's policies. You agree not to bring to the Company Group, or use or disclose to any person associated with the Company Group, any confidential or proprietary information belonging to any former employer or other person or entity with respect to which you owe an obligation of confidentiality under any agreement or otherwise.

8. **Definitions**. For purposes of this Letter:

"Cause" means (i) the commission of an act of fraud or misappropriation of Company assets or business opportunities by you in the course of your employment or service; (ii) the conviction of, or entering of a plea of nolo contendere by you, for a crime constituting a felony or in respect of any act of fraud; (iii) the commission of an act by you that results, or is likely to result, in you, the Company, or any member of the Company Group being enjoined, suspended, barred or otherwise formally disciplined by a government agency or a court for violation of federal or state securities laws, rules or regulations, including a statutory disqualification; (iv) gross negligence or willful misconduct in connection with your performance of your duties in connection with your employment by the Company, or your failure to comply with any of the restrictive covenants to which you are subject, which gross negligence, willful misconduct or failure results, or is likely to result, in material harm to the Company; (v) a material violation of this Letter or your willful failure to comply with any material written policies or procedures of the Company Group as in effect

from time to time, provided that you will have been delivered a copy of such policies or notice that they have been posted on a website prior to such compliance failure; or (vi) your willful failure to perform the material duties in connection with your position. In all cases, prior to being terminated for Cause, the Company will provide you with written notice which describes the events giving rise to Cause in reasonable detail and in the case of clause (v) and (vi) you will have not less than thirty (30) days to cure to the reasonable satisfaction of the Company. For purposes of this definition, no act or omission on your part will be considered "willful" unless it is done or omitted in bad faith or without reasonable belief that the act or omission was in the best interests of the Company. Any act or omission will be presumed to have been done or omitted in good faith and in the best interests of the Company if based upon (w) a resolution duly adopted by the Company, (x) written advice of outside counsel for the Company (y) written advice of an accountant or auditor, or (z) agreement among at least two other executives, which must include the executive(s) most closely connected to or responsible for the subject matter underlying the act or omission.

"Good Reason" means the occurrence of any of the following events without your consent: (i) a decrease in your Base Salary (excluding a reduction of ten percent (10%) or less pursuant to an "across-the-board," proportionate salary reduction applicable to all of the Company's similarly situated senior executives); (ii) the Company requiring you to work from a particular office location or imposing business travel requirements that are unreasonable or inconsistent with the Company's past practice (which the Company acknowledges would be a material breach of this Letter); or (iii) any other material breach by the Company of this Letter or any other agreement with you; provided, however, that, any such termination by you shall only be deemed to be for Good Reason pursuant to this definition if you give the Company written notice of your intent to resign for Good Reason within ninety (90) days following the first occurrence of the condition(s) that you believe constitute(s) Good Reason, which notice shall describe such condition(s), and the Company fails to cure such condition(s) within thirty (30) days of such notice and you actually terminate your employment within ninety (90) days thereafter.

III.    **General Provisions.**

1. **No Right to Continued Employment**.  This Letter is not an agreement of employment and does not guarantee that the Company (or following the Closing, the Company Group) will employ you for any specific time period, nor does it modify in any respect the Company's (or following the Closing, the Company Group's) right to terminate or modify your employment or compensation.

2. **Counterparts**.  This Letter may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

3. **Entire Agreement; Amendment**.  This Letter constitutes the entire understanding and agreement of the parties regarding the subject matter herein and supersedes all prior discussions, negotiations, correspondence, communications, understandings and

agreements between the parties relating to subject matter hereof, including, for this purpose, any compensatory arrangements with the Company and its affiliates, other than any merger consideration you may be entitled to pursuant to the Merger Agreement. No amendment, waiver, modification or change of any provision of this Letter will be valid unless in writing and signed by the parties hereto.

4. **Governing Law**.  This Letter shall be deemed to be made in the State of Delaware, and the validity, interpretation, construction and performance of this Letter in all respects shall be governed by the laws of the State of Delaware, without regard to its principles of conflicts of law. You acknowledge and agree that you were individually represented by independent counsel in connection with the negotiation of this Letter and this section, in particular. Accordingly, you understand that the provisions of Section 925(a) of the California Labor Code do not apply to the forum or venue selection or choice of law provisions set forth in this Letter.

5. **Construction**.  No presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions hereof.

6. **Survival**. The rights and obligations of both parties to this Letter not fully satisfied or performed, as the case may be, as of the termination of your employment, shall survive such termination until fully satisfied or performed.

7. **Sections 409A, 457A.** Any compensation payable hereunder is intended to either comply with, or be exempt from, the requirements of Sections 409A and 457A of the Internal Revenue Code of 1986, as amended (the "Code").  Accordingly, to the maximum extent permitted, this Letter shall be interpreted to be in compliance therewith.  Whenever this Letter specifies a payment period with reference to a number of days, the actual date of payment within the specified period will be within the sole discretion of the Company. For the purposes of the provisions of Section 409A of the Code, each separately identified payment shall be treated as a separate payment and any series of installment payments shall be treated as a right to a series of separate payments.  The Company reserves the right to amend the provisions this Letter at any time and in any manner without your consent solely to comply with the requirements of Section 409A or Section 457A of the Code and to avoid the imposition of the additional tax, interest or income inclusion under Sections 409A and 457A of the Code on any payment to be made hereunder.

[Remainder of Page Left Intentionally Blank]

IN WITNESS WHEREOF, the parties hereto, each intending to be legally bound hereby, have caused this Letter to be executed as of the date first above written.

**PAGAYA TECHNOLOGIES US LLC**

By: _____

Name: Gal Krubiner

Title: Chief Executive Officer

By: _____

Name: Eric Watson

Title: Chief Legal Officer

**HUGH EDMUNDSON**

_____

[Signature Page to Compensation Letter Agreement]

Docusign Envelope ID: 615AA2AC-3398-4CB0-86A4-95241E8BD758

IN WITNESS WHEREOF, the parties hereto, each intending to be legally bound hereby, have caused this Letter to be executed as of the date first above written.

**PAGAYA TECHNOLOGIES US LLC**

By:_____
   Name:
   Title:

**HUGH EDMUNDSON**

**PAGAYA TECHNOLOGIES LTD.**
**2022 SHARE INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

This Restricted Stock Unit Award Agreement (this "RSU Award Agreement"), dated as of [＿＿＿＿＿], 2024 (the "Date of Grant"), is made by and between Pagaya Technologies Ltd., an Israeli corporation (the "Company"), and Hugh Edmundson (the "Participant"). Any capitalized terms used but not defined herein shall have the meaning ascribed to them in the Pagaya Technologies Ltd. 2022 Share Incentive Plan (as may be amended from time to time, the "Plan").

1.  Grant of Restricted Stock Units. The Company hereby grants to the Participant the number of restricted stock units (the "RSUs") set forth below, subject to all of the terms and conditions of this RSU Award Agreement and the Plan.

> Number of RSUs: [●]
> Vesting Commencement Date: Closing[1]
> Vesting: First anniversary of the Closing and then quarterly pro rata through the third anniversary of the Closing

2.  Vesting.

(a)  The RSUs shall become vested as follows: (i) one third (1/3) of the RSUs shall vest on the first anniversary of the Vesting Commencement Date, and (ii) the remaining two thirds (2/3) of the RSUs shall vest in eight (8) substantially equal quarterly installments thereafter (each a "Vesting Date"), such that the RSUs shall be fully vested on the third anniversary of the Closing; provided that, the Participant remains in continuous employment with the Company or its Affiliates through, and has not given or received a notice of termination of such employment as of, the applicable Vesting Date subject to Section 2(b). Notwithstanding the foregoing, the vesting of the RSUs shall cease for any period during which the Participant is on an unpaid leave of absence from the Company or its Affiliates and will commence when such Participant returns from such leave of absence to active service, with each remaining Vesting Date being pushed back by the duration of such leave of absence.

(b)  If the Participant's employment is terminated for any reason, (i) this RSU Award Agreement shall terminate and all rights of the Participant with respect to RSUs that have not vested as of the date of termination shall immediately terminate, (ii) any such unvested RSUs shall be forfeited without payment of any consideration, and (iii) neither the Participant nor any of the Participant's successors, heirs, assigns, or personal representatives shall thereafter have any further rights or interests in such unvested RSUs. Notwithstanding the foregoing, (x) if the Participant's employment is terminated by Pagaya Technologies US LLC (the "Employer") without Cause (and not death or disability) or upon the Participant's resignation for Good Reason (each, as defined in the Letter Agreement dated [●], by and between the Participant and the

---

[1] "Closing" shall have the meaning set forth in that certain Agreement and Plan of Merger, by and among Theorem Technology, Inc., and Pagaya Technologies Ltd.

Employer), subject to the Participant's execution of an effective release of claims in favor of the Company, all unvested RSUs granted under this RSU Award Agreement shall become immediately vested upon the date of such termination and (y) if the Participant's employment is terminated for Cause, (A) this RSU Award Agreement shall terminate and all rights of the Participant with respect to all RSUs, including those that have not yet vested as of the date of termination as well as those that have vested and have not yet been settled pursuant to Section 3 as of the date of termination, shall immediately terminate; (B) any such RSUs shall be forfeited without payment of any consideration; and (C) neither the Participant nor any of the Participant's successors, heirs, assigns, or personal representatives shall thereafter have any further rights or interests in any such RSUs granted hereunder.

3.     Settlement. Each RSU granted hereunder shall represent the right to receive, in the sole discretion of the Company, one (1) Share (as applicable, the "Settlement"). The Settlement shall occur as soon as practicable after the applicable Vesting Date, but in no event later than March 15 of the year following the year in which such Vesting Date occurs.

4.     Voting and Other Rights. The Participant shall have no rights of a stockholder with respect to the RSUs (including the right to vote and the right to receive distributions or dividends) unless and until Shares are issued in respect thereof following the applicable Vesting Date.

5.     RSU Award Agreement Subject to Plan. This RSU Award Agreement is made pursuant to all of the provisions of the Plan, which is incorporated herein by this reference, and is intended, and shall be interpreted in a manner, to comply therewith. In the event of any conflict between the provisions of this RSU Award Agreement and the provisions of the Plan, the provisions of the Plan shall govern. The Participant hereby acknowledges receipt of a copy of the Plan. The Participant hereby acknowledges that all decisions, determinations and interpretations of the Administrator in respect of the Plan, this RSU Award Agreement and the RSUs shall be final and conclusive.

6.     Restrictive Covenants.

(a)     Acknowledgement. The Participant hereby acknowledges that (i) he or she is subject to all of the terms and conditions of the restrictive covenants set forth in this Section 6, as well as any restrictive covenants set forth in the Confidentiality, Non-Competition, Non-Interference, Non-Solicitation and Invention Assignment Agreement (attached hereto as Exhibit A) and any other agreement between the Company or its Affiliates and the Participant (collectively, the "Restrictive Covenants"); (ii) the Restrictive Covenants survive the termination of the Participant's employment with the Company or its Affiliates and the termination of the RSU in accordance with the terms thereof; and (iii) the Company would not have made the grant of RSUs to the Participant in the absence of his or her agreement to be subject to the Restrictive Covenants.

(b)     Nondisclosure of Confidential Information. During the course of the Participant's employment with the Company or its Affiliates, the Participant will have access to certain Confidential Information. During his or her employment by the Company or its Affiliates and thereafter, the Participant agrees to hold in confidence and not access, disclose or use for his

or her own benefit, other than such benefit as the Participant may derive as a member of the Company, the Company's Confidential Information. For purposes of this RSU Award Agreement, "Confidential Information" means data and information (i) relating to the business of the Company, regardless of whether the data or information constitutes a trade secret under applicable law, (ii) disclosed to the Participant or of which the Participant became aware as a consequence of the Participant's employment with the Company, (iii) having value to the Company, (iv) not generally known to competitors of the Company, and (v) which includes trade secrets, methods of operation, names of customers, price lists, financial information and projections, route books, personnel data, and similar information; provided, however, that such term shall not mean data or information (1) which has been voluntarily disclosed to the public by the Company, except where such public disclosure has been made by the Participant without authorization from the Company, (2) which has been independently developed and disclosed by others, or (3) which has otherwise entered the public domain through lawful means. In the event that the Participant becomes legally compelled to disclose any Confidential Information, the Participant shall provide the Company with written notice of such requirement within twenty-four (24) hours of learning of such obligation (and in any event, prior to any disclosure) to allow the Company to seek a protective order or other remedy. The Participant agrees to cooperate with the Company (at the Company's expense) in seeking such protection for Confidential Information. The Participant further agrees that any disclosure of Confidential Information pursuant to legal compulsion shall be only to the minimum extent necessary to comply with the Participant's legal obligation.

(c)     Proprietary Rights. The Participant assigns to the Company or its designee all of the Participant's interest in any and all inventions, discoveries, improvements and patentable or copyrightable works initiated, conceived or made by the Participant, either alone or in conjunction with others, during the Participant's employment with the Company and related to the Company's Business. Whenever requested to do so by the Company and at the Company's expense, the Participant shall execute any and all applications, assignments or other instruments that the Company, in good faith, shall deem necessary to apply for and obtain trademarks, patents or copyrights of the United States of America or any foreign country or otherwise protect the interests of the Company and its Affiliates therein. These obligations shall continue beyond the termination of the Participant's employment with the Company with respect to inventions, discoveries, improvements or copyrightable works initiated, conceived or made by the Participant during the Participant's employment with the Company. Notwithstanding any other provision in this Section 6 (c), the Participant understands and agrees that the Participant does not have to and should not disclose or assign to the Company any inventions that by law (including, without limitation, any intellectual property that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B)) the Participant cannot be required to assign.

(d)     Return of Company Property. Upon termination of the Participant's employment for any reason or earlier, upon the Company's request, the Participant shall promptly return to the Company all Property (as defined herein) that has been entrusted or made available to the Participant by the Company. For purposes of this RSU Award Agreement, "Property" means all Confidential Information, records, files, electronic storage media, memoranda, reports, price lists, customer lists, drawings, plans, sketches, keys, codes, computer

hardware and software, equipment and other property of any kind or description prepared, used or possessed by the Participant during the Participant's employment with the Company (and any duplicates of any such property), which relate to the Company or its Affiliates, or the Company's Business.

(e)      Remedies. The Participant acknowledges and agrees that the restrictions contained in this Section 6 are reasonable, necessary, and impose no greater restraint on the Participant than is necessary to protect what the Participant acknowledges to be the Company's legitimate business interests. The Participant agrees that, in the event of a breach of Section 6 of this RSU Award Agreement, damages will not be an adequate remedy and the Company will be entitled, *inter alia*, to injunctive relief to restrain any such breach, threatened or actual. The Participant expressly waives any obligation by the Company to post a bond or other security as a condition to obtaining such injunctive relief. Notwithstanding anything in this RSU Award Agreement or the Plan to the contrary, and subject to the Company's ability to obtain remedies in equity, including, without limitation, specific performance, injunctive relief, a temporary restraining order, and/or a permanent injunction in any court of competent jurisdiction, if the Board determines in good faith that the Participant has committed a breach of the Restrictive Covenants, then the Board may immediately cause the RSUs to cease to vest.

(f)      Permitted Disclosures.  Pursuant to 18 U.S.C. §1833(b), the Participant will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret of the Company that (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to the Participant's attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  If the Participant files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Participant may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding, if the Participant (1) files any document containing the trade secret under seal, and (2) does not disclose the trade secret, except pursuant to court order. Nothing in this RSU Award Agreement is intended to conflict with 18 U.S.C. §1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.  Further, nothing in any agreement the Participant has with the Company will prohibit or restrict the Participant from making any voluntary disclosure of information or documents related to any violation of law to any governmental agency or legislative body, or any self-regulatory organization, in each case, without advance notice to the Company.

7.      Recoupment. The RSUs may be subject to forfeiture/recoupment in the event of, as applicable to Participant, (i) the material breach of any non-competition, non-solicitation, non-interference or confidential information restrictive covenant between Participant and the Company, including the covenants set forth in Section 6 of this RSU Award Agreement or (ii) the Participant's termination of employment for Cause. The RSUs shall be subject to any Company policy regarding the recoupment of incentive compensation, as in effect from time to time.

8.      No Rights to Continuation of Employment.  Nothing in the Plan or this RSU Award Agreement shall confer upon the Participant any right to continue in the employ of the Company or its Affiliates or shall interfere with or restrict the right of the Company or its

Affiliates to terminate the Participant's employment at any time for any reason whatsoever, with or without Cause.

9. **Tax Withholding.** The Company shall be entitled to require a cash payment by or on behalf of the Participant in respect of any sums required or permitted by federal, state or local tax law to be withheld with respect to the Settlement of any RSUs; **provided**, that, notwithstanding the foregoing, and unless otherwise determined by the Administrator, the Participant shall be permitted, at his or her election, to satisfy the applicable tax obligations with respect to any RSUs by cashless exercise or net share settlement, pursuant to which the Company shall withhold from the number of Shares that would otherwise be issued upon settlement of the RSUs the largest whole number of Shares with a Fair Market Value equal to the applicable tax obligations.

10. **Section 409A Compliance.** The intent of the parties is that the payments and benefits under this RSU Award Agreement comply with Section 409A of the Code, to the extent subject thereto, and accordingly, to the maximum extent permitted, this RSU Award Agreement shall be interpreted to be in compliance therewith. Notwithstanding anything contained herein to the contrary, the Participant shall not be considered to have terminated employment with the Company for purposes of any payments under this RSU Award Agreement which are subject to Section 409A of the Code until the Participant would be considered to have incurred a "separation from service" from the Company within the meaning of Section 409A of the Code. Each amount to be paid or benefit to be provided under this RSU Award Agreement shall be construed as a separate identified payment for purposes of Section 409A of the Code. Without limiting the foregoing and notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A of the Code, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to this RSU Award Agreement or any other arrangement between the Participant and the Company during the six (6)-month period immediately following the Participant's separation from service shall instead be paid on the first business day after the date that is six (6) months following the Participant's separation from service (or, if earlier, the Participant's date of death). The Company makes no representation that any or all of the payments described in this RSU Award Agreement will be exempt from or comply with Section 409A of the Code and makes no undertaking to preclude Section 409A of the Code from applying to any such payment. The Participant shall be solely responsible for the payment of any taxes and penalties incurred under Section 409A of the Code.

11. **Governing Law.** This RSU Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such state. The Participant acknowledges and agrees that the Participant was individually represented by independent counsel in connection with the negotiation of this RSU Award Agreement and this Section 11, in particular. Accordingly, the Participant understands that the provisions of Section 925(a) of the California Labor Code do not apply to the forum or venue selection or choice of law provisions set forth in this Letter.

12. **RSU Award Agreement Binding on Successors.** The terms of this RSU Award Agreement shall be binding upon the Participant and upon the Participant's heirs,

executors, administrators, personal representatives, transferees, assignees and successors in interest, and upon the Company and its successors and assignees, subject to the terms of the Plan.

13. <u>No Assignment</u>. Notwithstanding anything to the contrary in this RSU Award Agreement, neither this RSU Award Agreement nor any rights granted herein shall be assignable by the Participant.

14. <u>Necessary Acts</u>. The Participant hereby agrees to perform all acts, and to execute and deliver any documents that may be reasonably necessary to carry out the provisions of this RSU Award Agreement, including but not limited to all acts and documents related to compliance with federal and/or state securities and/or tax laws.

15. <u>Severability</u>. Should any provision of this RSU Award Agreement be held by a court of competent jurisdiction to be unenforceable, or enforceable only if modified, such holding shall not affect the validity of the remainder of this RSU Award Agreement, the balance of which shall continue to be binding upon the parties hereto with any such modification (if any) to become a part hereof and treated as though contained in this original RSU Award Agreement. Moreover, if one or more of the provisions contained in this RSU Award Agreement shall for any reason be held to be excessively broad as to scope, activity, subject or otherwise so as to be unenforceable, in lieu of severing such unenforceable provision, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear, and such determination by such judicial body shall not affect the enforceability of such provisions or provisions in any other jurisdiction.

16. <u>Entire Agreement</u>. This RSU Award Agreement and the Plan contain the entire agreement and understanding among the parties as to the subject matter hereof, and supersedes any other agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof.

17. <u>Headings</u>. Headings are used solely for the convenience of the parties and shall not be deemed to be a limitation upon or descriptive of the contents of any such Section.

18. <u>Counterparts; Electronic Signature</u>. This RSU Award Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. The Participant's electronic signature of this RSU Award Agreement shall have the same validity and effect as a signature affixed by the Participant's hand.

19. <u>Amendment</u>. No amendment or modification hereof shall be valid unless it shall be in writing and signed by all parties hereto.

20. <u>Set-Off</u>. The Participant hereby acknowledges and agrees, without limiting the rights of the Company or its Affiliates otherwise available at law or in equity, that, to the extent permitted by law, the number of Shares or the amount of cash due to the Participant under this RSU Award Agreement may be reduced by, and set-off against, any or all amounts or other consideration payable by the Participant to the Company or its Affiliates under any other

agreement or arrangement between the Participant and the Company or its Affiliates; <u>provided</u> that any such set-off does not result in a penalty under Section 409A of the Code.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed this RSU Award Agreement as of the date set forth above.


**PAGAYA TECHNOLOGIES LTD.**


By: _____


Print Name:_____


Title:_____

The undersigned hereby accepts and agrees to all the terms and provisions of the foregoing RSU Award Agreement.

**PARTICIPANT**

Signature: _____

Print Name:  Hugh Edmundson

Address: _____

_____

## <u>EXHIBIT A</u>

**Confidentiality, Non-Competition, Non-Interference, Non-Solicitation and Invention Assignment Agreement**

[see attached]

## Exhibit B

If the Participant is employed by the Company in the State of California, the following provision applies:

**California Labor Code Section 2870.** Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)  Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)  Result from any work performed by the employee for his employer.

(b)  To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

<u>Exhibit B</u>
***Form of Release***

**CONFIDENTIAL GENERAL RELEASE AGREEMENT**

This Confidential General Release Agreement (this "**Agreement**") is entered into by and between Hugh Edmundson ("**Employee**") and Pagaya Technologies US LLC on behalf of itself, its parent, subsidiaries, and other corporate affiliates, including without limitation Theorem Technologies, Inc. (collectively referred to as the "**Company**") (Employee and the Company collectively referred to in this Agreement as the "**Parties**").

WHEREAS, in connection with his employment with the Company, Employee entered into a certain (i) Compensation Letter Agreement effective July __, 2024 (the "**Compensation Letter**"), (ii) the Restricted Stock Unit Award Agreement effective _____ __, 2024 (the "**RSU Award Agreement**"), and the (iii) Confidentiality, Non-Competition, Non-Interference, Non-Solicitation and Invention Assignment Agreement effective July __, 2024 (the "**Covenant Agreement**" and, together with the Compensation Letter and the RSU Award Agreement, the "**Employment Agreements**"); and

WHEREAS, in connection with the execution of the Employment Agreements, the Company and Employee mutually desire to compromise and settle any and all claims, disputes, controversies, matters or affairs between them, whether or not currently asserted or known, on the terms set forth in this Agreement.

NOW THEREFORE, in recognition of the foregoing and in consideration of the mutual covenants and obligations contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows:

1.     **Benefits**. If Employee timely executes and does not subsequently revoke this Agreement, the Company will make the Equity Grant, subject to the terms and conditions therein.

2.     **No Consideration Absent Execution of this Agreement.** Employee understands and agrees that Employee would not receive the consideration specified in Section 1 above, except for Employee's execution of this Agreement and the fulfillment of the promises contained herein. Employee acknowledges and agrees the Benefits provided for pursuant to this Agreement are above and beyond any compensation or benefits to which Employee otherwise would be entitled, and thus constitutes valid consideration in support of this Agreement, including Employee's general release of claims as set forth in Section 3 herein.

3.     **General Release of All Claims.** The purpose of this Agreement is to resolve any dispute Employee has or might ever have claimed arising from or relating to Employee's employment or separation of employment from the Company, and to facilitate Employee's transition to other employment. Accordingly, in exchange for the consideration set forth in Section 1 above, Employee, on Employee's own behalf and on behalf of Employee's heirs, administrators, executors, and assigns, hereby irrevocably and unconditionally waives, releases, and discharges the Company, and any and all of the Company's affiliates, parents, partnerships, divisions, and subsidiaries, and each of the Company's and its existing, former and future directors, managers, members, officers, directors, shareholders, employees, representatives, agents, attorneys, insurers, predecessors, successors, and assigns (collectively, the "**Released Parties**"), to the full extent permitted by law, from any and all claims, demands, actions, causes of actions, judgments, rights, fees, damages, debts, obligations, liabilities, and expenses (inclusive of attorneys' fees) of any kind whatsoever, whether known or unknown, that

Employee may have or has ever had against the Released Parties arising out of, or in any way related to Employee's hire, benefits, employment, or separation from employment with the Company by reason of any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter from the beginning of time up to and including the date of Employee's execution of this Agreement, including, but not limited to any and all claims under:

a. Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), the Families First Coronavirus Response Act (FFCRA), the Fair Labor Standards Act (FLSA), the Equal Pay Act, the Employee Retirement Income Security Act (ERISA) (regarding unvested benefits), the Civil Rights Acts of 1866, 1871 and 1991, Section 1981 of U.S.C. Title 42, the Worker Adjustment and Retraining Notification Act (WARN), the Uniform Services Employment and Reemployment Rights Act (USERRA), the Genetic Information Nondiscrimination Act (GINA), the Immigration Reform and Control Act (IRCA), the Age Discrimination in Employment Act, the Rehabilitation Act of 1973, the National Labor Relations Act, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Executive Order 11246, all claims under whistleblower protection laws (including but not limited to claims under the Sarbanes-Oxley Act or the Dodd-Frank Wall Street Reform and Consumer Protection Act), the Texas Labor Law, the Texas Commission on Human Rights Act, the Texas Hazard Communication Act, all including any amendments and their respective implementing regulations, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released;

b. any and all claims arising under tort, contract, and quasi-contract law, including, but not limited to, claims of breach of an express or implied contract, tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, promissory estoppel, detrimental reliance, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm, wrongful or retaliatory discharge, fraud, defamation, slander, libel, false imprisonment, and negligent or intentional infliction of emotional distress; and

c. wages, including overtime wages, bonuses, commissions, vacation pay, holiday pay, sick pay, severance, back pay, front pay, penalties, life insurance, health or medical insurance or any other fringe benefit or compensation of any kind including any such claims arising under federal or state law.

Additionally, nothing in this Agreement shall constitute a waiver of: claims under the California Fair Employment and Housing Act (Cal. Gov't Code §§ 129640 et seq.) or California Labor Code.

Notwithstanding the foregoing, the Parties agree that this general release does not apply to (i) any claims that cannot be waived or released under applicable law, (ii) any vested benefits accrued by Employee prior to the date hereof under any compensation or benefit plans, programs and arrangements maintained by the Company for the benefit of its employees and subject to ERISA, (iii) any rights Employee may have under Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), or (iv) merger consideration Employee is entitled to pursuant to that certain Agreement and Plan of Merger, by and among Pagaya Technologies Ltd. and Theorem Technologies, Inc.

Nothing in this Agreement shall restrict Employee's ability to testify truthfully in any suit, hearing, or investigation which Employee has not personally commenced provided that such testimony

is compelled by subpoena or other operation of law.  Further, notwithstanding anything in the foregoing, nothing herein prohibits Employee from initiating or participating in any charges, actions or proceedings before, or engaging in communications with, the U.S. Securities Exchange Commission ("**SEC**") and/or the Commodity Futures Trading Commission ("**CFTC**") about possible fraud or other securities law violations ("Covered Actions"), either prospectively after the date Employee signs this Agreement or prior to the date Employee signs this Agreement.

Nothing in this Agreement shall be construed to prohibit, prevent, or limit Employee from: (i) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful; (ii) filing an administrative charge, complaint, report, or concern with, or participating in any investigation conducted by, a governmental agency or legislature, including the U.S. Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the U.S. Equal Employment Opportunity Commission, the SEC, the CFTC, the California Civil Rights Department, the California Labor Commissioner and/or any other federal, state or local government agency ("**Government Agencies**"); (iii) filing, testifying or participating in or otherwise assisting in a proceeding relating to, or reporting, an alleged violation of any federal, state or municipal law relating to fraud or any rule or regulation of the SEC and/or the CFTC or any self-regulatory organization, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, or engaging in any Covered Actions as described above; or (iv) filing or disclosing any facts necessary to receive unemployment insurance, Medicaid, or other public benefits to which Employee is or may be entitled.

Nevertheless, Employee acknowledges and agrees that by virtue of the releases set forth in this Agreement above, Employee has waived any right to any relief otherwise potentially available to Employee (including without limitation, monetary damages, equitable relief and/or reinstatement) under any of the claims and/or causes of action waived in this Agreement.  Therefore, except as set forth herein, Employee agrees that Employee will not seek or accept any award or settlement from any source or proceeding (including but not limited to any proceeding brought by any other person or by any Government Agency) with respect to any claim or right waived in this Agreement.  This Agreement does not, however, waive or release Employee's right (if any) to receive a monetary award from the SEC for information provided to the SEC.

4.        **Waiver of Unknown Claims.**  This Agreement is intended to be effective as a bar to all Claims as stated above, up to and including the Effective Date (as defined in Section 16 below) of this Agreement.  Accordingly, Employee hereby expressly waives any and all rights and benefits conferred by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE ("**SECTION 1542**") and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims, if any, as well as those relating to any other Claims as stated above.  SECTION 1542 provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Employee warrants that Employee has had the opportunity to consult with counsel about this Agreement and, specifically, about the waiver of SECTION 1542 and that Employee understands the SECTION 1542 waiver and freely and knowingly enters into this Agreement.

5.      **Defend Trade Secrets Act.** Employee acknowledges that Employee has the following immunity rights in compliance with the requirements of the Defend Trade Secrets Act: (i) Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of confidential information that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, (ii) Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of confidential information that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and (iii) if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the confidential information to his attorney and use the confidential information in the court proceeding, if Employee files any document containing the confidential information under seal, and does not disclose the confidential information, except pursuant to court order.

6.      **Covenant Not To Sue.**  Except for an action arising out of a breach of the terms of this Agreement, Employee agrees never to bring (or cause to be brought) any claim, action, or proceeding against the Company or any of the Released Parties regarding any act or failure to act that occurred up to and including the date on which the Parties sign this Agreement, with respect to any claim, action or proceeding relating to Employee's employment or Employee's separation of employment from the Company, or other matter within the scope of the matters released pursuant to Section 3 above.  Except as otherwise expressly provided herein and to the fullest extent permitted by law, Employee further promises never to institute or pursue any such claims in any court, tribunal, arbitral forum, governmental agency or other forum; provided that, nothing in this Agreement waives or attempts to waive any claims that cannot legally be waived, or any rights Employee may have to file a charge of discrimination with a federal or state administrative agency or cooperate or participate in the investigation of an administrative charge or proceeding.  To the extent Employee institutes any such claims in any federal or state administrative agency and/or to the extent any such claims are instituted or pursued by any other persons or entities (in any forum), Employee hereby agrees not to seek, accept or obtain, and to hereby waive and affirmatively forego, any recovery, damages or other relief, of any kind or nature whatsoever, that Employee may be or may have been entitled or eligible to receive, or may be or may have been awarded, as a result of such claims.

7.      **Employee Acknowledgements and Affirmations.**  Employee acknowledges, affirms, and agrees that:

a.      Employee has not filed, caused to be filed, and is not presently a party to any claim, complaint, charge, or action against any Released Party, in any forum or form;

b.      Employee has no known workplace injuries or occupational diseases and that Employee has been granted or has not been denied any leave to which Employee was entitled under any disability accommodation or sick leave laws; and

c.       Employee has not assigned or otherwise transferred any rights or interests in any actual or potential claims Employee might ever have asserted against the Company or any of the Released Parties.

8.       **No Admission of Liability & Inadmissibility.**  Employee and the Company agree that nothing in this Agreement is to be construed as an admission of liability by the Company or any Released Parties of any unlawful, discriminatory, or other wrongful conduct or practice.  This Agreement is offered to resolve fully all matters which Employee has, may have, or might ever have raised relative to Employee's employment with and/or separation from the Company.  This Agreement shall not be used as evidence in any proceeding, except one alleging a breach of this Agreement.

9.       **Confidential Agreement & Remedies for Breach.**  Employee agrees (a) to treat this Agreement as confidential as to the terms or existence of this Agreement, including, without limitation, the payment(s) Employee is receiving under the Agreement and (b) except as required by law (after giving due prior notice to the Company providing the Company with a reasonably sufficient opportunity to respond and/or object), not to disclose any such information to any person or entity other than the tax authorities and Employee's attorney, accountant, and immediate family (after advising such individuals of the confidential nature of this Agreement and securing their binding promise not to further disclose its existence or promise to any person or entity).  If Employee does institute or pursue any claims released pursuant to this Agreement or otherwise violate this Agreement, then, in addition to any remedies or damages available to the Company, Employee expressly agrees that, unless otherwise prohibited under applicable law, the benefits set forth in Section 1 above shall be immediately forfeited, less one thousand dollars ($1,000.00), which shall constitute continuing consideration for Employee's obligations under this Agreement, and Employee shall be liable and to reimburse the Company for any attorneys' fees and/or costs or expenses incurred by the Company in defending against any such claims or otherwise in enforcing this Agreement.

10.       **Governing Law.**  Except as otherwise provided under the Federal Arbitration Act ("FAA") or other applicable federal law, this Agreement shall be governed by the laws of the State of California without reference to any state's or country's choice of law provisions to the contrary.

11.       **Arbitration.**  Employee agrees that any dispute or controversy between the parties in any way arising out of, related to, or connected with this Agreement, Employee's employment with the Company or termination of the same, shall be resolved through final and binding arbitration in San Mateo, California, pursuant to the Employment Arbitration Rules and Procedures of JAMS, Inc. ("JAMS"), available at www.jamsadr.com.  In the event of a dispute subject to this section, the parties shall be entitled to written discovery and depositions adequate to give the parties access to documents and witnesses that are essential to the dispute, subject to the discretion of the arbitrator and pursuant to the applicable JAMS rules.  The arbitrator selected shall have the authority to grant either party or both all remedies otherwise available by law, including injunctions  The arbitrator shall render an award and written opinion explaining the basis for the award.  The arbitral award shall be binding upon the parties. Judgment upon the award rendered by the arbitrator may be entered in any court having competent jurisdiction thereof.

Both parties shall take all reasonable steps to maintain the confidentiality of the arbitration award, including executing a confidentiality stipulation in a form acceptable to the Company.  The prevailing

party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees, in accordance with applicable law.  Provided however, the Company shall pay for all costs which are unique to the arbitration process, if required by applicable law.  The parties acknowledge that by agreeing to arbitration pursuant to this section, they are waiving their right to a judicial forum and to a trial by jury.

The parties agree that FMNA is engaged in interstate commerce and that, except as provided in this Agreement, the FAA shall govern the interpretation and enforcement of, and all proceedings pursuant to, this Agreement.

12.     **Severability.**  The provisions of this Agreement are severable, and if any part is found to be unenforceable, the remainder shall remain fully valid and enforceable, with the unenforceable portions modified to the minimum extent necessary to render them enforceable (or to excise some or all of such provisions from the Agreement, if/as ever may be required).

13.     **No Oral Modification.**  Neither this Agreement nor any of its provisions may be altered, amended, or waived, except by an express written document signed by the Parties.

14.     **Entire Agreement/Non-Reliance.**  This Agreement contains the entire understanding between Employee and the Company relating to the subject matters hereof and supersedes any and all prior and contemporaneous understandings, discussions, agreements, representations, and warranties of any kind, whether written or oral, regarding any such subject matters, provided that the Parties agree that the Covenant Agreement shall remain in full force and effect.

15.     **Knowing and Voluntary Agreement.**  Employee is entering this Agreement knowingly and voluntarily, expressly acknowledging that:

        a.      Employee has read and understands each of the terms and provisions of this Agreement; and

        b.      Employee has had a reasonable opportunity of up to twenty-one (21) days to consider this Agreement prior to signing it (and, if Employee signs it prior to the end of such twenty-one (21), does so of Employee's own free choice); and

        c.      Employee has been advised of Employee's right and encouraged in writing (via this Agreement) to consult with an attorney of Employee's choosing prior to signing this Agreement and has had a full opportunity to consult with such attorney prior to signing this Agreement; and

        d.      Employee is entering this Agreement knowingly and willingly, without any duress, intimidation, or undue influence, and without any promises other than those expressly set forth herein.

16.     **Review Period; Effective Date.**  Employee is advised that Employee has twenty-one (21) days from the date this Agreement is delivered to Employee within which to consider whether to sign

this Agreement (the "**Review Period**").  If Employee executes this Agreement before the expiration of the Review Period, Employee will have done so knowingly and voluntarily and have chosen to waive the remainder of the Review Period. Employee will have a period of seven (7) calendar days after signing this Agreement to revoke Employee's signature on and agreement to be bound by the terms of this Agreement, by e-mailing notice of such revocation to Edward Sample, at *edward.sample@pagaya.com*, within such seven (7) day period (or, if Mr. Sample is no longer employed by the Company, the Chief People Officer of the Company).  This Agreement will become effective, if not sooner revoked by Employee, on the eighth (8th) day after Employee signs this Agreement (the "**Effective Date**").

17.      **Counterparts; Electronic Signature.**  This Agreement may be executed in counterparts and will be as fully binding as if signed in one entire document.  This Agreement may be signed by electronic signature and such signatures shall be valid and binding upon the Parties.

**THIS GENERAL RELEASE AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS, INCLUDING THOSE PURSUANT TO THE AGE DISCRIMINATION IN EMPLOYMENT ACT. HAVING ELECTED TO EXECUTE THIS AGREEMENT, TO FULFILL THE PROMISES AND TO RECEIVE THE BENEFITS AS SET FORTH IN SECTION 1 ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST THE COMPANY AND THE RELEASED PARTIES AS OF THE DATE OF EXECUTION OF THIS AGREEMENT AND TO RE-AFFIRM THE CONFIDENTIALITY, NON-COMPETITION, NON-SOLICITATION AND NON-DISPARAGEMENT TERMS AS SET FORTH IN EMPLOYEE'S COVENANT AGREEMENT WITH THE COMPANY.**

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement voluntarily and of their own free will and deed, after due time to review and consider it, and without any duress or coercion, as follows.

PAGAYA TECHNOLOGIES US LLC

By: _____

Name: [NAME]

Title: Chief People Officer

Date: _____

EMPLOYEE

Signature: _____

Print Name: [NAME]

Date: _____

Exhibit C
**Restrictive Covenant Agreement**

Exhibit C – Hugh Edmundson

**CONFIDENTIALITY, NON-COMPETITION, NON-INTERFERENCE, NON-SOLICITATION AND INVENTION ASSIGNMENT AGREEMENT**

This Confidentiality, Non-Competition, Non-Interference, Non-Solicitation and Invention Assignment Agreement ("Agreement"), effective as of the Closing Date (as defined below) (the "Effective Date"), is entered into by and among Pagaya Technologies US LLC, having a place of business at 90 Park Avenue, New York, NY ("Pagaya"), Theorem Technology, Inc. and its subsidiaries, having a place of business at 90 Park Avenue, New York, NY 10016 ("Employer", and together with Pagaya, the "Company Group") and Hugh Edmundson, an individual residing at [EMPLOYEE HOME ADDRESS] ("Key Employee"). Employer, Pagaya and Key Employee shall collectively be referred to as the "Parties."

**WHEREAS,** Employer, Pagaya and certain other parties have entered into an Agreement and Plan of Merger, dated as of July __, 2024 (the "Merger Agreement"), pursuant to which Pagaya will acquire one hundred percent (100%) of the outstanding shares of common stock of Employer, with Employer continuing as a wholly-owned subsidiary of Pagaya or one of its affiliates (the "Transaction");

**WHEREAS,** Key Employee is an employee of Employer and will receive substantial consideration upon the consummation of the Transaction and thereafter, and, accordingly, as a condition of Pagaya's willingness to enter into the Merger Agreement, the Parties are entering into this Agreement;

**WHEREAS**, as a material inducement for Pagaya to enter into the Merger Agreement and consummate the Transaction, Key Employee has agreed to continue employment with Employer and enter into this Agreement as of the date of the closing (the "Closing Date") in order to protect certain interests of the Company Group;

**WHEREAS,** as a further inducement and essential consideration for Employer to continue to employ Key Employee, and as a condition for Key Employee's continued employment with Employer, and in exchange for other good and valuable consideration, the Parties desire to memorialize the terms and conditions of Key Employee's obligations to the Company Group with respect to confidentiality, non-interference, non-solicitation and proprietary rights under this Agreement as of the Effective Date.

**NOW, THEREFORE**, in consideration of the mutual agreements set forth herein, the Parties hereby agree as follows:

**ARTICLE I**

**CONFIDENTIALITY**

I.1.    Confidential Information.

(A)    During the course of his employment, Key Employee has been and will continue to be provided with access to Confidential Information relating to Employer and/or the Company Group, their business, potential business, and the business and information of their clients and customers. "Confidential Information" includes all non-public information that relates to the actual or anticipated business or research and development of Employer and/or the Company Group, technical data, trade secrets, know-how, show-how, theories, and technical, operating, financial, and other business information, whether or not reduced to writing or other medium and whether or not marked or labeled confidential, proprietary or the like, specifically including, but not limited to, product plans or other information regarding Employer's products or services and markets, clients and customers (including clients and customers of Employer on whom Key Employee called or with whom Key Employee became acquainted during the term of Key Employee's employment),

information regarding source codes, software programs, computer systems, concepts, creations, costs, plans, materials, enhancements, research, specifications, works of authorship, techniques, documentation, models and systems, sales and pricing techniques, inventions, processes, formulas, technology, designs, inventions, discoveries, products, improvements, modifications, methodology, processes, concepts, records, files, memoranda, reports, plans, proposals, price lists, product development, project procedures, marketing, finances or other business information.

(B)     Confidential Information does not include information that is generally available to the public, other than information which has become generally available as a result of Key Employee's direct or indirect act or omission in violation of this Agreement or any other obligation owed to the Company Group or that Key Employee knows has become generally available due to the breach of any obligation to Employer by any third-party.

I.2.     With respect to Confidential Information of Employer and the Company Group and their clients and customers:

(A)     Key Employee will use Confidential Information only in the performance of Key Employee's duties for the Company Group. Key Employee will not use Confidential Information at any time (during or after Key Employee's employment with Employer) for Key Employee's personal benefit, for the benefit of any other individual or entity, or in any manner adverse to the interests of Employer and the Company Group and their clients and customers, except to the extent required by applicable law.

(B)     Key Employee will not disclose Confidential Information at any time (during or after Key Employee's employment with Employer) except to authorized Company Group personnel, unless the Company Group consents in advance in writing or unless the Confidential Information indisputably becomes of public knowledge or enters the public domain (other than through Key Employee's direct or indirect act or omission) or as authorized by a court or regulatory agency.

(C)     Key Employee will safeguard the Confidential Information by all reasonable steps and abide by all policies and procedures of the Company Group in effect from time to time regarding storage, copying, destroying, and handling of documents.

I.3.     Key Employee will return or destroy all materials, models, software, prototypes and the like containing and/or relating to Confidential Information, together with all other property of the Company Group and its clients and customers, to Employer when Key Employee's employment relationship with the Company Group terminates or otherwise on demand and, at that time Key Employee will certify to the Company Group, in writing and under oath, that Key Employee has complied with this Agreement. Key Employee shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, databases, diskettes, or other documents or electronically stored information of any kind relating in any way to the business, potential business or affairs of Employer and its clients and customers.

I.4.    <u>Permitted Disclosures</u>.

(A)     Key Employee acknowledges receipt of the following notice under the Defend Trade Secrets Act: An individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret if (i) he/she makes such disclosure in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney and such disclosure is made solely for the purpose of reporting or investigating a suspected violation of law; or (ii) such disclosure was made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal.  Key Employee understands that if Key Employee files a lawsuit for retaliation by Employer for reporting a suspected violation of law, Key Employee may disclose the trade secret to Key Employee's attorney and use the trade secret information in the court proceeding if Key Employee (x) files any document containing the trade secret under seal, and (y) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement, or any other agreement that Key Employee has with Employer, is intended to conflict with the Defend Trade Secrets Act or create liability for disclosures of trade secrets that are expressly allowed by such section.

(B)     Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement or any other agreement by and between Employer and Key Employee shall prohibit Key Employee from:

(i)      voluntarily communicating with an attorney retained by Key Employee;

(ii)     voluntarily communicating with any law enforcement or government agency, including the Securities and Exchange Commission ("<u>SEC</u>"), the Equal Employment Opportunity Commission, any state or local commission on human rights or any self-regulatory organization regarding possible violations of law, in each case without advance notice to Employer, or otherwise initiating, testifying, assisting, complying with a subpoena from, or participating in any manner with an investigation conducted by such government agency;

(iii)    recovering a SEC whistleblower award as provided under Section 21F of the Securities Exchange Act of 1934;

(iv)    disclosing any Confidential Information to a court or other administrative or legislative body in response to a subpoena, provided that Key Employee first promptly notifies and provides Employer with the opportunity to seek, and joins in its efforts at the sole expense of Employer, to challenge the subpoena or obtain a protective order limiting its disclosure, or other appropriate remedy; or

(v)     filing or disclosing any facts necessary to receive unemployment insurance, Medicaid or other public benefits to which Key Employee is entitled.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES; OBLIGATIONS TO OTHER PERSONS

II.1.    Key Employee represents and warrants the following to Employer and the Company Group, each of which is a material inducement to Key Employee's willingness to enter into this Agreement:

(A)     Key Employee is not a party to or bound by any employment agreement, restrictive covenant, non-compete restriction, non-solicitation restriction, and/or confidentiality or non-disclosure agreement with any other person, business or entity, or any agreement or contract requiring Employee to assign inventions to another party, and Key Employee has conducted a thorough review of any and all agreements Key Employee may have entered into with any current or former employer or any other relevant party to ensure that this representation and warranty is correct

(B)     Key Employee further represents and warrants that no agreement prohibits, restricts, limits or otherwise affects Key Employee's employment with Employer or ability to perform any of Key Employee's duties or responsibilities for Employer as contemplated herein.

(C)     Key Employee has not made any material misrepresentation or omission in the course of Key Employee's communications with Employer regarding any agreements or other obligations to any current or former employer.

(D)     Key Employee has not, directly or indirectly, removed, downloaded, or copied any confidential or proprietary information or records of any current or former employer without the express written consent of an authorized representative of such entity, and will not use or possess, as of the date Key Employee begins employment and during Key Employee's employment with Employer, any confidential or proprietary information or records of any current or former employer, whether in hard copy or electronic form, including, but not limited to, documents, files, disks, or other materials, all of which Key Employee is prohibited from using in connection with Key Employee's employment with Employer.

## ARTICLE III

### NON-COMPETITION & NON-INTERFERENCE, AND OTHER COVENANTS

III.1.   Covenants Against Interference with Business Relationships.

(A)     Key Employee acknowledges and understands that Key Employee's position with Employer affords Key Employee extensive access to Confidential Information of the Company Group. Key Employee therefore agrees that during the course of Key Employee's employment with Employer, Key Employee shall not, anywhere within the United States of America or any other country in which the Company Group then conducts or actively proposes to conduct business, either directly or indirectly, as an owner, stockholder, member, partner, joint venturer, officer, director, consultant, independent contractor, agent or executive, or in any other capacity, engage in or perform any services for or on behalf of himself or any business or other enterprise which is engaged in or is seeking to engage in a Competitive Business; provided that such Key Employee shall be permitted to (i) be a passive owner of less than five percent (5%) of the outstanding stock of any class of a corporation or other person which is publicly traded or which is privately held, so long as such Key Employee has no active participation in the business of such corporation, or (ii) perform services for a company that has a division or group which is a Competitive Business, provided that such Key Employee has no involvement at all with any division, group or subsidiary which is a Competitive Business.

(B)     As used in this Agreement, "Competitive Business" shall mean any of the following, any place in the United States and anywhere else in the world where any member of the Company Group is engaged in business:

4

(i)    A business that provides products or services related to the disposition, acquisition, facilitation or enablement of consumer credit, including as a direct-to-borrower provider of credit, originator or network enabling others to provide consumer credit;

(ii)    Any credit-related hedge fund which has a significant focus on consumer credit and competes with the Company Group by working directly or indirectly with originators of consumer credit; or

(iii)    Any other business, or part thereof, primarily providing products or services that are substantially similar to those products and services developed, marketed, or otherwise provided by any member of the Company Group as of the Closing Date, or actively planned to be developed, marketed, or otherwise provided by the Company Group , or actively planned to be developed, marketed, or otherwise provided by, Key Employee and/or any member of the Company Group as of the Closing Date.

III.2.    Covenants Against Solicitation. Key Employee further agrees that during the course of Key Employee's employment with Employer and for twelve (12) months thereafter (the "Restricted Period"), Key Employee shall not, directly or indirectly, either on Key Employee's own behalf or on behalf of any other individual or commercial enterprise, solicit, induce, or assist any third party in soliciting or inducing, any individual or entity who or which is then (or was at any time within the preceding twelve (12) months prior to the date Key Employee's employment with Employer terminates) an employee, consultant, independent contractor or agent of the Company Group to leave the employment or engagement of the Company Group or cease performing services for the Company Group.

III.3.    Non-Disparagement. Subject to the permitted disclosures in Article I.4, Key Employee agrees not to, at any time during Key Employee's employment and at all times following the termination of Key Employee's employment with Employer, disparage or make any oral or written statements that place in the negative light the business or reputation of Employer or the Company Group, or any of their respective clients and customers and their respective officers, directors, agents or employees (including on any social media site such as Glassdoor, LinkedIn, Facebook and Instagram). Nothing in this Agreement is intended to prevent Key Employee from providing truthful information to the extent required or permitted by applicable law or as requested by any regulatory or self-regulatory organization. Further, nothing in this Agreement prevents Key Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Key Employee has reason to believe is unlawful.

III.4.    Cooperation with Investigations/Litigation. Key Employee agrees that during Key Employee's employment and at all times thereafter, upon the Company Group's request, to reasonably cooperate both during and after Key Employee's employment with Employer in any investigations, litigation, arbitration, or regulatory proceedings relating to any events that occurred during Key Employee's employment with Employer. Key Employee will be reasonably available to consult with counsel for the Company Group, to provide information, and (to the extent requested) to appear to give truthful testimony. The Company Group will reimburse Key Employee for reasonable out-of-pocket meal and travel expenses Key Employee incurs in extending such cooperation, so long as Key Employee provides advance written notice of Key Employee's request for reimbursement and provides satisfactory documentation of the expenses.

III.5.    Reasonable Restrictions/Damages Inadequate Remedy. The Parties to this Agreement acknowledge that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate business interests of the Company Group and that any breach by Key Employee of any provision contained in this Agreement may result in immediate irreparable injury to the Company Group for which a remedy at

law would be inadequate. Accordingly, and notwithstanding the mandatory arbitration requirement for other claims as set forth in <u>Article V.7</u> below, the Parties shall be entitled to temporary or permanent injunctive or other equitable relief (without being obligated to post a bond or other collateral) from a court of competent jurisdiction or an arbitrator in the event of any breach or threatened breach of the provisions of this Agreement, in addition to any other remedy that may be available whether at law or in equity. The foregoing shall not prejudice the right of Employer and/or any other member of the Company Group to recover any other damages that may be available at law or equity or to require Key Employee to account for and pay over, and Key Employee hereby agrees to account for and pay over, the compensation, profits, monies, accruals or other benefits derived or received by Key Employee as a result of any act constituting a breach of this Agreement.

III.6.    <u>Tolling</u>. In the event of a breach or violation of Key Employee of <u>Article III.2</u> of this Agreement, the Restricted Period shall be tolled (retroactive to the date such breach commenced), until such breach or violation has been duly cured.

III.7.    <u>Separate Covenants</u>. In the event that any arbitrator or court of competent jurisdiction determines that any one or more of the provisions contained in this Agreement is invalid or unenforceable in any respect, then such provision shall be deemed modified, limited and restricted to the extent that the arbitrator or court deems necessary to render the provision to be valid and enforceable. It is the intention of the Parties to this Agreement that the covenants and restrictions in this Agreement be given the broadest interpretation permitted by law. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof. If, in any judicial or arbitration proceedings, a court of competent jurisdiction or arbitrator should refuse to enforce all of the separate covenants and restrictions in this Agreement, then such unenforceable covenants and restrictions shall be eliminated from the provisions of this Agreement for the purpose of such proceeding to the extent necessary to permit the remaining separate covenants and restrictions to be enforced in such proceeding.

## ARTICLE IV

## OWNERSHIP OF PROPRIETARY RIGHTS

IV.1.    <u>Proprietary Rights</u>. For the purposes of this Agreement, "<u>Proprietary Rights</u>" shall mean all right, title and interest (including any copyrights, patent rights, trademarks, servicemarks and trade names) in and to, or associated with, or arising from, any and all notes, data, reference materials, sketches, drawings, memoranda, documentation, and any and all work product conceived, created, reduced to any medium of expression and/or produced as part of the activities of Key Employee for the Company Group, including all written, graphical, pictorial, visual, audio, and audiovisual elements relating thereto, software code or records in any way incorporating or reflecting any Confidential Information and any original works of authorship, derivative works, inventions, developments, concepts, know-how, improvements, trade secrets or ideas, whether or not fixed in a tangible medium of expression, that are conceived or developed in whole or in part by Key Employee alone or in conjunction with others, whether or not conceived or developed during regular working hours by, or in association with, Employer that are made through the use of any Confidential Information or any of the Company Group's equipment, facilities, supplies, or trade secrets, or that relate to business of the Company Group or Employer's actual or demonstrably anticipated research and development, or that result from any work performed by Key Employee for the Company Group.

IV.2.    <u>Ownership of Proprietary Rights.</u> Key Employee covenants and agrees with the Company Group that all Proprietary Rights shall belong exclusively to Employer and/or the Company Group, and Key Employee agrees to assign and hereby assigns to the Company Group, all rights, title and interest throughout the world in and to all Proprietary Rights. Key Employee agrees to promptly make full written disclosure to the Company Group, and will hold in trust for the sole right and benefit of the Company Group, all

Proprietary Rights. Key Employee agrees that, upon request of the Company Group and without any separate remuneration or compensation, Key Employee shall take such action and execute and deliver such documents and instruments as may be necessary or proper to vest in the Company Group all right, title and interest in and to all such Proprietary Rights. Without limiting the foregoing, Key Employee further agrees that for any original works of authorship created by Key Employee, Employer and/or the Company Group shall be deemed the author thereof under the United States Copyright Act; provided, however, that in the event and to the extent such works do not to constitute "works made for hire" as a matter of law, Key Employee agrees to irrevocably assign and transfer, and hereby irrevocably assigns and transfers to Employer and/or the Company Group, all right, title and interest in and to such works, including but not limited to copyrights. Notwithstanding any other provision in this Section IV.2, Key Employee understands and agrees that Key Employee does not have to and should not disclose or assign to the Company any Proprietary Right that by law (including, without limitation, any intellectual property that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit A)) Key Employee cannot be required to assign.

IV.3.    Maintenance of Records. Key Employee covenants and agrees to take commercially reasonable measures to keep and maintain adequate and current written records of all inventions and works of authorship made by Key Employee (solely or jointly with others) during the course of Key Employee's relationship with Employer. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, and any other format. The records will be available to and remain the sole property of Employer and/or the Company Group at all times. Key Employee agrees not to remove such records from Employer's place of business except as expressly permitted by Company Group policy, which may, from time to time, be revised at the sole election of the Company Group. Key Employee agrees to return all such records (including any copies thereof) to the Company Group at any time Employer and/or the Company Group requests and at the time of termination of services with Employer.

IV.4.    Recordation of Proprietary Rights. Key Employee covenants and agrees to assist Employer and/or the Company Group, or their designee, at Employer's or and/or the Company Group's expense, in every proper way to secure Employer's and/or the Company Group's, or their designee's, rights in Proprietary Rights in any and all countries, including the disclosure to Employer and/or the Company Group or their designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordation, and all other instruments that Employer and/or the Company Group or their designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to Employer and/or the Company Group or their designee and any successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Proprietary Rights. Key Employee further agrees that the obligation to execute or cause to be executed, when it is in Key Employee's power to do so, any such instrument or papers shall continue after the termination of this Agreement until the expiration of the last such intellectual property right to expire in any country of the world. If Employer and/or the Company Group or their designee is unable because of Key Employee's mental or physical incapacity or unavailability or for any other reason to secure Key Employee's signature to apply for or to pursue any application for any United States or foreign patents, copyrights, or other registrations covering Proprietary Rights assigned or to be assigned to Employer and/or the Company Group or their designee as above, then Key Employee hereby irrevocably designates and appoints Employer and/or the Company Group and their duly authorized officers and agents as Key Employee's agent and attorney-in-fact, to act for and on Key Employee's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright or other registrations thereon with the same legal force and effect as if originally executed by Key Employee. Key Employee hereby waives and irrevocably quit claims to Employer and/or the Company Group or their designee any and all claims, of any nature whatsoever, that Key Employee now or hereafter has for

infringement of any and all proprietary rights assigned to Employer and/or the Company Group or such designee.

## ARTICLE V

## MISCELLANEOUS

V.1.    <u>Benefit of Agreement and Assignment</u>. Employer and the Company Group may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of Employer or the Company Group. This Agreement shall inure to the benefit of each member of the Company Group and each of their respective successors and assigns, and shall be binding upon the Company Group and its successors and assigns. This Agreement shall also inure to the benefit of and be binding upon Key Employee and Key Employee's heirs, administrators, executors and assigns. Key Employee may not assign or delegate Key Employee's duties under this Agreement, without the prior written consent of Employer.

V.2.    <u>Notices</u>. All notices, requests, demands and other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given (A) on the date delivered if personally delivered or if delivered by email, (B) upon receipt by the receiving party of any notice sent by registered or certified mail (first-class mail, postage pre-paid, return receipt requested) or (C) on the date targeted for delivery if delivered by nationally recognized overnight courier or similar courier service, in each case addressed to Employer or Key Employee, as the case may be, at the respective addresses indicated in the caption of this Agreement or such other address as any Party may in the future specify in writing to the other.

V.3.    <u>Entire Agreement/Modification</u>. This Agreement, together with the agreements expressly referred to herein, contains the entire agreement of the Parties related to the subject matters set forth herein and therein, and supersedes any and all prior or contemporaneous agreements and understandings, whether written or oral, between the Parties with respect to the subject matters of this Agreement. Key Employee acknowledges and agrees that Key Employee has not relied on any such prior or contemporaneous agreements or understandings. This Agreement may not be changed or modified except by an instrument in writing, signed by Key Employee and an authorized representative of Employer and/or the Company Group.

V.4.    <u>No Waiver</u>. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a continuing waiver or as a consent to or waiver of any subsequent breach hereof.

V.5.    <u>Rule of Construction</u>.  The Parties hereby expressly acknowledge that each of them has had the opportunity to have their respective counsel review and modify this Agreement. Accordingly, no Party hereto shall be presumptively entitled to have any provisions of this Agreement construed against any other Party hereto in accordance with any rule of law, legal decision or doctrine, which would require the interpretation of any ambiguities in this Agreement against the party that drafted it.

V.6.    <u>Headings</u>. The Article and Section headings in this Agreement are for the convenience of reference only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

V.7.    <u>Confidential/Mandatory Arbitration</u>.

(A)    Except as otherwise set forth herein, all disputes, claims, or controversies arising out of or relating in any way to Key Employee's employment with Employer or any of its parents, affiliates

or subsidiaries, the termination thereof, and/or this Agreement, including all statutory, contractual, and common law claims, shall be finally settled by confidential binding arbitration before a single arbitrator selected by the express mutual agreement of Key Employee, Employer and the Company Group, or in the absence of such agreement a single arbitrator selected in accordance with the JAMS Comprehensive Arbitration Rules and Procedures, including the Emergency Relief Procedures and Expedited Procedures (the "Rules") of JAMS; provided, however, that nothing herein will require arbitration of any claim or charge which, by law, cannot be the subject of a compulsory arbitration agreement; provided, further, that, notwithstanding anything to the contrary herein, Key Employee may, but is not required to, arbitrate claims for sexual harassment or assault to the extent applicable law renders a pre-dispute arbitration agreement covering such claims invalid or unenforceable.

(B)     Any arbitration hereunder shall be conducted before JAMS pursuant to the Rules then in effect. The Rules are available online at https://www.jamsadr.com/rules-comprehensive-arbitration/, or upon request to Employer. Key Employee, Employer and any other member of the Company Group may bring claims against the other only in that Party's individual capacity and not as a plaintiff or class member in any purported class, collective, or representative proceeding.

(C)     Employer shall initially bear the cost of the JAMS filing fees and the arbitrator's fees, unless otherwise ordered by the arbitrator or expressly required by the Rules. Each Party shall bear such Party's own legal expenses and disbursements incurred in connection with the arbitration, except that the arbitrator shall have the power, but shall not be required to award, attorney's fees and disbursements to the Party that substantially prevails (including any fees and expenses of JAMS and the arbitrator paid by Employer if Employer is the prevailing party), as further set forth in paragraph F below. Any arbitration commenced by any Party shall be held in San Mateo, California, or at such other location as the Parties may agree.

(D)     The Parties acknowledge and agree that all aspects of any arbitration proceeding pursuant to this Agreement (including all submitted evidence and all determinations made by the arbitrator) constitute "Confidential Information" under this Agreement, and the Parties and their agents agree not to disclose to any third party (i) the existence or status of the arbitration, (ii) any information made known and documents produced in the arbitration not otherwise in the public domain, and (iii) any awards arising from the arbitration, except and to the extent that disclosure is required by applicable law or is required to protect or pursue a legal right.

(E)     Except as otherwise set forth herein, Key Employee understands and acknowledges that by entering into this Agreement, Key Employee is waiving Key Employee's right to have a court and a jury determine Key Employee's rights. The decision of the Arbitrator shall contain findings of fact and conclusions of law, shall be final and binding, and shall not be appealable upon any grounds other than as permitted pursuant to the Federal Arbitration Act.

(F)     The arbitrator will be empowered to award any Party any remedy at law or in equity, including, but not limited to monetary damages, an injunction and specific performance of any obligation under this Agreement, and attorney's fees and costs, that the Party would otherwise have been entitled to had the matter been litigated in court; provided, however, that (i) the authority to award any remedy is subject to whatever limitations, if any, exist in the applicable law on such remedies, and (ii) the arbitrator shall not be permitted to award consequential or punitive damages.

V.8.     Certain Claim Filing by Employer. Notwithstanding anything in Article V.7, any of the Parties may elect to file and pursue (in federal or state court, in accordance with Article V.9) claims for temporary or permanent injunctive or other equitable relief.

V.9.  Governing Law; Jurisdiction.

(A)  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to any conflict of law principles thereof that would give rise to the application of the laws of any other jurisdiction and except for Article V.7, which shall be governed by the Federal Arbitration Act, Title 9, United States Code.

(B)  Without limiting the requirements of Article V.7, any judicial action arising from or related to this Agreement shall be brought only in the United States District Court for the District of Delaware in Wilmington, Delaware, or, if such court lacks subject matter jurisdiction, in any state court of competent jurisdiction in Wilmington, Delaware. Key Employee hereby expressly and irrevocably consents and submits to the jurisdiction of such courts. Key Employee waives, to the fullest extent permitted by applicable law, any objection which Key Employee now or hereafter has to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in an arbitration or court, as applicable, and agrees that Key Employee shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court.

(C)  SUBJECT TO APPLICABLE LAW, THE COMPANY GROUP, EMPLOYER AND KEY EMPLOYEE HEREBY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY.

(D)  KEY EMPLOYEE ACKNOWLEDGES AND AGREES THAT KEY EMPLOYEE WAS INDIVIDUALLY REPRESENTED BY INDEPENDENT COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT AND THIS SECTION, IN PARTICULAR. ACCORDINGLY, KEY EMPLOYEE UNDERSTANDS THAT THE PROVISIONS OF SECTION 925(A) OF THE CALIFORNIA LABOR CODE DO NOT APPLY TO THE FORUM OR VENUE SELECTION OR CHOICE OF LAW PROVISIONS SET FORTH IN THIS LETTER.

V.10.  Counterparts. This Agreement may be executed in one more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument. Signatures may be exchanged by electronic means.

V.11.  Agreement to Take Actions. Each Party to this Agreement shall execute and deliver such documents, certificates, agreements and other instruments, and shall take all other actions, as may be reasonably necessary or desirable in order to perform such Party's obligations under this Agreement.

V.12.  Survival. The Parties acknowledge and agree that the post-employment terms and conditions of this Agreement, including as set forth in Article I, Article III and Article IV herein, shall survive the termination of Key Employee's employment with Employer.

[*Signature Page Follows*]

IN WITNESS WHEREOF, Employer, Pagaya and Key Employee have duly executed this Agreement voluntarily and of their own free act and deed, without any coercion, duress or undue influence, as of the date first written above.

EMPLOYER:  Theorem Technology, Inc.


_____
Name:
Title:


KEY EMPLOYEE: Hugh Edmundson


_____


Pagaya Technologies US LLC


_____

Name: Susie Robinson
Title: Chief People Officer

[*Signature Page to Confidentiality, Non-Competition, Non-Interference, and Invention Assignment Agreement*]

<u>Exhibit A</u>

<u>If Key Employee employed by the Company in the State of California, the following provision applies:</u>

**California Labor Code Section 2870.** Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

> (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

> (2) Result from any work performed by the employee for his employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.