# EXHIBIT A

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GEORGE B. ADAMS III, SBN 321904
    gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendants PAGAYA TECHNOLOGIES LTD.,
THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        7/17/2025
By____/s/ **Kimberly Claussen**____
                **Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| HUGH EDMUNDSON, an individual,<br><br>                Plaintiff,<br><br>        v.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>                Defendants. | CASE NO. 25-CIV-04254<br><br>**DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**<br><br>ASSIGNED FOR ALL PURPOSES TO:<br>HON. JEFFREY R. FINIGAN<br>DEPT. 24<br><br>Action Filed:   June 4, 2025<br>Trial Date:     None set. |

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF HUGH EDMUNDSON AND HIS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT Defendants Pagaya Technologies Ltd., Theorem Technology, Inc. and Theorem Partners, LLC have removed the above-entitled action from the Superior Court in and for the County of San Mateo to the United States District Court for the Northern District of California. The Notice of Removal by Defendants was filed in the United States District Court for the Northern District of California on July 17, 2025.

A copy of the Notice of Removal and supporting documents filed in the Northern District of California are attached hereto as **Exhibit 1**, have been served on Plaintiff, and are fully incorporated herein by reference, thus effecting removal pursuant to 28 U.S.C. § 1446(d). Accordingly, this Court is respectfully requested to proceed no further in this action. (See 28 U.S.C. § 1446(d).)

DATED: July 17, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Katherine V.A. Smith*
Katherine V.A. Smith

Attorneys for Defendants PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC

Gibson, Dunn & Crutcher LLP

DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT

# EXHIBIT 1

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GEORGE B. ADAMS III, SBN 321904
    gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendants
PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY,
INC., THEOREM PARTNERS, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HUGH EDMUNDSON, an individual,<br><br>   Plaintiff,<br><br>  v.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>   Defendants. | CASE NO. 3:25-cv-06029<br><br>**NOTICE OF REMOVAL OF ACTION BY DEFENDANTS PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., AND THEOREM PARTNERS, LLC**<br><br>(Originally filed in the Superior Court in and for the County of San Mateo, Case No. 25-CIV-04254) |

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' NOTICE OF REMOVAL
CASE NO. 3:25-cv-06029

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, AND TO PLAINTIFF HUGH EDMUNDSON AND HIS COUNSEL OF RECORD:

**PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. §§ 1332 and 1441, Defendants Pagaya Technologies Ltd. ("Pagaya"), Theorem Technology, Inc., and Theorem Partners, LLC (together with Theorem Technology, Inc., "Theorem," and with Pagaya, "Defendants") hereby remove to the United States District Court for the Northern District of California, San Francisco Division, the above-captioned state court action, originally filed as Case No. 25-CIV-04254 in the Superior Court in and for the County of San Mateo.  Removal is proper on the following grounds:

**TIMELINESS OF REMOVAL**

1.      On June 4, 2025, Plaintiff Hugh Edmundson filed this Complaint against Defendants in the Superior Court in and for the County of San Mateo.  Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the (a) Summons; (b) Complaint; (c) Civil Cover Sheet; (d) Notice of Assignment and Case Management Conference; (e) Notice and Acknowledgement of Service on Pagaya; (f) Notice and Acknowledgement of Service on Theorem Technology, Inc.; and (g) Notice and Acknowledgement of Service on Theorem Partners, LLC are attached hereto as Exhibits A through G to the Declaration of Katherine V.A. Smith, filed concurrently herewith.

2.      According to the Notice and Acknowledgement of Service, Plaintiff completed service on Pagaya and Theorem on June 17, 2025.  Smith Decl., Exs. E-G.

3.      Under 28 U.S.C. § 1446, a defendant may remove an action from state to federal court "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading."  28 U.S.C. § 1446(b)(1).

4.      The statutory deadline to remove this action is July 17, 2025.  Fed. R. Civ. P. 6(a)(C).  Removal is therefore timely.[1]

---

[1] Defendants believe that Plaintiff's claims are subject to mandatory arbitration under the terms of Plaintiff's employment agreement.  By filing this Notice of Removal, Defendants do not waive and expressly reserve any and all rights to move in the U.S. District Court for the Northern District of California or any other forum to compel Plaintiff's claims to arbitration.

Gibson, Dunn & Crutcher LLP

**SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL**

5.     Plaintiff is a disgruntled former officer of Theorem, who was terminated for cause on April 27, 2025, following a unilateral, unauthorized effort to return $120 million in investor capital from Theorem-managed funds—an effort he actively concealed in the moment and then lied about after the fact when Pagaya investigated.

6.     Plaintiff asserts claims under California law for: (1) Whistleblower Retaliation; (2) Retaliation; (3) Aiding and Abetting Retaliation; (4) Wrongful Termination; (5) Aiding and Abetting Wrongful Termination; (6) Breach of Contract (Employment Agreement); (7) Breach of Implied Covenant of Good Faith and Fair Dealing; (8) Breach of Contract (Restricted Stock Unit Award Agreement); (9) Breach of Implied Covenant of Good Faith and Fair Dealing; (10) Unfair Competition; (11) Defamation; (12) Intentional Infliction of Emotional Distress; (13) Declaratory Relief; (14) Failure to Produce Personnel Records; and (15) Failure to Produce Wage Records. *See* Smith Decl., Ex. B (Compl.) ¶¶ 116–245.

7.     For purposes of this removal only, Defendants assume Plaintiff's allegations are true.[2]

8.     Removal is proper pursuant to 28 U.S.C. § 1332 because, as described below, there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Defendants deny Plaintiff's factual allegations and that he is entitled to any relief. Based on the allegations in the Complaint and Plaintiff's prayer for relief, however, all requirements for federal jurisdiction under Section 1332 have been met, and this Court has original jurisdiction over this action.

**A.     There Is Complete Diversity of Citizenship**

9.     The first requirement for removal under 28 U.S.C. § 1332 is satisfied because Plaintiff

---

[2] Defendants deny that liability or damages can be established as to Plaintiff. Defendants do not concede and reserve the right to contest, at the appropriate time, that any of Plaintiff's allegations constitute a cause of action against it under applicable California law. No statement or reference contained herein shall constitute an admission of liability or a suggestion that Plaintiff will or could actually recover any damages based upon the allegations contained in the Complaint or otherwise. Defendants' notice seeks only to establish that the amount in controversy is more likely than not in excess of section 1332's jurisdictional minimum. "The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Lewis v. Verizon Commc'ns., Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

Gibson, Dunn & Crutcher LLP

3

and Defendants are "citizens of different states."  28 U.S.C. § 1332(a).

10.     For diversity purposes, a person is a citizen of the state in which he or she is domiciled. *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983).  A party is domiciled where she "resides with the intention to remain or to which she intends to return."  *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).  A party's residence is prima facie evidence of his or her domicile.  *Elhania v. Airbnb, Inc.*, 2023 WL 3510378, at *2 (N.D. Cal. May 16, 2023) (citing *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994)).

11.     Plaintiff is an individual residing in California, Ex. B (Compl.) ¶ 15, which is prima facie evidence that he is domiciled in California, *Elhania*, 2023 WL 351038, at *2.  Defendants "may rely on the presumption of continuing domicile, which provides that, once established, a person's state of domicile continues unless rebutted with sufficient evidence of change."  *Mondrago v. Cap. One Auto Fin.*, 736 F.3d 880, 885 (9th Cir 2013).

12.     Pursuant to 28 U.S.C. § 1332, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The "principal place of business" for the purpose of determining diversity subject matter jurisdiction refers to "the place where a corporation's officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).  Ordinarily, this is the company's headquarters, "provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings."  *Id.*

13.     Pagaya is incorporated under the laws of Israel and has its headquarters and principal place of business in New York.  Declaration of Natalie Wilmore ISO Removal ("Wilmore Decl.") ¶¶ 2–3.  New York is the center of direction, control, and coordination for Pagaya's operations, and key executives of Pagaya are based out of its New York headquarters.  *Id.*, ¶ 3.  The foregoing was and is true at the time the Complaint was filed and at the time of removal.  *Id.*, ¶ 7.  Accordingly, Pagaya is a citizen of Israel and the State of New York for purposes of determining diversity.  *See* 28 U.S.C. § 1332(c)(1).

14.     Theorem Technology, Inc. is incorporated under the laws of Delaware and has its

headquarters and principal place of business in New York. Wilmore Decl., ¶¶ 4–5. New York is the center of direction, control, and coordination for Theorem Technology, Inc.'s operations, and key executives of Theorem Technology, Inc. are based out of its New York headquarters. *Id.*, ¶ 5. The foregoing was and is true at the time the Complaint was filed and at the time of removal. *Id.*, ¶ 7. Accordingly, Theorem Technology, Inc. is a citizen of the States of Delaware and New York for purposes of determining diversity. *See* 28 U.S.C. § 1332(c)(1).

15. In the case of a limited liability company, courts consider the citizenship of each member or owner of the company. *See, e.g.*, *Johnson v. Columbia Props. Anchorage, L.P.*, 437 F.3d 894, 899 (9th Cir. 2006) ("[L]ike a partnership, an LLC is a citizen of every state in which its owners/members are citizens."). Theorem Partners, LLC's sole member and owner is Theorem Technology, Inc. Wilmore Decl. ¶ 6. As set forth above, Theorem Technology, Inc. is a citizen of New York and Delaware. *Id.*, ¶¶ 4–5. Accordingly, Theorem Partners, LLC is also a citizen of the States of New York and Delaware for purposes of determining diversity. *See* 28 U.S.C. § 1332(c)(1).

16. Accordingly, at the time the Complaint was filed and at the time of removal, there was and is complete diversity of citizenship between Plaintiff and all Defendants. *See* 28 U.S.C. § 1332(a).

**B.     The Amount in Controversy Exceeds $75,000**

17. The second requirement for removal under 28 U.S.C. § 1332 is also satisfied because the amount in controversy as alleged by Plaintiff exceeds $75,000.

18. Courts evaluate a removing defendant's assertion of the amount in controversy under a "preponderance of the evidence" standard. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996); 28 U.S.C. § 1446(c)(2)(B). Although "[u]sually, 'preponderance of the evidence' is a phrase used for determining whether a factual allegation is, in fact, true," "a defendant is not required to admit, and is certainly not required to *prove*, the truth of plaintiff's assertions before invoking diversity jurisdiction." *Patel v. Nike Retail Servs., Inc.*, 58 F. Supp. 3d 1032, 1040 (N.D. Cal. 2014). "The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Lewis*, 627 F.3d at 400; *see also McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008) (cited with approval in *Lewis*) ("The amount in controversy is not proof of the amount the plaintiff will recover. Rather, it is an estimate of the amount that will be put at issue

Gibson, Dunn & Crutcher LLP

5

in the course of the litigation.").

19.     A removing defendant is not required to "'research, state, [or] prove the plaintiff's claims for damages.'" *Lippold v. Godiva Chocolatier, Inc.*, 2010 WL 1526441, at *3 (N.D. Cal. Apr. 15, 2010). Instead, a removing defendant may make a "reasonable extrapolation[] from the plaintiff's allegations suffic[ient] to establish the amount in controversy." *Patel*, 58 F. Supp. 3d at 1041; *see also, e.g.*, *Lippold*, 2010 WL 1526441, at *3 (finding it reasonable for defendant to assume that plaintiff worked "13 hours a day every day that plaintiff worked for" defendant, because plaintiff alleged that he "regularly and/or consistently worked in excess of 12 hours per day"); *Archuleta v. Avcorp Composite Fabrication, Inc.*, 2018 WL 6382049, at *3 (C.D. Cal. Dec. 6, 2018) ("[D]efendants who prepare a 'well-founded evidentiary record' are entitled to make 'reasonable extrapolations' from the allegations in the complaint."). Moreover, in assessing whether the amount in controversy requirement has been satisfied, "a court must 'assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint.'" *Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 648 (9th Cir. 2012). In other words, the focus of the Court's inquiry must be on "what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008).

20.     The amount in controversy in this action exceeds $75,000 exclusive of interest and costs, because Plaintiff seeks, among other relief, "lost wages, benefits, bonuses, and other compensation, including the full amount of his lost earn-out consideration." Ex. B, Prayer for Relief ¶ 3. Plaintiff alleges his share of the earn-out consideration from the merger was approximately $43 million at the time of the merger, but it was "reduced to merely $8 million." *Id.*, ¶ 115. Thus, Plaintiff's alleged lost earn-out consideration is $35 million, which exceeds the amount-in-controversy requirement. 28 U.S.C. § 1332(a). Moreover, the total amount in controversy may well be higher, as this figure does not include the non-economic, punitive damages, or other compensation that Plaintiff demands in his Complaint. Ex. B, Prayer for Relief ¶¶ 4–7. Nor does it include possible attorneys' fees, which Plaintiff demands pursuant to Cal. Gov't Code § 12965, and which also count toward the amount in controversy. *See* Smith Decl., Ex. B, Prayer for Relief ¶ 10; *see also Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) ("[A] court must include future attorneys' fees

recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met.").

### THE COURT HAS JURISDICTION AND REMOVAL IS PROPER

21.    Based on the foregoing facts and allegations, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because:

a) This is a civil action within the meaning of § 1332(a);

b) The properly named parties are citizens of different states as required by § 1332(a)(1); and

c) The amount in controversy exceeds $75,000 as required by § 1332(a).

Accordingly, this action is properly removable under 28 U.S.C. § 1441.

22.    The United States District Court for the Northern District of California, San Francisco Division is the federal judicial district in which the Superior Court in and for the County of San Mateo sits.  This action was originally filed in the Superior Court in and for the County of San Mateo, Ex. B, rendering venue in this federal judicial district and division proper.  28 U.S.C. § 84(a); *see also* 28 U.S.C. § 1441(a).

23.    True and correct copies of the (a) Summons; (b) Complaint; (c) Civil Cover Sheet; (d) Notice of Assignment and Case Management Conference; (e) Notice and Acknowledgement of Service on Pagaya; (f) Notice and Acknowledgement of Service on Theorem Technology, Inc.; and (g) Notice and Acknowledgement of Service on Theorem Partners, LLC are attached as Exhibits A through G to the Smith Declaration, filed concurrently herewith.  These filings constitute the complete record of all records and proceedings in the state court.

24.    Upon filing the Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court in and for the County of San Mateo, pursuant to 28 U.S.C. § 1446(d).

Gibson, Dunn &
Crutcher LLP

7

DATED: July 17, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Katherine V.A. Smith*
Katherine V.A. Smith

Attorneys for Defendants PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GEORGE B. ADAMS III, SBN 321904
    gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendants
PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY,
INC., THEOREM PARTNERS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| HUGH EDMUNDSON, an individual,<br><br>                    Plaintiff,<br><br>        v.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>                    Defendants. | CASE NO. 3:25-cv-06029<br><br>**DECLARATION OF KATHERINE V.A. SMITH IN SUPPORT OF NOTICE OF REMOVAL**<br><br>(Originally filed in the Superior Court in and for the County of San Mateo, Case No. 25-CIV-04254) |

I, Katherine V.A. Smith, declare as follows:

1.    I am an attorney admitted to practice law before this Court and all of the Courts of the State of California.  I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendants Pagaya Technologies Ltd. ("Pagaya"), Theorem Technology, Inc., and Theorem Partners, LLC (together with Theorem Technology, Inc., "Theorem," and with Pagaya, "Defendants") in the above-captioned action.  I offer this declaration in support of Defendants' Notice of Removal of the instant action from the California Superior Court in and for the County of San Mateo, to the United States District Court for the Northern District of California.  I have personal knowledge of the facts set forth in this declaration and, if called to testify, I could and would competently testify to them.

2.    In accordance with 28 U.S.C. § 1446(a), Exhibits A through G to this declaration include "all process, pleadings and orders" relevant to this action.

3.    Attached hereto as **Exhibit A** is a true and correct copy of the Summons filed by Plaintiff Hugh Edmundson ("Plaintiff") in the Superior Court in and for the County of San Mateo on June 4, 2025 and served on Defendants on June 17, 2025.

4.    Attached hereto as **Exhibit B** is a true and correct copy of the Complaint filed by Plaintiff in the Superior Court in and for the County of San Mateo on June 4, 2025 and served on Defendants on June 17, 2025.

5.    Attached hereto as **Exhibit C** is a true and correct copy of the Civil Case Cover Sheet filed by Plaintiff in the Superior Court in and for the County of San Mateo on June 4, 2025.

6.    Attached hereto as **Exhibit D** is a true and correct copy of the Notice of Assignment and Case Management Conference dated June 4, 2025.

7.    Attached hereto as **Exhibit E** is a true and correct copy of the Notice and Acknowledgement of Service on Pagaya dated June 17, 2025.

8.    Attached hereto as **Exhibit F** is a true and correct copy of the Notice and Acknowledgement of Service on Theorem Technology, Inc. dated June 17, 2025.

9.    Attached hereto as **Exhibit G** is a true and correct copy of the Notice and Acknowledgement of Service on Theorem Partners, LLC dated June 17, 2025.

Gibson, Dunn & Crutcher LLP

2

DECLARATION OF KATHERINE V.A. SMITH IN SUPPORT OF NOTICE OF REMOVAL
CASE NO. 3:25-cv-06029

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California, on this 17th day of July 2025.


/s/ Katherine V.A. Smith
Katherine V.A. Smith

DECLARATION OF KATHERINE V.A. SMITH IN SUPPORT OF NOTICE OF REMOVAL
CASE NO. 3:25-cv-06029

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
HUGH EDMUNDSON, an individual

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED**
by Superior Court of California, County of San Mateo
ON 6/4/2025
By **/s/ Anthony Berini**
**Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* SAN MATEO SUPERIOR COURT

Hall of Justice, 400 County Center, 1st Floor, Redwood City, CA 94063

CASE NUMBER:
*(Número del Caso):* **25-CIV-04254**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Diane Doolittle,Quinn Emanuel Urquhart & Sullivan, LLP;555 Twin Dolphin Drive, 5th Fl, Redwood Shores, CA 94065;(650)801-5000

DATE: June 4, 2025          Chad L. Peace          Clerk, by          /s/ Anthony Berini          , Deputy
*(Fecha)*                                          *(Secretario)*                                          *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# EXHIBIT B

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        6/4/2025
By_____ /s/ **Anthony Berini**
Deputy Clerk

QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Diane Doolittle (CA Bar No. 142046)
 dianedoolittle@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

 Michael Liftik (CA Bar No. 232430)
 michaelliftik@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone:    (202) 538-8000
Facsimile:    (202) 538-8100

*Attorneys for Plaintiff Hugh Edmundson*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| HUGH EDMUNDSON, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br>Case No.    25-CIV-04254<br><br>**COMPLAINT For:**<br>1. **Retaliation in Violation of California Labor Code § 1102.5**<br>2. **Retaliation in Violation of California Government Code § 12940(h)**<br>3. **Aiding and Abetting Retaliation**<br>4. **Wrongful Termination in Violation of Public Policy**<br>5. **Aiding and Abetting Wrongful Termination**<br>6. **Breach of Contract (Employment Agreement)**<br>7. **Breach of Implied Covenant of Good Faith and Fair Dealing (Employment Agreement)**<br>8. **Breach of Contract (RSU Agreement)**<br>9. **Breach of Implied Covenant of Good Faith and Fair Dealing (RSU Agreement)**<br>10. **Violation of California Business & Professions Code § 17200 (Unfair Competition Law)**<br>11. **Defamation**<br>12. **Intentional Infliction of Emotional Distress (IIED)**<br>13. **Declaratory Relief**<br>14. **Failure to Produce Personnel Records (Cal. Labor Code § 1198.5, and § 432)**<br>15. **Failure to Produce Wage Records (Cal. Labor Code § 226)** |

COMPLAINT

Plaintiff Hugh Edmundson ("Plaintiff"), an individual, by and through his undersigned counsel, brings this Complaint against Defendants Pagaya Technologies Ltd. (NASDAQ: PGY) ("Pagaya"), Theorem Technology, Inc., and Theorem Partners, LLC (collectively, "Theorem") (Pagaya and Theorem are collectively referred to as "Defendants"), and DOES 1-100, and alleges as follows:

## INTRODUCTION

1.    Plaintiff Hugh Edmundson ("Plaintiff"), the founder, and at various times, the Chief Executive Officer and Chief Investment Officer of Theorem, built this California-based hedge fund from the ground up, transforming it into a leading force in consumer credit investment. Started in 2014 with less than $1 million of assets under management, Theorem quickly became a dominant player in the industry, pioneering machine-learning models to analyze and price consumer loans, evaluate loan origination platforms, and oversee investments for some of the world's largest institutional investors—including endowments, sovereign wealth funds, pensions, healthcare organizations, insurance companies, and family offices. Under Plaintiff's leadership, Theorem successfully managed more than $1.7 billion in assets by 2024, collectively acquired over $10 billion in consumer loans, with $2.6 billion sourced through custom partner integrations, and earned a reputation as one of the most sophisticated fintech platforms in the market.

2.    Plaintiff's contributions extended beyond technical innovations. His strategic vision led to the merger with Pagaya Technologies Ltd. (NASDAQ: PGY), a publicly traded company, which would allow it to expand its AI-driven financial product offerings. The merger, announced in July 2024 and completed in October 2024, was marketed by Pagaya as a strategic union that would preserve Theorem's autonomy and investment process while leveraging Pagaya's resources to expand its fund management business to over $3 billion in capital.

3.    To protect investors, Theorem negotiated critical safeguards into the merger agreement and letter to investors (Investor Letter) dated July 31, 2024. These protections included explicit commitments that:

> Pagaya's intention is for Theorem's current investment committee to maintain control and discretion over the Funds' investment strategy for at least the first year. A material reconstitution or diminution in the scope or authority of the investment committee during

the first year would result in clients having the opportunity to redeem and elect a liquidating trust.

*See* Exhibit I, Form of Transaction Notice (Investor Letter) of the Merger Agreement.

Material reconstitution or diminution of the scope or authority of the TIC (through expansion, removals, material changes in responsibilities or otherwise) that results in the legacy members of the TIC becoming a minority or ceasing collectively to have material control over investment decisions for the Theorem funds.

*See* Theorem Integration and Operating Principles, Schedule 1.1(i) of the Merger Agreement.

4.     These representations were critical to securing client approval and were heavily relied upon by investors in consenting to the merger. The protections ensured Theorem's Investment Committee (Theorem IC), of which Plaintiff was a member since inception, would remain independent in its investment decision-making, that the Theorem research team would continue to apply its quantitative, research-based underwriting process, and that Pagaya would not change the fund's administrator, valuation agent, or valuation processes during the first year.

5.     In reality, the promises Pagaya made to Plaintiff, investors, and regulators were calculated deceptions. Almost immediately after the merger closed, Defendants began systematically dismantling Theorem's independence and strategic decision-making authority. Rather than honoring their commitments, Defendants seized control over Theorem's investment process, drastically curtailed the Theorem IC's ability to invest in 3rd party platforms, pushed out key personnel, and deliberately misled investors about the company's stability and governance structure—all to serve their own financial interests at the expense of Theorem's clients.

6.     Shortly after the merger was finalized, Plaintiff presented the Theorem team with "opportunities" to purchase Pagaya-originated whole loans. Upon conducting thorough analysis, however, the Theorem research team identified concerning increases in losses. Based on this analysis, the team concluded that the expected returns for the Pagaya product did not align with the funds' investment objectives and were less attractive compared to other opportunities from third-party loan origination platforms. Plaintiff communicated these findings to Pagaya and proposed constructive alternatives, but Pagaya failed to provide meaningful responses.

7.     Following the merger, Plaintiff, in his capacity as Chief Investment Officer of Theorem and continuing member of the Theorem IC, attended the inaugural meeting of the Pagaya

-3-
COMPLAINT

Capital Deployment Committee (PCDC). During this meeting, Pagaya announced a stunning directive: the Theorem IC was prohibited from investing in loans from third-party lending platform programs, effectively forcing investments into lesser-performing, Pagaya-sponsored programs only. These included long established programs with lenders such as LendingClub, BestEgg, Sofi, and Upgrade. This directive contradicted the Investor Letter and merger agreement, obliterating the promised independence of Theorem's investment process and undermining the very investment strategy that had been communicated to investors to secure their consent to the merger.

8.     In response to Plaintiff's objections, Pagaya's Chief Executive Officer, Gal Krubiner, explicitly stated that he would not reinstate the third-party platforms. To procure Plaintiff's acquiescence to this flagrantly illegal and improper scheme, Mr. Krubiner offered to modify Plaintiff's deferred compensation, proposing a handsome guaranteed minimum payment on the condition that Plaintiff direct Theorem to purchase $50 million per month of Pagaya-originated loans and bonds over the next 12 months, without regard to performance or clients' best interests. Plaintiff immediately declined this attempted bribe that would have required him to compromise his fiduciary duties to the funds' clients.

9.     When it became clear Defendants could not coerce Plaintiff through incentives, they initiated a pressure campaign. They imposed further restrictions on the Theorem IC's investment independence, prohibited the Theorem funds from issuing new securitizations until the Theorem IC agreed to purchase Pagaya's loans, and violated key terms of the merger agreement by refusing to rebate fees owed to the funds. Defendants also implemented illegal employment agreements containing unenforceable non-compete clauses in violation of California law, despite being informed these provisions were unlawful and sought to gut the Theorem research team that performed the analysis of prospective fund investments.

10.     After exhausting internal remedies, Plaintiff formally reported his concerns to Pagaya's Chief Compliance Officer and, through legal counsel, to Defendants' Chief Legal Officer. His comprehensive report meticulously documented numerous violations, including: (a) Pagaya's unwarranted interference with Theorem's investment decisions; (b) material misrepresentations to investors regarding fund independence; (c) self-dealing that prioritized Pagaya's interests over

-4-
COMPLAINT

investors; (d) improper imposition of unlawful employment agreements containing non-compete clauses prohibited under California law; (e) withholding of required notices and withdrawal options for investors; and (f) deliberate actions to undermine the agreed-upon terms of the Merger Agreement. Plaintiff also filed a detailed whistleblower complaint with the Securities and Exchange Commission, documenting these serious legal and regulatory violations.

11.    Plaintiff's concerns and complaints explicitly identified potential violations of federal securities laws and regulations, including but not limited to: (a) violations of the Investment Advisers Act of 1940, specifically Sections 206(1) and 206(2) prohibiting fraud by investment advisers; (b) violations of Rule 206(4)-8 regarding misleading statements to investors; (c) violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 regarding misleading statements in connection with the purchase or sale of securities; (d) violations of Section 17(a) of the Securities Act regarding misleading statements in the offer or sale of securities; and (e) violations of the books and records and internal control provisions of the federal securities laws for material misrepresentations in public filings. Plaintiff reasonably believed these violations were occurring based on his direct observations of Defendants' conduct.

12.    In direct and calculated retaliation for Plaintiff's protected whistleblowing activities, Defendants orchestrated a systematic campaign to isolate, discredit, and ultimately remove him entirely. After Plaintiff raised his serious concerns, Defendants immediately restricted Plaintiff's access to Theorem's investors, severed key communication channels, and reassigned team members who previously reported to him. When Plaintiff, acting in his capacity as the Chair of the Theorem IC, and consistent with his fiduciary obligations, authorized a lawful return of excess capital to investors from the Theorem funds that could not be deployed consistent with fund objectives due to Pagaya's restrictions, Defendants seized on this proper exercise of his authority as a pretext. In a stunning escalation, they abruptly placed Plaintiff on administrative leave, revoked his system access, made false and defamatory statements to investors, and even contacted his personal banking institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts, leaving him without access to essential funds. Shortly thereafter, Defendants threatened to bring frivolous claims against Plaintiff to hold him liable for all the supposed "losses" to the Theorem

funds and simultaneously terminated his employment, despite having no legitimate basis for doing so.

13.    Throughout this retaliatory campaign, Defendants waged a coordinated defamation effort designed to destroy Plaintiff's professional reputation. Defendants deliberately made false statements to investors, clients, and third parties, falsely alleging that Plaintiff had engaged in misconduct, unauthorized activities, policy violations, and self-dealing—all while Defendants were actively concealing their own fiduciary breaches. These defamatory statements inflicted substantial reputational damage and were made with actual malice, as Defendants knew these characterizations were false or acted with reckless disregard for their truth. Defendants' actions constituted a deliberate attempt to not only eliminate Plaintiff from the organization he built, but to systematically dismantle his professional credibility and standing in the industry.

14.    Defendants' orchestrated campaign of retaliation against Plaintiff for his protected whistleblowing activities constitutes egregious violations of California Labor Code § 1102.5 and California Government Code § 12940(h), wrongful termination in violation of fundamental California public policy, breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, and intentional infliction of emotional distress, among other wrongs. Through this action, Plaintiff seeks to hold Defendants directly accountable for their calculated and unlawful conduct, as well as for aiding and abetting the retaliation and wrongful termination. Plaintiff also seeks declaratory relief regarding his rights under certain of the agreements at issue. The Court should not countenance Defendants' brazen retaliation against a whistleblower who sought to uphold his fiduciary duties and protect investors from ongoing misconduct.

**PARTIES**

15.    **Plaintiff Hugh Edmundson** is an individual residing in California and an investment professional, widely regarded as a visionary in the financial technology sector. As the founder and, until his recent termination, the Chief Executive Officer and Chief Investment Officer of Theorem (his employer), Plaintiff built a company that revolutionized consumer credit investing, leading a team of PhD researchers and engineers to develop cutting-edge machine-learning models

-6-
COMPLAINT

that transformed risk assessment and investment strategies. Under his leadership, Theorem grew into a billion-dollar enterprise, trusted by the world's most sophisticated institutional investors. Plaintiff's reputation for integrity, strategic foresight, and unparalleled expertise was instrumental in securing Theorem's acquisition by Pagaya. Plaintiff was contractually promised continued leadership post-merger by his employer, Theorem, yet Defendants systematically dismantled his role, disregarded his contractual rights, and ultimately forced him out through a campaign of retaliation and pretextual allegations.  Plaintiff is also a limited partner in the Theorem funds, having invested his own personal funds alongside other third party investors.

16.    **Defendant Pagaya Technologies Ltd.** is a publicly traded corporation (NASDAQ: PGY) based in New York City.  It operates in the financial technology and investment management sector, overseeing billions in assets through its SEC-registered subsidiaries. Defendants acquired Theorem in 2024, publicly representing the transaction as a strategic expansion while privately orchestrating a scheme to strip Theorem of its independence, misappropriate its assets, and push out its founder under false pretenses. After the acquisition, Pagaya substantially aided and abetted Theorem in fraudulent misrepresentations, breached contractual obligations, and retaliated against Plaintiff for refusing to condone its self-dealing and regulatory violations.

17.    **Defendant Theorem Technology, Inc. and Theorem Partners, LLC** (collectively, "Theorem") was co-founded by Plaintiff and has been an SEC-registered investment adviser since November 2016.  Theorem, which served as Plaintiff's employer at all relevant times, has its headquarters and principal place of business is Menlo Park, California. Theorem specializes exclusively in the consumer credit space and has developed sophisticated machine learning models to analyze and price loans and evaluate loan origination platforms.  Theorem, acting through its post-merger leadership and under the direction of Pagaya, engaged in fraudulent misrepresentations, breached its contractual obligations to Plaintiff, and retaliated against him for refusing to participate in self-dealing and regulatory violations.

18.    Theorem operated as a single, integrated enterprise with respect to Plaintiff's employment and the investment operations at issue in this complaint. The two Theorem entities shared common ownership, directors, officers, and management personnel; maintained interrelated

operations with centralized control of labor relations; operated from the same physical location; used the same branding and represented themselves to the public as a unified business; shared and commingled financial resources; and made coordinated decisions regarding employment matters, investment operations, and business strategy. Employees, including Plaintiff, performed services for both entities simultaneously without distinction. Throughout Plaintiff's employment, the two Theorem entities functioned as alter egos of one another, with such unity of interest and ownership that the separate corporate personalities of the entities ceased to exist in practice. Accordingly, Theorem Technology, Inc. and Theorem Partners, LLC should be treated as a single employer and/or integrated enterprise for purposes of all claims asserted in this action.

19. **DOES 1-100** are officers, directors, and senior executives of Defendants who actively participated in the wrongful conduct alleged in this Complaint, as well as other individuals or entities whose identities are currently unknown but who were involved in, or facilitated, the wrongful conduct alleged herein. These individuals exercised direct control over corporate governance, investment decisions, and compliance policies at Defendants, including actions that breached fiduciary duties, misrepresented financial information, and retaliated against Plaintiff for engaging in protected whistleblowing activities. These Defendants personally approved, facilitated, or failed to prevent the misconduct described herein.

20. Plaintiff will amend this Complaint to identify these Defendants as their identities become known through discovery.

## JURISDICTION AND VENUE

21. The Superior Court of California for the County of San Mateo has subject matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution. Plaintiff asserts claims arising under California law, including, but not limited to, claims for retaliation, wrongful termination, breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, intentional infliction of emotional distress, and declaratory relief.

22. The Superior Court of California for the County of San Mateo has personal jurisdiction over Defendants because Defendants conduct substantial business in California, including maintaining operations, employing personnel, and managing financial transactions within

-8-
COMPLAINT

the state. Defendants purposefully availed itself of California's laws and protections by acquiring Theorem, a California-based company, and engaging in tortious and employment-related conduct directed at Plaintiff while he was working in California.

23. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 because a substantial portion of the wrongful acts and omissions giving rise to this action occurred in California. Plaintiff worked in California throughout the course of his employment with Theorem, including during and after the merger with Defendants. Additionally, key decisions affecting Plaintiff's employment status, access to Theorem's operations, and Defendants' retaliatory actions were carried out within California, impacting Plaintiff and Theorem's stakeholders in the state.

24. Defendants' misconduct, including the wrongful termination, defamatory statements and retaliatory actions against Plaintiff, had a direct and substantial impact in California. The improper removal of Plaintiff from his executive role, the mismanagement of Theorem's investment funds, and the fraudulent misrepresentations made to investors all directly affected California-based employees, investors, and business operations. Given these substantial connections to the state, California courts have a strong interest in adjudicating this dispute and ensuring that California's laws protecting executives, employees, and investors from corporate misconduct are upheld.

25. Plaintiff has exhausted his administrative remedies under the California Fair Employment and Housing Act. On May 30, 2025, the California Civil Rights Department issued Plaintiff a Notice of Case Closure and Right to Sue (CRD Matter No. 202505-29623630), attached hereto as **Exhibit A**. This Complaint is being filed within one year of the issuance of that Notice.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**<u>Pre-Merger Representations and Inducements</u>**

26. Defendant Pagaya actively pursued Theorem for a potential merger over the course of several years, initiating multiple outreach efforts between 2019 and 2024. During this time, Defendant Pagaya persistently sought to persuade Plaintiff and the broader Theorem team to consider combining efforts, while also attempting to recruit senior members of Theorem's leadership team as early as 2019.

-9-<br>COMPLAINT

27. On July 30, 2024, Pagaya issued a press release announcing its agreement to acquire Theorem Technology, Inc. (which owned Theorem), stating that "Theorem has powered billions of dollars of credit investments across its network since its founding in 2014 with stable, long-term capital, utilizing its proprietary technology." The Pagaya press release highlighted that the "combination brings Theorem's consumer credit funds as well as its engineering and data science expertise under the Pagaya umbrella. This strategic transaction solidifies Pagaya's overall mission to serve its partners, their customers and investors by expanding access to credit across the lending ecosystem."

28. Pagaya's press release contained two key representations that Pagaya had no intention of following and thus were false: First, the press release made clear that after the merger there would be an expansion of the Theorem funds' investment options while still including the investment options Theorem had historically used: "**In addition to its existing investment opportunities**, investors in Theorem's credit funds will now have access to credit assets generated by Pagaya's network of 30 of the top lenders in the US, including over $180 billion of application volume per quarter." (Emphasis added.) In retrospect, Pagaya had a clear motive to make this representation as it would impact (i) Theorem fund investors approving the merger, and (ii) Pagaya shareholders' belief that Theorem would continue to be successful consistent with its prior performance.

29. Second, the press release made clear that part of the value of the merger to Pagaya was Theorem's employees. In particular, Mr. Gal Krubiner (Chief Executive Officer of Pagaya) was quoted as saying "We are very excited about Theorem and its amazing employees **becoming a part of Pagaya**, . . ." (Emphasis added.) "I believe that their institutional fund management expertise will sharpen Pagaya's already market-leading capabilities." Pagaya had a clear motive to make this representation for the same reasons. The merger agreement contained explicit provisions designed to ensure the continuity of Theorem's operations, including its staff, and preserve its investment independence. Among these, Defendants committed that Theorem's investment decision-making authority would remain intact, particularly through the Theorem IC, which had earned the trust of institutional investors over years of successful fund management. Defendants also made express

COMPLAINT

representations to Plaintiff, Theorem investors, and regulators that Plaintiff would continue as CIO, retaining full authority over investment strategies and fund management post-merger.

30. Shortly after announcing the merger on July 30, 2024, a letter was sent to Theorem fund investors seeking their approval of the merger. *See* Exhibit A ("Investor Letter"). Pagaya reviewed and approved the Investor Letter and required, as a term of the merger agreement, that Theorem send the Investor Letter to Theorem fund investors to obtain their consent to the merger. The Investor Letter stated that "Theorem structured important terms in seeking to maintain continuity, client focus and eliminate conflicts." Among these included that: a. "Pagaya's intention is for Theorem's current investment committee to maintain control and discretion over the Funds' investment strategy for at least the first year. A material reconstitution or diminution in the scope or authority of the investment committee during the first year would result in clients having the opportunity to redeem and elect a liquidating trust." b. "Theorem's IC will maintain discretion to execute the investment strategy and to select (or reject) any loans sourced from Pagaya network partners. Pagaya will offset any origination or similar fees it receives on whole loans purchased by Theorem funds either through a rebate or a purchase price adjustment, and for products other than whole loans, Theorem funds will not bear any such fees other than securitization costs unless a third-party investor would also bear such fees as part of an arms' length transaction."

31. The Investor Letter also included a section on "Key Investor Protections" that emphasized that "Theorem is focused on fund performance, relying on the management and incentive fees it generates from the funds. As it relates to the funds, the only stakeholders who matter are you, our Investors." The letter further stated that "the Theorem Investment Committee will continue to be in charge of the strategy for the Theorem funds," and that "Theorem's IC will remain in charge of selecting assets to purchase in its discretion, taking into account criteria it sees fit." It also assured investors that "Pagaya will either (i) adjust the purchase price [of whole loans] such that it is reduced by an amount corresponding to the net fees realized by Pagaya or (ii) if not so adjusted, rebate any such unadjusted net fees realized to Theorem funds."

32. The Investor Letter further outlined strategic advantages for Pagaya, again emphasizing the value of Theorem personnel, stating that: "Pagaya sees this combination benefiting

-11-

COMPLAINT

them in a number of ways, including the ability to bring in a world-class team to extend the competitive moat it has already built in the consumer credit space."

33. On October 28, 2024, Pagaya filed a Form 8-K with the SEC, accompanied by a press release announcing the completion of its merger with Theorem on October 22, 2024.[1] The press release claimed that "[f]und investors are expected to gain access to credit assets generated by Pagaya's network of 31 of the top lenders in the U.S., creating **more** growth opportunities across the lending ecosystem." (Emphasis added.) Mr. Krubiner specifically stated: "Our **combined** capabilities will enable us to better meet unprecedented institutional demand for consumer credit, while also diversifying our funding sources and improving our capital efficiency." (Emphasis added.)

34. Around October 31, 2024, Theorem filed an updated Form ADV with the SEC to reflect post-merger changes. The filing detailed Theorem's business operations, investment methodologies, and conflict-of-interest management practices—each of which was subsequently undermined by Pagaya's conduct.  These business operations included: a. *Theorem's Proprietary Models*. "Theorem develops proprietary models that characterize the risk of consumer credit assets as well as asset backed securities ("ABS"). The Firm uses these models to evaluate investment opportunities such as pro-rata and custom whole loan forward flow arrangements with financial institutions, secondary whole loan pool sales, active marketplace lending loans, primary issuance ABS deals, secondary market ABS transactions, and other credit deals based on consumer loans." b. *Theorem's Employees*. "Theorem's team responsible for analyzing individual loans and constructing portfolios has expertise in advanced statistics, physics, computer science, machine learning, and mathematics. Theorem also works with domain experts in the field of credit analytics to understand market microstructure and other qualitative sources of return generation."

35. The ADV also discussed potential conflicts of interest due to Pagaya: "These activities of Pagaya Tech and its affiliates may give rise to conflicts of interest with the activities of

---

[1]  *See* https://content.edgar-online.com/ExternalLink/EDGAR/0001883085-24-000173.html?hash=231813891a8c227c541e6c76f615823f71c10b4d775c2da1c431c91de2bd6d1e&dest=pgy-20241022_htm#pgy-20241022_htm.

Theorem and the Funds. Conflicts of interest that arise between a Fund and Pagaya Tech and its affiliates will be evaluated in order to determine the appropriate course of conduct, which, depending on the circumstances, may include consultation with or approval by the board of directors, a limited partner advisory committee, or another governing body or independent representative on behalf of a Fund. Any such evaluation will take into consideration the interests of the relevant parties and the circumstances giving rise to the conflict."

36.    In contravention of the promises to investors and representations to its regulators, Pagaya seized control over the key aspects of the investments and employees at Theorem almost immediately after the merger, making decisions for Pagaya's financial benefit at the expense of the Theorem funds. There were no meaningful efforts by Pagaya to address any of these conflicts of interest, which prevented Theorem from deploying capital.  Had it succumbed to Pagaya's undue pressure, Theorem would have been investing its funds in conflicted and/or underperforming assets that were inconsistent with the funds' investment objectives.

**Defendants' Immediate Post-Merger Misconduct**

37.    The merger between Theorem and Pagaya closed in October 2024. The ink had barely dried on the merger agreement when Defendants began systematically dismantling the very independence, governance structures, and strategic decision-making that had made Theorem valuable and was essential to securing client approval for the merger.

38.    Shortly after the merger was finalized, Plaintiff presented the Theorem team with "opportunities" to purchase Pagaya-originated whole loans. Upon conducting a thorough analysis of the performance of recent Pagaya-originated loans, the Theorem research team identified a concerning increase in losses.  Based on this analysis, the team concluded that the expected returns from these loans did not align with the funds' investment objectives and were less attractive compared to other opportunities available from third-party loan origination platforms. The Theorem team communicated these findings to Pagaya and, in an effort to propose constructive solutions, suggested alternatives such as a larger risk-sharing arrangement or a price discount to align the performance of the loans with the funds' investment objectives. Despite these efforts, Pagaya failed to provide a meaningful response to the proposed alternatives.

39.     Also following the merger, Plaintiff, in his capacity as CIO of Theorem, and a member of the Theorem IC which directed Theorem's investments, attended the inaugural meeting of the Pagaya Capital Deployment Committee (PCDC), ostensibly created to address potential allocation conflicts. During this meeting, Pagaya announced a stunning directive: the Theorem IC was prohibited from investing in loans from third-party lending platforms' standard loan programs, and was required to shutter all of its custom "second look" loan programs, effectively forcing investments into lesser performing, Pagaya-sponsored programs only. This restriction was not merely unexpected—it fundamentally sabotaged Theorem's independence and its core investment strategy that had been promised to investors and upon which they had based their consent to the merger.

40.     Plaintiff traveled to New York City to meet with several members of Pagaya's senior executive team in an effort to address the legal and practical issues stemming from the imposed restrictions. During one of these meetings, Pagaya's Chief Executive Officer, Gal Krubiner, explicitly stated that he would not reinstate the third-party platforms. This statement was particularly troubling, as the PCDC was designed to function independently of Pagaya's CEO, who was not a member because his involvement presented a clear conflict of interest.

41.     In response to Plaintiff's objections to shutting off access to all third-party platforms for investment, Mr. Krubiner proposed a "side deal" with Plaintiff. Mr. Krubiner offered to enhance the terms of Plaintiff's deferred compensation associated with the merger agreement, proposing instead a guaranteed minimum payment to Plaintiff on the condition that Plaintiff have Theorem purchase $50 million per month of Pagaya-originated loans and bonds over the next 12 months, without regard to performance or the clients' best interests. Plaintiff immediately declined this offer that would have him compromise his fiduciary duties to the funds' clients. Mr. Krubiner's attempted bribe of Plaintiff was troubling for a separate and independent reason, namely, the PCDC was designed to function independently of Pagaya's CEO, whose involvement presented a clear conflict of interest, and the Theorem IC, with Plaintiff serving as its Chairman, was also designed to function independently.

42. In the same conversation, Mr. Krubiner informed Plaintiff that Pagaya's Chief Risk Officer, Raj Singh, had been ordered *not* to speak or interact with Plaintiff in any capacity. Despite Plaintiff's repeated efforts over the course of several months—including emails, meeting requests, and internal escalations—Plaintiff was consistently stonewalled and denied any meaningful access to Mr. Singh. Plaintiff had sought access to Mr. Singh to discuss the troubling pressure being placed upon the Theorem IC, among other things, but was stymied by Mr. Krubiner's interference. Plaintiff was ultimately only ever able to speak directly with Mr. Singh once, and even that occurred only after Plaintiff pointed out the absurdity of the situation, remarking that it was unacceptable for the Chief Investment Officer to be unable to reach the Chief Risk Officer after months of attempting to do so in the ordinary course of their responsibilities.

43. Through persistent efforts, Plaintiff successfully persuaded Pagaya to re-approve a limited number of third-party platforms for deployment. However, these approvals were restricted to a few smaller platforms, accounting for fewer than 5 out of nearly 20 historical platforms, whose collective volume represented less than a third of the funds' target deployment. Buying Pagaya's loans thus remained the only alternative provided to fill the gap to deploy available Theorem fund capital. Plaintiff believes these selective re-approvals were largely driven by Pagaya's specific business development goals with those platforms and an attempt to make the effort to divert deal volume to Pagaya less overt. This was a blatant breach of Pagaya's fiduciary duty to serve the best interests of Theorem Fund clients.

**Defendants' Escalating Pressure Campaign**

44. When it became clear they could not coerce Plaintiff through incentives, Defendants initiated a pressure campaign to force Plaintiff and the Theorem IC to purchase Pagaya-program personal loan and auto loan assets. This campaign included further restrictions on the Theorem IC's investment independence, such as prohibiting the Theorem funds from issuing a new securitization until the Theorem IC agreed to purchase Pagaya's loans and collateral. Additionally, Defendants violated key terms of the merger agreement by refusing to rebate fees owed to the funds for a structured transaction entered into with Pagaya—a clear contractual obligation. While the fees in

-15-
COMPLAINT

question were not significant, this refusal underscored the extent of Pagaya's desperation for additional capital and its willingness to disregard its fiduciary duties.

45. Around this time, Pagaya also sought to implement employment agreements for Theorem employees containing non-compete clauses and other restrictive covenants that were neither lawful nor enforceable under California law, where Theorem primarily operated. Despite being informed by Plaintiff and senior members of the Theorem team that such provisions violated state law, Defendants insisted on their inclusion. This approach jeopardized the retention of key personnel, as the affected employees were widely aware of the agreements' legal deficiencies. While Defendants initially agreed to remove these provisions during the post-merger transition, they reintroduced them after the Theorem IC declined to purchase underperforming collateral from the Pagaya personal loan program.

46. Notably, Defendants demonstrated inconsistency by selectively waiving these restrictive provisions for certain individuals they sought to retain. Pagaya's Chief Legal Officer further exacerbated the situation by making generalized claims to Theorem employees that the agreements complied with applicable laws, while simultaneously acknowledging to certain select employees that specific terms were unenforceable under California law. This contradictory conduct undermined Pagaya's credibility and raised concerns about the ethical standards guiding their employment practices.

47. Gal Krubiner, Pagaya President Sanjiv Das, and Pagaya's COO sought to damage Plaintiff's reputation by circumventing him and ordering one of his direct reports to communicate directly with partner loan originators, falsely attributing the program shutdowns solely to the Theorem IC and Plaintiff, while portraying Pagaya as entirely uninvolved. This directive was issued despite Defendants' full awareness that the sudden termination of longstanding programs would tarnish reputations and create widespread fallout. The employee, recognizing the inaccuracy of the directive and its potential harm, refused to carry out the instructions to disseminate false information.

48. Despite significant challenges by reason of Pagaya's improper interference, Plaintiff sought to fulfill his fiduciary responsibilities by deploying available capital within the limited

-16-

COMPLAINT

investment options provided. At the same time, Plaintiff repeatedly advocated to Pagaya that the restrictions imposed on the Theorem IC were not only violations of the merger agreement and Investor Letter, but also detrimental to the growth and success of an institutional asset management business. The Theorem team proactively delivered detailed and comprehensive underwriting analyses for all proposed investment platforms on multiple occasions. However, Pagaya never provided substantive feedback or comments on these analyses.

49.    Defendants made further repeated efforts to pressure Plaintiff and the Theorem IC to purchase the underperforming Pagaya loans. During a conversation with Pagaya's Chief Operating Officer and nominal Head of the PCDC, Ralph Leung, Mr. Leung acknowledged to Plaintiff that the restrictions imposed on Theorem were directives from Pagaya's CEO. The COO proposed that Plaintiff commit to purchasing $30 million of Pagaya whole loans per month, $20–$30 million of Pagaya bonds per month, as well as Pagaya auto loan products. These were the exact products that that Theorem team had carefully evaluated and concluded were likely to underperform. He further suggested that if this pattern was maintained for a six-month period, Pagaya's CEO *might* consider reducing or lifting some of the imposed restrictions on Theorem's investments.

50.    During the one conversation Plaintiff was finally able to have with Pagaya's Chief Risk Officer, Raj Singh, important information came to light. Mr. Singh disclosed that *none* of the platform restrictions originated from him or his team. He admitted that he was unaware of the details of many restrictions being imposed on the Theorem IC and stated that, while he had provided general frameworks and data, all specific decisions regarding platform restrictions on Theorem were made by Pagaya's COO Ralph Leung and CEO Gal Krubiner. This revelation underscores Defendants' disregard for their fiduciary obligations and their failure to fulfill key responsibilities under the Merger Agreement and Investor Letter.

**Key Employee Departures and Plaintiff's Protected Whistleblowing Activities**

51.    In late January 2025, Theorem's then Head of Research and another Theorem IC member, Nico Salzetta, notified Plaintiff and Theorem of his constructive dismissal caused by Pagaya's actions. Defendants attempted to compel Mr. Salzetta into signing an unlawful employment agreement containing restrictive covenants such as a non-compete that Pagaya insisted

-17-
COMPLAINT

upon as a condition of his continued employment. His departure alone triggered the right to a liquidation trust and redemption for the funds' limited partners, as it constituted a material change to the Theorem IC. However, despite removing Mr. Salzetta from its payroll, Defendants falsely characterized his departure as voluntary in written communications with the funds' clients, seemingly to obscure the event's implications and avoid revealing the triggering of the trust liquidation option.

52.    After exhausting efforts to address the situation internally, Plaintiff reported his concerns to Pagaya's CCO and, through legal counsel, to the Chief Legal Officer of Pagaya. In this communication, Plaintiff highlighted numerous issues, including:

a.    The conflicts of interest and breaches of fiduciary duty stemming from the curtailing of the Theorem IC's authority. This included the abrupt termination of Theorem's third-party forward flow loan purchasing arrangements, the shutdown of custom loan purchasing programs, the failure to adhere to allocation policies required by regulatory mandates, and the obstruction of the Theorem IC's ability to issue securitizations. These actions constituted potential violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, which prohibit investment advisers from engaging in fraudulent, deceptive, or manipulative practices, and breach of fiduciary duties owed to clients.

b.    Pagaya's refusal to rebate fees associated with a private securitization, contradicting commitments made during the merger agreement, assurances provided to clients, and applicable regulatory standards. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8, which prohibits investment advisers from making false or misleading statements to investors or prospective investors.

c.    The improper imposition of employment agreements on Theorem's employees containing non-compete and non-solicitation clauses, which contravened state laws. *See e.g.,* Cal. Bus. & Prof. Code §§ 16600, 16600.5 (as amended by SB 699, effective Jan. 1, 2024) (barring employers from entering into or enforcing non-compete agreements, even if signed and the employment was out of state); Cal. Lab. Code § 432.5 (prohibiting employers from requiring employees to agree to terms they know are unlawful).

d.    The lack of timely notification to Theorem's fund investors concerning the departure of key personnel, resulting in a violation of commitments under the fund agreements and misleading stakeholders. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8.

e.    Pagaya's deliberate withholding of notices and withdrawal options for Theorem fund investors. These actions breached promises made during the merger to secure investors' approval and violated the terms of the merger agreement, which required notice and withdrawal options in the event of significant changes to Theorem IC's authority or structure. This breach was further underscored by both the restrictive measures imposed on the Theorem IC and the circumstances surrounding the departure of a critical team member. This conduct violated Investment Advisers Act Sections 206(1) and 206(2) and Rule 206(4)-8.

f.    Actions taken by Pagaya that undermined the agreed-upon terms of the merger agreement, including intentional efforts to limit the potential for the contingent consideration to be realized. These actions included restricting the Theorem IC's ability to pursue more favorable investment opportunities while exerting pressure to prioritize Pagaya's collateral over higher-performing third-party alternatives.

53.    On or about February 3, 2025, Plaintiff sent a formal email to Pagaya's CCO documenting his concerns about Pagaya's misconduct. That same day, Plaintiff, through his legal counsel, sent a comprehensive letter to Pagaya's CLO detailing Pagaya's numerous violations of securities laws and other legal requirements. These communications explicitly identified the ongoing breaches of fiduciary duties, misrepresentations to investors, and unlawful business practices that threatened investor interests.

54.    On or about February 12, 2025, Plaintiff filed a formal and detailed whistleblower complaint with the Securities and Exchange Commission, submitting documentary evidence of Pagaya's regulatory violations. The whistleblower complaint specifically detailed how Pagaya had (1) systematically dismantled Theorem's independence in violation of representations made to investors; (2) attempted to force the Theorem IC to purchase underperforming Pagaya-originated assets; (3) improperly valued assets in Pagaya-sponsored funds; and (4) made material

misrepresentations in SEC filings regarding the maintenance of Theorem's investment independence following the merger.

55.    Plaintiff's whistleblower complaints to Pagaya's CCO, CLO, and the SEC constituted protected activity under multiple federal and state statutes, including Section 21F of the Securities Exchange Act as amended by the Dodd-Frank Act, Section 806 of the Sarbanes-Oxley Act, and California Labor Code § 1102.5. Plaintiff reasonably believed the conduct he reported concerned violations of the federal securities laws and regulations and was harmful to investors. Plaintiff engaged in this protected activity with the explicit purpose of preventing ongoing violations of securities laws and protecting investors from fraud and misrepresentation.

56.    When Plaintiff raised objections—both internally and through protected whistleblower actions—Defendants retaliated with increasing intensity. They systematically sought to undermine Plaintiff's authority, diminish his role, tarnish his reputation, and ultimately force him out of the very company he had built over the course of a decade. Following his whistleblower disclosures, Defendants immediately restricted Plaintiff's access to Theorem's investors, severed key communication channels, and reassigned team members who previously reported to him, despite being warned repeatedly that such actions against a whistleblower are unlawful.

57.    Key decision-makers at Defendants, including CEO Gal Krubiner, COO Ralph Leung, and members of Pagaya's legal department, were aware of Plaintiff's whistleblower complaints and the specific regulatory violations he had identified. This awareness is evidenced by direct communications, including emails acknowledging receipt of his concerns, meetings where these issues were discussed, and the abrupt change in Defendants' treatment of Plaintiff immediately following his protected disclosures. The temporal proximity between Plaintiff's protected whistleblowing activities and Defendants' adverse actions—including restricting his access, reassigning his team members, and ultimately placing him on administrative leave and later firing and threatening to sue him on frivolous claims—establishes a clear causal connection between his protected activity and the retaliation he experienced.

58.    Plaintiff also discovered the following additional violations by Defendants:

-20-
COMPLAINT

a. Pagaya's improper valuation practices of assets in the Pagaya Opportunities Fund, including the failure to properly update valuations of equity tranche securities and junior bond tranches in PGY securitizations to reflect current market conditions and interest rates, resulting in inflated net asset value calculations and excessive management fees charged to fund investors. These valuation practices potentially violated GAAP principles and SEC regulations regarding fair valuation practices, including ASC 820.

b. Pagaya's attempts to manipulate the structure of payments and recognition of revenue around its securitization sponsor activities to inflate topline revenue figures in its SEC filings, including the use of arrangements that appeared to involve roundtripping revenue with limited or no actual risk transfer. This conduct potentially violated SEC financial reporting requirements and constituted material misrepresentations in violation of securities laws.

c. Pagaya's misleading and potentially fraudulent statements to investors regarding the Pagaya funds' purchase of junior tranches of Pagaya-originated securitizations, particularly their concentration in high-risk B-rated bonds, and the failure to accurately disclose the true risk exposure of the funds to these securities.

d. Pagaya's manipulation of discount rates used for valuation of securities to create the appearance of compliance with Regulation RR (which requires retention of a 5% horizontal or vertical slice of securitizations), as documented through independent third-party valuation analysis.

e. Pagaya's misrepresentation of facts in SEC filings regarding the maintenance of Theorem's investment independence following the merger, despite Pagaya's behind-the-scenes systematic dismantling of that independence.

**Defendants' Retaliation and Pretextual Investigation**

59. Rather than addressing the serious issues raised in Plaintiff's whistleblower report, Defendants ignored the concerns entirely or sought to cover them up. The investment and platform restrictions remained unchanged, and no effort was made to inform clients about the critical issues brought forward by Plaintiff. Meanwhile, significant members of the Theorem team were forced out through coercive employment practices. Defendants bypassed legal mechanisms by presenting

severance packages to key personnel, enticing them to resign while evading contractual obligations under the merger agreement that restricted their ability to terminate these employees. Pagaya's Chief Strategy Officer acknowledged this strategy as a way to sidestep the merger provisions prohibiting them from directly firing essential staff.

60.    As a result, Theorem was rapidly depleted of the skilled team and resources necessary to execute its investment program as outlined in the Investor Letter. At the time of the merger announcement, Theorem employed a team of over 50 people. Upon information and belief, currently fewer than 5 remain, leaving the firm unable to function as originally promised to clients and stakeholders.

61.    Shortly after Plaintiff's whistleblower complaint, a report by Iceberg Research was publicly released, highlighting significant concerns about Defendants' conduct.[2] The report alleged that Defendants engaged in systemic practices that violated fiduciary responsibilities, including the misuse of the Pagaya Opportunity Fund. According to the report, the Pagaya Opportunity Fund, managed by Pagaya's Chief Investment Officer, Ed Mallon, was allegedly used to offload risky and unsellable securities from PGY securitizations onto fund investors, thereby shifting potential losses off Pagaya's balance sheet. These actions represented a clear breach of fiduciary duty and echo the concerns Plaintiff raised to Defendants.

62.    During this time, Plaintiff participated in a call with Mr. Mallon and a Theorem client, during which Mr. Mallon made misleading statements regarding the involvement of the Pagaya funds in purchasing Pagaya securities. Mr. Mallon claimed that the Pagaya funds accounted for less than 5% of the purchasing within Pagaya's securitizations. However, this statement failed to disclose a critical detail: the Pagaya funds were primarily buying the junior tranches of the securitizations, particularly the most vulnerable B-rated bonds. In many cases, these transactions made Pagaya the majority, if not sole, purchaser of these high-risk bond classes, which were essential for closing the deals. Mr. Mallon's statements falsely implied that the Pagaya funds were

---

[2]    *See* Pagaya: Using Other People's Money to Hide Massive Losses – Iceberg Research available at https://iceberg-research.com/2025/02/11/pagaya-using-other-peoples-money-to-hide-massive-losses/.

insignificant participants purchasing securities akin to those acquired by institutional investors, concealing the reality of their disproportionate and concentrated exposure to risk.

63.    Plaintiff raised concerns about Mr. Mallon's misleading statements with a compliance officer, but to his knowledge, no action was taken to address the matter. The Iceberg report, titled "Pagaya: Using Other People's Money to Hide Massive Losses," further alleged that as the capacity of the Pagaya Opportunity Fund diminished, Defendants began to implement similar practices with the Theorem funds, exposing them to substantial risk while prioritizing Pagaya's financial interests. Plaintiff came to believe and continues to believe that the concerns articulated in the Iceberg report reflect broader patterns of misconduct by Defendants.

64.    The pattern of systematic misconduct exhibited by Defendants constitutes unlawful, unfair, and fraudulent business practices that extend beyond private contractual violations and into the realm of market-wide competitive harm. By maintaining a business model that prioritized their own financial interests through deceptive means—such as misrepresenting fund independence, manipulating asset valuations, and imposing unlawful employment provisions on California employees—Defendants gained improper competitive advantages in the marketplace and deprived competitors who operated lawfully of business opportunities. These practices not only violated specific statutory provisions but also contravened the public policy of fair competition enshrined in California law.

**Plaintiff's Capital Return Decision and Defendants' Escalating Retaliation**

65.    After weeks of inaction by Defendants and with only minimal progress made in addressing Plaintiff's concerns—such as the delayed notice to Theorem fund clients regarding several senior departures—Plaintiff, in his capacity as Chair of the Theorem IC, determined that the only course of action to fulfill his fiduciary duties to the funds' clients was to explore options for returning capital to investors, which had been accumulating in the funds over the past several months. Pagaya had limited Theorem's investment options to products that Theorem's team had evaluated as underperforming and inconsistent with the funds' investment objectives and representations to investors. Thus, investing in those limited vehicles would breach Theorem's fiduciary duties. But having the funds continue to hold cash (as opposed to deploying it into

investments) was also not an option, as it was both inconsistent with the stated purpose of the funds and would result in clients paying significant management fees on cash, as opposed to investments.

66.     Faced with this dilemma, the Theorem IC had no choice but to reduce its deployment, rather than compromise the funds' mandate, and ultimately return capital to clients.

67.     To ensure clarity regarding his responsibilities and authority, Plaintiff consulted with members of Theorem's internal team. Upon review of the funds' Limited Partnership Agreements and the merger agreement, it was evident that the Theorem IC held the authority to manage cash and facilitate the return of capital to investors. Additionally, Theorem's officer signature resolutions confirmed that, as CEO and CIO, Plaintiff had the necessary authority to execute transactions on all relevant bank accounts.

68.     Plaintiff collaborated with Theorem's operations, investor relations, and compliance teams, along with the external CFO and Fund Administrator, to plan the process. The team adhered to established protocols, ensuring the returns would align with the same procedures used for normal monthly redemptions, both before and after the merger, and not interfere with existing capital returns from investor redemption requests. This approach ensured the return of capital would be efficient, accurate, and consistent with prior practices.

69.     In a February meeting of the Theorem IC, Plaintiff expressed his views to the Theorem team and Pagaya's appointed Theorem IC observer, as part of the monthly capital allocation review process, that he had no choice consistent with his fiduciary duties but to return capital to Theorem funds' investors.  At this point, Plaintiff was the sole remaining member of the Theorem IC and served as its Chair.  During this discussion, Pagaya's appointed observer acknowledged that no changes were planned to the employee offer letters, the letters that included illegal restrictive covenants. Furthermore, Pagaya's observer disclosed that the upcoming PCDC meeting—a forum where Plaintiff's concerns about allocation restrictions could have been addressed—had been canceled without explanation. This context bolstered the conclusion that returning capital was not only highly appropriate, but also the only responsible option given Plaintiff's fiduciary obligations.

70.     On or about February 20, 2025, following the investment committee meeting, in his capacity as Chair of the Theorem IC, Plaintiff authorized the transfer of funds to return approximately $120 million of capital on a pro rata basis to all Theorem fund investors. This was executed through the funds' third-party administrator, US Bank, in full compliance with the standard signatory authorizations and dual approval procedures established by Theorem, both prior to and after the merger. These protocols, which had regularly governed redemption payments post-merger, were followed to ensure the integrity of the process. In light of Defendants' ongoing breaches of fiduciary duties, conflicts of interest, and the risk of potential fraud, Plaintiff determined that expediting the return of capital—while adhering strictly to proper procedures—was the most prudent course of action. There was no reasonable prospect of deploying the accumulated uninvested capital in appropriate investments due to Pagaya's unlawful restrictions, yet investors continued to be charged management fees on these idle funds. The capital return was implemented efficiently and appropriately to safeguard investor interests.

71.     Shockingly, during the process of returning capital to Theorem Main Fund investors, Defendants intervened and abruptly halted the return without providing any justification or explanation for their actions. Worse, Defendants contacted each of Theorem's Prime Fund investors who had received the return of capital and represented to them that the capital return was unauthorized, an error, and/or perpetrated by a rogue employee who was engaged in self-dealing. Defendants demanded that the investors send all of the capital that had been returned back to the Theorem funds.

72.     Following this, Defendants revoked Plaintiff's access to all Theorem systems, effectively barring him from managing the portfolio. At this point, Plaintiff was the sole legacy remaining member of the Theorem IC, meaning that there was no one managing the funds at all, let alone any of the persons in whom Theorem's investors had reposed their trust. Plaintiff believes these actions constitute yet further breaches of Defendants' fiduciary duties to Theorem clients and constitute further retaliation for Plaintiff's repeated complaints of and refusal to go along with Defendants' illegal scheme.

-25-

COMPLAINT

73.     On or about February 20, 2025, within hours of learning about Plaintiff's return of capital to fund investors, Defendants sent Plaintiff's counsel a letter falsely characterizing Plaintiff's actions as 'fraudulent, deceitful and unauthorized,' despite Plaintiff having clear authority to take such actions under the company's signature resolutions. On or about the same day, Defendants immediately revoked Plaintiff's access to all Theorem systems, including email, calendar, risk systems, portfolio management platforms, and all client communications, effectively preventing him from performing his duties as CIO and head of the Theorem IC.

74.     On or about February 21-23, 2025, Defendants attempted to coerce Plaintiff into appointing Pagaya officers to the Theorem IC, despite this directly contradicting representations made to fund investors. Specifically, Defendants demanded that Plaintiff appoint at least two of four Pagaya-selected individuals within arbitrary 24-hour deadlines. When Plaintiff refused, citing his fiduciary obligations to the funds, his concern for investors, and the terms of the merger agreement requiring the independence of the Theorem IC from Pagaya, Defendants threatened to deem his silence as consent and proceed with appointing their own officers regardless of Plaintiff's objections.

75.     Defendants' interference with the return of capital to investors and their false statements to investors about this process were direct retaliatory actions taken in response to Plaintiff's protected whistleblowing activities. Indeed, Defendants took these actions within approximately eight days of learning about Plaintiff's whistleblower complaint to the SEC. This capital return was not only proper under the fund agreements but also aligned with Plaintiff's fiduciary duties to investors in light of the investment restrictions Defendants had improperly imposed—the very restrictions Plaintiff had identified as potential securities law violations in his protected communications.

76.     Plaintiff was and remains of the view that Defendants prioritized retaining the capital (and demanding that all returned investor capital be sent back to Defendants) to secure management fees and repurpose the funds into Pagaya-originated collateral, rather than acting in the best interests of investors. Plaintiff further contends that any management fees collected by Defendants on the withheld capital represent a breach of trust and a disservice to the funds' investors.

-26-
COMPLAINT

**Administrative Leave, Defamation, and Termination**

77. Over the course of the following weekend, Defendants engaged in multiple actions designed to intimidate Plaintiff. They issued a threatening letter demanding that Plaintiff appoint a new majority of Pagaya employees to the Theorem IC, a demand that directly violated the terms of the Investor Letter. Alarmingly, the proposed candidates put forth by Pagaya were either unqualified, conflicted, or both. Among the candidates was Mr. Mallon, who had been implicated in non-fiduciary conduct in a recent report, and Pagaya's Chief Strategy Officer, whose investment experience was limited to less than six months of observing Theorem IC meetings without any decision-making authority. The remaining two candidates were entirely unfamiliar to Plaintiff, presented only by name, title, and with no evidence of their qualifications or suitability to serve.

78. Defendants issued a demand late on a Friday evening, asserting—without any basis in the Limited Partnership Agreement, merger agreement, or client correspondence—that Plaintiff must respond within 24 hours or face the unilateral appointment of two Pagaya representatives to the Theorem IC, bypassing Plaintiff's consent. This demand blatantly violated the explicit terms of the Merger Agreement and the Investor Letter. Plaintiff refused to acquiesce to the improper placement of Pagaya employees on the Theorem IC. However, Plaintiff proposed a reasonable alternative: appointing experienced members of the Theorem team to the committee or consenting to Pagaya's appointees if Pagaya secured proper client approvals in advance. Rather than engaging in constructive dialogue or considering these viable compromises, Defendants abandoned the issue entirely, resorting instead to disparaging remarks about the Theorem team members suggested by Plaintiff.

79. Shortly thereafter, Pagaya informed Plaintiff that he was being placed on administrative leave pending an investigation. In a troubling escalation, Defendants sent a communication to Theorem fund investors falsely accusing Plaintiff of policy violations and misconduct—this before any investigation had even commenced. Defendants further alleged that the investigation would be overseen by "independent counsel" from Proskauer Rose. In reality, Proskauer Rose was anything but independent. As one of Pagaya's primary outside legal counsel, Proskauer had advised Defendants on numerous matters, including subjects central to Plaintiff's

whistleblower complaints, and had also served as Defendants' legal representative in finalizing the Theorem/Pagaya merger. Defendants and Proskauer failed to disclose these glaring and material conflicts of interest to Theorem fund clients, further calling into question the credibility and impartiality of the so-called "investigation."

80.    On or about February 25, 2025, Defendants sent a communication to Theorem fund investors falsely stating that Plaintiff's return of capital 'was not approved internally and did not comply with internal protocols,' despite Plaintiff having full authority to execute such transactions as Theorem's CEO, according to a process that had been in effect for dozens of transactions, including other capital payments to investors, since the close of the merger. This communication deliberately mischaracterized Plaintiff's proper exercise of his fiduciary duties as misconduct and damaged his professional reputation. Pagaya also concealed from investors that Defendants had effectively left the Theorem funds with no one managing investment decisions by placing Plaintiff on leave and revoking his access to all systems.

81.    At the same time that Defendants were explicitly or implicitly telling investors that Plaintiff's action to return capital to them was unauthorized and violated company policies, Defendants refused to identify the specific policies Plaintiff was alleged to have violated. Defendants offered a generic copy of the Pagaya Code of Ethics and other unrelated policies without pointing to any particular provision, none of which applied or Plaintiff violated. Notably, one of the provided policies—the September 2024 Cash Management Policy—explicitly delegates responsibility for managing and overseeing cash balances to the Theorem Financial Operations team, which Plaintiff led as CEO of Theorem. This policy unequivocally affirmed the propriety of Plaintiff's actions, directly contradicting Defendants' claims.

82.    Defendants thereafter escalated their actions by launching a deliberate and malicious campaign aimed at tarnishing Plaintiff's reputation. They made false and defamatory statements, openly accusing Plaintiff of fraudulent conduct and self-dealing, and misrepresenting the reasons for his removal to investors and other third parties. These defamatory claims went so far as to suggest to his personal banking institution that Plaintiff had engaged in a fraudulent scheme where

Defendants were the victims, which led to the freezing of his personal bank accounts, leaving him without access to essential funds, including those for basic living expenses such as rent.

83.    Additionally, Defendants verbally disseminated false and misleading allegations to Theorem fund investors. Specifically, they implied that Plaintiff had authorized the return of capital from the Theorem Prime+ Yield Fund LP to improperly access his own investment in the fund, placing his interests above those of other investors. This accusation was entirely unfounded.  In truth, Plaintiff had authorized the return of capital across both relevant funds, including the fund in which he held no personal investment. Of the over $100 million distributed, Plaintiff received only a nominal amount—approximately $60,000—and, once he realized that the return of capital to all investors would also include him, he immediately took steps to return this entire sum to the fund in question to preclude even the appearance of a potential conflict of interest. Plaintiff was not motivated to return capital to benefit himself financially, nor has he actually benefitted financially in any way from the capital return.  Further, Plaintiff's *return* of $60,000 of his personal investment in one of the Theorem funds occurred well before Pagaya could have spoken to any investor. Plaintiff and his legal team have repeatedly requested that Defendants retract these baseless and damaging statements, but Defendants have failed to even acknowledge or respond to these demands.

84.    Instead, Defendants continued to weave together a false and misleading narrative for internal and external audiences, alleging that Plaintiff was placed on leave due to inadequate risk management involving an unrelated partner loan originator, Tally. They claimed Plaintiff continued purchasing new loans from Tally up until just prior to Tally's bankruptcy. These allegations are not only baseless, but intentionally deceptive. First, the Theorem IC had ceased purchasing new Tally loans more than a year before Tally's bankruptcy, focusing solely on managing the winddown of the remaining portfolio. Second, Defendants themselves had purchased a significant volume of Tally loans, which were also undergoing winddown at the time of Tally's bankruptcy. Third, several of Defendants' other loan originators had declared bankruptcy in prior years, while the Theorem team experienced only a single bankruptcy among a similar number of counterparties—demonstrating Theorem's superior counterparty risk management practices. Lastly, Tally's bankruptcy occurred in August 2024, prior to the merger's closing, a fact Defendants knew well. In fact, Pagaya

collaborated closely with Theorem's team to address the aftermath of Tally's bankruptcy and manage the transition of portfolios to a backup servicer. The Theorem team willingly facilitated this process, even before the merger was completed. Defendants' statements on this matter are therefore defamatory and intentionally misleading.

85.    Defendants also made materially misleading statements to public investors by promoting Theorem's investment independence in communications, including filings with the SEC, while deliberately concealing their behind-the-scenes actions to undermine the autonomy of Theorem's IC. These actions included tightly restricting the investment universe and failing to disclose that, following Plaintiff's placement on administrative leave, no authorized members of the Theorem IC were actively managing the funds.

86.    Defendants have further retaliated by neglecting their financial commitments to Plaintiff. They withheld the release of  company stock owed to Plaintiff and other Theorem stakeholders, as required under the merger agreement, delaying their distribution without explanation. Additionally, when Plaintiff submitted a written redemption request for his limited partner interests in the Prime+ fund and elected a liquidating trust in accordance with the terms of the merger agreement, Defendants failed to even acknowledge, let alone process the request. To date, they have provided no response to Plaintiff's valid redemption request. The same is true with respect to Plaintiff's requests that Pagaya cease and remediate the false and defamatory statements made about him to investors and others. As with the redemption request, Defendants did not bother to even acknowledge receipt of these requests to withdraw the defamatory statements, let alone act on them. This blatant disregard for the contractual obligations governing the fund and legal obligations appears to be an intentional effort to exert financial pressure on Plaintiff by unlawfully retaining his capital and intimidating him through its campaign of publishing false and harmful statements about him.

87.    At the time of the events that give rise to the various causes of action, the corporate structure and related entities involved in Plaintiff's termination was as follows. While Theorem was Plaintiff's direct employer, Pagaya acted as the controlling parent company that directed and authorized all significant decisions after the merger, including Plaintiff's ultimate termination.

Throughout the course of events leading to Plaintiff's termination, executives from Pagaya, including CEO Gal Krubiner, COO Ralph Leung, and other senior management directly involved themselves in matters relating to Theorem's operations and personnel decisions. These executives not only knew about the planned termination but actively directed it, with full knowledge that Plaintiff was being terminated for his protected whistleblowing activities and refusal to participate in practices he reasonably believed violated securities laws. Email communications, meeting minutes, and contemporaneous notes demonstrate that Pagaya executives deliberately circumvented proper corporate channels, bypassed Theorem's established policies, and directed subordinate entities to terminate Plaintiff. Pagaya substantially assisted in the wrongful termination by providing the pretextual justifications, drafting communications related to the termination, and instructing Theorem management on execution of the termination. This direct involvement and substantial assistance from the parent entity in orchestrating Plaintiff's wrongful termination constitutes aiding and abetting of the unlawful employment action.

**Whistleblower System Failures and Board Notification**

88.    As these events were unfolding, on two separate occasions, Plaintiff attempted to file complaints with Pagaya's corporate whistleblower system for employees, only to discover that the system was nonfunctional. Pagaya's corporate whistleblower policy claimed to use an independent third-party service, Convercent, to handle whistleblower submissions. However, when Plaintiff attempted to file a complaint through Convercent, he found that Pagaya was not listed as a client. Upon contacting Convercent's whistleblower hotline, the representative confirmed that Pagaya did not appear in their system as a client and could not assist Plaintiff.

89.    Plaintiff made another attempt to file a whistleblower complaint, hoping to escalate the matter directly to Pagaya's board of directors. Once again, he found that Pagaya was not listed in the whistleblower system. Furthermore, the emails sent to the board members' email addresses in the company's directory were all returned as being sent to nonexistent recipients, effectively cutting the board off from all internal communication. As a result, Plaintiff directly emailed two members of Pagaya's board, Avi Zeevi and Dan Petrozzo, describing many of the illegal and improper actions by Defendants, offering to provide additional information, urging an independent

investigation, and notifying them that the whistleblower system was not operational. Within hours of sending this email, Defendants' counsel accused Plaintiff of acting inappropriately by attempting to contact the board and falsely asserting that the whistleblower system had been operational at all times. This response not only dismissed Plaintiff's concerns but further emphasized the lack of a functional and transparent process for addressing whistleblower complaints within the company. To date, no Board member has responded to Plaintiff in any way, nor expressed any concerns about the troubling conduct reported in his email.

90.    Image 1 below shows that when Plaintiff initially tried to file a whistleblower complaint, Pagaya wasn't listed as a company in the Convercent system. This supports his allegation that the whistleblower system was nonfunctional, despite company policy stating they used Convercent.



91.    Image 2 below shows that other companies were visible in the Convercent system, proving the system itself was working, but Pagaya specifically wasn't registered or listed.



92.    Image 3 below shows Pagaya suddenly appearing as an option in the Convercent whistleblower system after Plaintiff's board letter, directly contradicting Defendants' assertion about continuous system functionality.



93. Plaintiff had previously documented evidence of Pagaya's name being absent from Convercent's whistleblower system, capturing screenshots that clearly displayed other companies while omitting Pagaya. After receiving Defendants' threatening response, Plaintiff checked Convercent's system again and found that Pagaya's name had suddenly appeared. This abrupt change directly contradicts Defendants' counsel's assertion that the whistleblower system had been operational at all times. The evidence demonstrates that the system was nonfunctional until it was reinstated following Plaintiff's email.

**Termination and Ongoing Harm**

94. On March 28, 2025, Pagaya, improperly purporting to act on behalf of Theorem (Plaintiff's actual employer), without providing any legal basis or citing specific company policies that Plaintiff purportedly violated, notified Plaintiff of their decision to terminate his employment, supposedly for "cause," effective April 27, unless a resolution could be reached, an obvious reference to a legal settlement. Defendants further attempted to pressure Plaintiff to either walk away or take a modest amount in settlement with the threat of initiating numerous vague and unspecified investigations and making frivolous multi-million dollar claims against Plaintiff based upon his returning capital to investors consistent with his fiduciary duties and in the course and scope of his employment. These actions were in obvious bad faith as Defendants know well that actions taken by an employee in the course and scope of employment, even that may cause an employer to lose money, do not give rise to a cause of action against the employee, except in extremely limited circumstances that do not apply. As Defendants well knew, they were the ones who created the untenable position for the Theorem IC by restricting the products into which it could invest, and forcing it to return capital to fulfill its fiduciary duties. Defendants also knew that any litigation against Plaintiff would trigger an absolute right of indemnification in favor of Plaintiff, meaning that Defendants could sue him, but it would be required to pay for all of Plaintiff's defense costs and any judgment against him, were it able to procure one, which, given the frivolous nature of the threatened claims, was all but impossible. Defendants' cynical threats were further acts of retaliation in response to Plaintiff's repeated concerns raised about Defendants' illegal conduct as outlined above.

95. During this time, Defendants continued to "manage" the Theorem funds without the involvement of Plaintiff or any members of the original Theorem team—a blatant breach of the commitments made to Theorem fund investors regarding the independence of fund management as outlined in the Investor Letter, while apparently taking the position that any losses suffered by the funds were caused by Plaintiff and would have to be covered by Plaintiff.

96. In late April 2025, while Plaintiff remained on administrative leave, Defendants appointed Pagaya's Ed Mallon and two new individuals to the Theorem IC, without obtaining Plaintiff's consent or consulting anyone from Theorem, as required by the merger agreement.

97. Defendants subsequently issued a communication to Theorem fund investors, further defaming Plaintiff by insinuating his involvement in inappropriate activities. Pagaya called Plaintiff's actions "unforeseen circumstances," suggesting Plaintiff engaged in misconduct and breached company policies, and made assurances that "this situation will not be repeated." These false insinuations, implying wrongdoing, impropriety, or fraudulent activity by Plaintiff, particularly on the heels of earlier disparaging remarks, were intended to harm his standing and legitimacy among investors. Additionally, Defendants referred to the fact that Plaintiff would "no longer be with the firm" after an "investigation" was conducted further compound the defamation by insinuating highly improper, unethical or illegal conduct by Plaintiff.

98. Defendants' multi-faceted misconduct has not just harmed Plaintiff individually, but has also impacted the broader market through a pattern of unfair competition. By systematically engaging in unlawful practices—such as imposing illegal non-compete provisions on California employees, misrepresenting material information to investors, manipulating asset valuations to inflate fees, and retaliating against whistleblowers—Defendants have operated their business in a manner that gives them improper competitive advantages over law-abiding market participants. These business practices directly contradict California's strong public policy of ensuring fair competition and protecting both consumers and employees from unfair, unlawful, and fraudulent business conduct. The harm resulting from these practices extends beyond the parties to this action and affects the integrity of the investment management marketplace, particularly in the California business community where many of these unfair practices were implemented and executed.

**Summary of Defendants' Pattern of Misconduct**

99.    Overall, the events of the preceding months reveal a calculated series of actions defined by obfuscation and ruthless self-interest. What ensued was a deliberate and increasingly aggressive campaign involving breaches of fiduciary duty, acts of retaliation, and efforts to damage Plaintiff's reputation:

100.    **Breached Fiduciary Duties** — Immediately following the merger, Defendants systematically disregarded the governance provisions outlined in the Merger Agreement and violated their fiduciary responsibilities, as well as clear commitments made to their clients. These actions were taken to prioritize Defendants' short-term need for external capital to fund their lending operations, at the expense of their obligations to clients.

101.    **Disregard for Regulatory Standards —** In pursuit of their own interests, Defendants engaged in practices that violated multiple regulatory guidelines. This included misrepresenting the independence of the Theorem IC to clients and investors, as well as disregarding both SEC requirements and internal allocation policies. These violations were designed to eliminate several Theorem investment programs, thereby creating additional volume to support securitization activities that benefited Defendants.

102.    **Undermined Plaintiff's Authority** — Despite contractual assurances guaranteeing his continued leadership, Defendants immediately began overriding Plaintiff's investment decisions, blocking him from key meetings, and directing Theorem's assets toward Defendants-affiliated originations in clear violation of fiduciary obligations and representations made in the merger process. Defendants' executives, who had no prior expertise in Theorem's core business, inserted themselves into investment decisions, disregarded established risk models, thereby jeopardizing the financial stability of Theorem's managed funds. All the while, they continued to represent externally that the Theorem IC was independent and had the same investment opportunities as before the merger.

103.    **Created a Pretext for Termination and Retaliated Against Plaintiff** — When Plaintiff objected to Defendants' illegal activity, ranging from false and misleading statements to investors, securities law violations, and illegal restrictive employment covenants, Defendants

-36-
COMPLAINT

retaliated. They began constructing a false narrative of alleged performance concerns, despite Plaintiff's unblemished track record, stellar reputation, and critical role in Theorem's growth. They manufactured false claims of "policy violations" as a pretext to terminate his employment "for cause." They savaged his professional integrity, his competency, his ethics and his reputation with investors. They threatened to file frivolous claims against him for tens of millions of dollars based on false allegations of workplace misconduct.

104. **Orchestrated a Retaliatory Smear Campaign** — Defendants deliberately sought to erode Plaintiff's credibility with investors and internal stakeholders, falsely stating that he had perpetrated a fraud, breached company protocols and thus his authority had been reduced due to legitimate business concerns. Defendants imposed arbitrary and unprecedented restrictions on Plaintiff's ability to communicate with investors, directly contradicting prior assurances that he would retain oversight of investor relations. This was a blatant and calculated act of retaliation designed to isolate Plaintiff and force him into a position where he could no longer effectively perform his duties.

105. **Manufactured a Crisis to Justify His Removal** — In a final and desperate attempt to force Plaintiff out, Defendants decided on an appropriate and lawful capital distribution to investors—one that Plaintiff executed in accordance with his fiduciary obligations. Lacking any internal policies prohibiting such actions, Defendants retroactively labeled the distribution "unauthorized" and falsely accused Plaintiff of misconduct. Within days, Defendants placed Plaintiff on administrative leave, severing his access to internal systems, investor communications, and key decision-making processes, as part of a concerted effort to engineer his removal under a fabricated pretext. Mere weeks later, Defendants invoked this pretext as the basis to unlawfully terminate Plaintiff's employment.

106. **Launched a Campaign of Defamation to Discredit Plaintiff —** Throughout this period, Defendants repeatedly made false and disparaging statements to employees, investors, clients, and third parties, wrongly accusing Plaintiff of misconduct and unethical behavior. Defendants' calculated smear campaign further damaged Plaintiff's professional reputation and falsely portrayed him as untrustworthy to justify its predetermined decision to remove him.

107. **Failed to comply with legal obligations under Califronia law —** Plaintiff formally requested access to policies, records, and documentation that Defendants, as the employers, were legally obligated to maintain and provide. In response, Defendants disregarded these requirements and only provided partial documentation, such as pay stubs and the employment agreement, while withholding essential employment records and policies necessary for Plaintiff to fully understand and exercise his rights. This failure to comply with their legal obligations hindered Plaintiff's ability to address employment-related concerns and demonstrated a failure on Defendants' part to uphold their responsibilities under the law.

108. **Failed to provide clients with contractually required liquidating trust —** Upon Plaintiff's termination, Defendants failed to fulfill its contractual duty to provide notice regarding the redemption and liquidating trust option explicitly outlined in the agreement. Despite ongoing inquiries from both Plaintiff and several clients aware of the issue as referenced in the Investor Letter, Defendants refused to address or honor this obligation. This deliberate inaction constitutes a clear breach of Defendant's contractual commitments, causing harm not only to Plaintiff but also to fund investors who relied on  these terms in approving the merger.

109. Defendants' actions were not just an orchestrated corporate retaliation and post-merger betrayal—they were a textbook case of wrongful termination in violation of California law. Plaintiff was not simply an executive—he was a fiduciary, an equity holder, and a whistleblower. Defendants eliminated him not for cause, but for standing up to clear breaches of duty and protecting investors from mismanagement. Plaintiff was an essential figure in the company's success and was contractually promised a leadership role in the merged entity. Instead, Defendants executed a deliberate, calculated plan to eliminate him in retaliation for standing up for his fiduciary obligations and refusing to participate in Defendants' unlawful and self-serving conduct.

110. Defendants' misconduct was not limited to isolated instances; rather, it constituted a pattern of unfair, unlawful, and fraudulent business practices that harmed both Plaintiff and the broader marketplace. By systematically restricting investment options, imposing illegal employment terms, misrepresenting fund independence to investors, and manipulating valuations—all while portraying Theorem funds as operating under the same investment principles that had

attracted investors pre-merger—Defendants engaged in a deceptive scheme that distorted market competition and deprived investors of the investment management services they were promised. These unfair business practices not only violated multiple California statutes but were fundamentally contrary to established public policy that protects market participants from deceptive business conduct. Defendants' actions undermined fair competition in the fund management space by obtaining competitive advantages through deception rather than superior products, service, or ethical business operations.

**Plaintiff's Ongoing Concerns Regarding Fund Management and Investor Risk**

111.　　Under Plaintiff's leadership, Theorem transformed from an asset manager with under $1 million in assets under management into a multi-billion-dollar firm, consistently focusing on delivering exceptional value to its clients. This success was driven by assembling a high-caliber research and engineering team that exceeded 20 members at its peak, and by developing a robust operational framework widely regarded for its quality. The firm's infrastructure earned strong praise from several leading operational due diligence auditors, even during its early days when managing less than $250 million in assets. Theorem also fostered a culture centered on compliance and accountability, collaborating with esteemed risk advisors and consultants, including Charles River and Deloitte, to ensure adherence to the highest industry standards. Notably, Theorem proactively implemented an SR 11-7 compliance program based on the auditing requirements of major banking partners, reflecting its forward-thinking approach. Additionally, Plaintiff is proud of Theorem's pre-merger achievements in underwriting governance: in its first bank model governance disparate lending assessment, a premier third-party auditor specializing in disparate impact analysis identified no material deficiencies in Theorem's underwriting model.

112.　　Before the merger, Plaintiff and Theorem earned a strong reputation within the institutional investor community for their commitment to transparency and integrity, even during challenging periods such as the inflation-driven economic downturn of 2022-2023, which impacted performance across the industry. This reputation enabled Plaintiff to cultivate and retain a prestigious client base comprising some of the largest and most respected institutional investors globally—clients that Defendants had never been able to secure independently.

COMPLAINT

113. Now, based on his direct experience at Pagaya and his observations during and after the merger, Plaintiff has serious concerns regarding the ongoing management of the funds and the risks posed to investors. These concerns were furthered by a letter sent by Ed Mallon to the Theorem Fund clients that radically and materially changed the structure of the Theorem Funds, while refusing to honor the Merger Agreement requirements for independence, a liquidating trust, or the rebate of fees. These concerns include, but are not limited to, the following:

a. **Use of the Funds to Support Pagaya's Origination Business at Investor Expense**: Plaintiff is concerned that Pagaya will use the funds primarily to absorb and offload its own origination volume, in a similar manner to that described in the Iceberg Research report, rather than to pursue independent, risk-adjusted investment strategies in the best interest of investors. This was affirmed by Mr. Mallon's letter, which states that going forward the funds will only buy loans for the Pagaya Loan Network.

b. **Highly Leveraged Equity Tranches**: Plaintiff is specifically concerned that Pagaya will begin allocating residual or equity tranches of its own highly leveraged deals—leveraged at 10–25x—into the funds. These instruments pose significant credit and structural risk to investors, particularly in adverse market conditions. This was affirmed by Mr. Mallon's letter, in which he described a plan to securitize and lever the existing and new Pagaya-only purchased loans in the funds, despite the fact that over 90% of investors have requested redemptions.

c. **Inclusion of Risky, Non-Market-Clearing Bonds**: Plaintiff is also concerned that Pagaya will introduce junior ABS securities from Pagaya's securitizations (e.g., B-rated bonds) into the funds. These bonds are not typically priced in a market-clearing manner, often with the only buyer being Pagaya's other fund vehicle, the Pagaya Opportunity Fund and, in Plaintiff's view, pose serious and unnecessary principal risk. There is also so little subordination provided to these bonds that significant risk of principal is extremely high. While Pagaya previously offered an informal promise to cover principal losses if B-rated bonds underperformed, Plaintiff believes this "guarantee" is inadequate, as correlated failures across these securities is quite high and correlated losses would easily exceed Defendants' financial resources. This concern was reaffirmed in Mr. Mallon's letter, in which he stated that the Theorem Main Fund would deploy a

-40-

COMPLAINT

majority of its assets into ABS securities. Based on Plaintiff's understanding of the Pagaya Opportunity Fund's ABS deployment, this means that Defendants are likely to purchase a majority – if not solely – ABS assets from Pagaya. This is exactly the thesis the Iceberg Research report warned about.

d.    **Dumping of Unsold Pagaya Assets**: Plaintiff is concerned that Pagaya may allocate its own unsold personal loan, auto loan products and similar products into the funds simply because it lacks external buyers, without proper regard for risk, suitability, or performance.

e.    **Failure to Honor Pricing Rebates**: Under the merger agreement, Defendant was obligated to rebate origination fees on whole loan and customized structured products to the funds. However, during Plaintiff's tenure, Defendant failed to comply with this requirement, refusing to extend loans to the funds on the agreed terms and neglecting to provide the required fee rebates. Mr. Mallon's letter notably fails to make any mention of efforts by Pagaya to honor this contractual promise, despite his simultaneous decision to focus the funds almost entirely on Pagaya-program loan assets and ABS securities.

f.    **Failure to Acquire Attractive Third-Party Collateral**: Plaintiff believes the funds are unlikely to pursue attractive collateral from unaffiliated partners—opportunities that previously produced strong, diversified returns—due to shifting internal incentives to fund as much Pagaya originations as possible and a lack of personnel capacity. This was also affirmed by Mr. Mallon in his letter, which stated that the funds would only invest in Pagaya Loan Network assets going forward

g.    **Depletion of Key Personnel**: At the time of Plaintiff's departure, more than 80% of the original Theorem team had exited. Plaintiff does not believe the remaining personnel have the expertise or resources necessary to manage the funds in accordance with the standards and representations made in the Investor Letter. Pagaya has also failed to communicate to investors the high level of attrition due to Pagaya's actions to investors.

h.    **Potential Regulatory Exposure**: Plaintiff is deeply concerned about the impact  on investors of potential regulatory actions or investigations against Pagaya, based on its

governance practices, related-party transactions, and internal compliance failures he observed before his termination.

   i.  **Misalignment of Interests in a Downturn**: Plaintiff is particularly concerned that in the event of a market downturn or recession, Pagaya will use the funds primarily to support its own balance sheet and origination revenue, rather than protecting fund investors. This could include allocating suboptimal or distressed collateral into the funds for Pagaya's benefit at the expense of investor capital.

   j.  **The improper use of leverage**: Plaintiff is deeply concerned that Defendant may significantly increase the amount of leverage applied to the funds, primarily to facilitate the inclusion of additional Pagaya-originated loan collateral. While such actions could generate higher origination fee revenues for the Defendant, they would disproportionally expose the fund's investors to increased risks of loss, particularly in a high-interest-rate environment where underperformance of the collateral is more likely. This was affirmed in Mr. Mallon's letter, which detailed plans to securitize new and existing fund assets, presumably to create more liquidity to fund even more Pagaya collateral. This action, taken despite the high level of investor redemptions, is an enormous breach of fiduciary duty.

   k.  **Failure to Follow Investment Process**: Defendant failed to uphold its commitment to utilize an independent, data-driven investment process supported by Theorem's research team, as initially stated in the Investor Letter. Due to the disruption and dismantling of this team, resulting from Pagaya's improper employment practices, Defendant can no longer fulfill this essential obligation. This was also affirmed by Mr. Mallon's letter, which admitted that going forward the funds would no longer independently price collateral, and only diversify by factors such as term, vintage, and loan servicer.

  114. These concerns reflect Plaintiff's good-faith belief, based on his direct experience and fiduciary responsibilities prior to his removal, that the funds are no longer being managed in alignment with investor interests or in accordance with Pagaya's representations to investors.

  115. At the time of the merger announcement, the net asset value (NAV) of the Theorem funds was approximately $900 million, which would have entitled Plaintiff to approximately $43

million of the earn-out consideration (approximately $26 million in stock and $17.5 million in cash). By December 2024, just months after the merger closed, Defendants' interference had already reduced the NAV to approximately $550 million, significantly below the thresholds required for Plaintiff to receive most of the earn-out consideration. Under this artificially suppressed NAV, Plaintiff's potential earn-out was reduced to merely $8 million, representing less than 20% of what he would have received had Defendants honored their contractual obligations.

## CAUSES OF ACTION

### First Cause of Action:
### Retaliation in Violation of California Labor Code § 1102.5
(Against Theorem Defendants)

116.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

117.    California Labor Code § 1102.5 prohibits an employer from retaliating against an employee for disclosing information that the employee reasonably believes constitutes a violation of a state or federal law, rule, or regulation, including federal securities laws, to a person with authority over the employee or to a government agency.

118.    Plaintiff engaged in protected whistleblowing activity by formally reporting Defendants' violations of federal securities laws, breaches of fiduciary duty, investor misrepresentations, and financial misconduct. Specifically, on or about February 3, 2025, Plaintiff sent a formal email to Pagaya's Chief Compliance Officers documenting his concerns and, through legal counsel, sent a comprehensive letter to Pagaya's Chief Legal Officer detailing Pagaya's numerous violations. On or about February 12, 2025, Plaintiff filed a formal whistleblower complaint with the Securities and Exchange Commission documenting these serious legal and regulatory violations.

119.    Plaintiff's protected disclosures included, but were not limited to:

a.       Defendants' violations of the Investment Advisers Act of 1940, specifically Sections 206(1) and 206(2) prohibiting fraud by investment advisers, through their interference with Theorem's investment decision-making processes and imposition of investment limitations that

-43-
COMPLAINT

benefited Pagaya at the expense of Theorem fund investors and by prioritizing Pagaya's financial interests over those of Theorem fund investors;

b.    Defendants' violations of Rule 206(4)-8 of the Investment Advisers Act regarding misleading statements to investors, by misrepresenting the independence of the Theorem IC and failing to disclose Pagaya's efforts to force the purchase of underperforming Pagaya-originated assets;

c.    Defendants' violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 regarding misleading statements in connection with the purchase or sale of securities transactions, through public statements misrepresenting Theorem's post-merger independence;

d.    Defendants' violations of Section 17(a) of the Securities Act through material misrepresentations in offering documents;

e.    Defendants' violations of the SEC's books and records and internal control provisions of the federal securities laws governing material misrepresentations in public filings about the maintenance of Theorem's investment independence;

f.    Defendants' violations of the financial reporting standards of the federal securities laws based on improper valuation practices in the Pagaya Opportunities Fund, including failure to properly update valuations of securities to reflect market conditions, resulting in inflated NAV calculations and excessive management fees;

g.    Defendants' manipulation of discount rates used for valuation of securities to create the appearance of compliance with Regulation RR;

h.    Defendants' imposing of illegal employment agreements containing non-compete clauses in violation of California law, despite being informed these provisions were unlawful under Cal. Bus. & Prof. Code §§ 16600, 16600.5 and Cal. Lab. Code § 432.5.

i.    Defendants' other violations of state and federal laws and regulations.

120.    In direct retaliation for Plaintiff's protected disclosures, Defendants engaged in a calculated campaign to isolate and discredit him, ultimately leading to his termination. Defendants' retaliatory actions began shortly after Plaintiff's initial February 3, 2025 internal complaints and included, but were not limited to:

a. In early February 2025, immediately following Plaintiff's internal complaints, systematically undermining Plaintiff's authority by restricting his access to Theorem's investors and severing key communication channels;

b. Reassigning team members who previously reported to Plaintiff;

c. Continuing the retaliation campaign following Plaintiff's SEC whistleblower complaint on February 12, 2025, with increasingly severe measures;

d. On or about February 20, 2025, falsely characterizing Plaintiff's authorized return of capital to investors as "fraudulent, deceitful and unauthorized";

e. On or about February 20, 2025, revoking Plaintiff's access to all Theorem systems, including email, calendar, risk systems, portfolio management platforms, and client communications, preventing him from performing his duties as CIO;

f. Between February 21-23, 2025, attempting to coerce Plaintiff into appointing Pagaya officers to the Theorem IC, setting arbitrary 24-hour deadlines outside normal business hours;

g. On or about February 25, 2025, sending a communication to Theorem fund investors falsely stating that Plaintiff's return of capital "was not approved internally and did not comply with internal protocols";

h. Contacting Plaintiff's financial institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts;

i. Creating an intolerable work environment designed to coerce Plaintiff's resignation;

j. On March 27, 2025, terminating Plaintiff's employment purportedly "for cause," without providing any legal basis or citing specific company policies that Plaintiff purportedly violated;

k. Maliciously characterizing his termination as being "for cause" as a basis to deny him his substantial earn-out and other benefits due under the merger agreement, despite the fact that even had he done what he is alleged to have done—violated corporate policy by authorizing a return of capital—such actions would not constitute "cause" under his employment agreement;

-45-

COMPLAINT

l.      Threatening to bring frivolous multi-million dollar claims against him for alleged workplace misconduct for authorizing the return of capital, and seeking to hold him personally liable for millions of dollars in damages.

121.    Defendants' retaliation against Plaintiff was willful, malicious, and undertaken with the intent to punish him for exposing unlawful conduct, in violation of California Labor Code § 1102.5.  The close temporal proximity between Plaintiff's protected whistleblowing activities and Defendants' retaliatory actions demonstrates the clear causal connection between his protected activity and the adverse employment actions.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial economic and reputational harm, including loss of income, denial of his earned deferred compensation from the merger, damage to his career prospects and professional reputation in the investment industry, and severe emotional distress. Plaintiff has also suffered non-economic damages including humiliation, anxiety, and mental anguish as a result of Defendants' retaliatory campaign.

123.    Defendants' retaliatory conduct was willful, malicious, and carried out in conscious disregard of Plaintiff's protected rights, as evidenced by their systematic campaign to discredit him through false and defamatory allegations to investors and third parties, their efforts to freeze his personal bank accounts, their attempts to coerce compliance through threats of frivolous multi-million dollar lawsuits, and their deliberate efforts to prevent him from fulfilling his fiduciary duties to investors. The coordinated nature of these actions across multiple executives and entities demonstrates the intentional and calculated nature of Defendants' retaliation. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

**Second Cause of Action:**
**Retaliation in Violation of California Government Code § 12940(h)**
(Against Theorem Defendants)

124.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

125.    California Government Code § 12940(h) prohibits an employer from retaliating against any person because that person has opposed practices forbidden under the Fair Employment

-46-
COMPLAINT

and Housing Act (FEHA) or filed a complaint, testified, or assisted in any proceeding related to FEHA.

126. Plaintiff engaged in protected activity under § 12940(h) by opposing Defendants' unlawful employment practices, including but not limited to:

a. Objecting to and refusing to implement Defendants' illegal employment agreements containing non-compete and non-solicitation clauses prohibited under California law;

b. Advocating on behalf of Theorem employees who were being coerced to sign these unlawful agreements as a condition of continued employment;

c. Informing Defendants that their employment practices violated California law, including Bus. & Prof. Code §§ 16600, 16600.5, and Cal. Lab. Code § 432.5;

d. Opposing Defendants' selective enforcement of these illegal provisions, wherein they waived restrictive covenants for certain employees while enforcing them against others;

e. Opposing Defendants' constructive termination of Theorem employees who refused to sign these illegal agreements, including Nico Salzetta, Theorem's Head of Research.

127. Plaintiff reasonably believed that Defendants' employment practices were unlawful under California law and violated the rights of Theorem employees, including those protected by FEHA, and he communicated these concerns to Defendants.

128. Defendants were aware of Plaintiff's protected activities, as evidenced by:

a. On or about February 3, 2025, Plaintiff's formal complaints to Pagaya's Chief Compliance Officers and Chief Legal Officer explicitly identified the illegal employment agreements as violations of California law;

b. Multiple verbal communications between Plaintiff and Pagaya executives in which Plaintiff objected to these unlawful employment practices;

c. Plaintiff's refusal to implement or enforce these illegal provisions against employees who reported to him.

129. In retaliation for Plaintiff's protected opposition to unlawful employment practices, Defendants subjected him to adverse employment actions, including but not limited to:

-47-
COMPLAINT

a.    Restricting his authority over employment matters and personnel decisions;

b.    Isolating him from decision-making processes related to employment policies;

c.    Creating a hostile work environment intended to force his resignation;

d.    Placing him on administrative leave on false pretenses;

e.    Revoking his access to company systems and communications;

f.    Terminating his employment on March 27, 2025, purportedly "for cause" despite the absence of any legitimate basis.

130.    There is a clear causal connection between Plaintiff's protected activities and the adverse employment actions taken against him, as evidenced by:

a.    The temporal proximity between his opposition to the unlawful employment practices and the retaliatory actions;

b.    The escalating pattern of adverse actions following his protected activities;

c.    Defendants' statements and communications indicating animus toward Plaintiff for his opposition to their employment practices.

131.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered substantial harm, including:

a.    Loss of employment and compensation;

b.    Denial of earn-out consideration;

c.    Damage to his professional reputation;

d.    Emotional distress, humiliation, and mental suffering.

132.    Defendants' retaliatory conduct was willful, malicious, and carried out with conscious disregard for Plaintiff's rights under California law. Their coordinated campaign against Plaintiff after he opposed their unlawful employment practices demonstrates the intentional nature of their violations. Plaintiff therefore seeks punitive damages pursuant to Civil Code § 3294.

**Third Cause of Action:**
**Aiding and Abetting Retaliation**
(Against Pagaya)

133.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

134.    Under California law, a defendant who knowingly provides substantial assistance to another person or entity in committing a wrongful act may be held liable for aiding and abetting that wrongful conduct.

135.    Pagaya, as the parent company and controlling entity of Theorem, knowingly provided substantial assistance to and directed, authorized, and participated in the retaliatory actions taken against Plaintiff in violation of California Labor Code § 1102.5 and Government Code § 12940(h).

136.    Theorem, acting under the direction and control of Pagaya after the merger, executed the retaliatory actions against Plaintiff while knowing that such actions violated California law prohibiting retaliation against whistleblowers.

137.    Each Defendant substantially assisted the other Defendants in the retaliatory conduct by:

a.    Pagaya executives, including CEO Gal Krubiner and COO Ralph Leung, directly participating in decisions to restrict Plaintiff's access to information, investors, and personnel following his protected disclosures;

b.    Pagaya providing the pretextual justifications for Plaintiff's administrative leave and eventual termination, which were then executed through Theorem;

c.    Pagaya drafting and directing the dissemination of false and defamatory communications to investors regarding Plaintiff's return of capital to investors;

d.    Theorem implementing the directives from Pagaya to revoke Plaintiff's system access, limit his authority, and effectuate his administrative leave and termination;

e.    Pagaya executives directing Theorem personnel to falsely characterize Plaintiff's authorized actions as unauthorized and fraudulent;

-49-
COMPLAINT

f.        The Defendants collectively coordinating to circumvent proper corporate channels and established policies to expedite retaliatory actions against Plaintiff.

138.    Each Defendant knew that retaliating against Plaintiff for his protected whistleblowing activities was wrongful and unlawful, yet each provided substantial assistance to the other Defendants in carrying out this unlawful conduct.

139.    Email communications, meeting minutes, and contemporaneous notes demonstrate that executives from Pagaya deliberately circumvented proper corporate channels, bypassed Theorem's established policies, and directed subordinate entities to take retaliatory actions against Plaintiff.

140.    The coordinated nature of the retaliatory actions, involving executives and personnel across all Defendant entities, demonstrates the substantial assistance that each Defendant provided to the others in executing the unlawful retaliation campaign against Plaintiff.

141.    As a result of Defendants' aiding and abetting of retaliation, Plaintiff has suffered the same damages as alleged in the First and Second Causes of Action, including substantial economic loss, reputational damage, and emotional distress.

142.    Defendants' conduct in aiding and abetting retaliation against Plaintiff was willful, malicious, and carried out in conscious disregard of Plaintiff's protected rights. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

**Fourth Cause of Action:**
**Wrongful Termination in Violation of Public Policy**
(Against Theorem Defendants)

143.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

144.    Under California law, it is unlawful for an employer to terminate an employee in violation of fundamental public policies embodied in state and federal statutes and regulations. A claim for wrongful termination in violation of public policy arises when an employer terminates an employee for engaging in legally protected activity, such as reporting corporate misconduct, refusing to engage in unlawful conduct, or exercising statutory rights.

-50-
COMPLAINT

145.   Defendants terminated Plaintiff's employment on or about March 27, 2025, purportedly "for cause," but in reality, because of his protected whistleblowing activities and his refusal to participate in or facilitate Defendants' unlawful conduct.

146.   Plaintiff's termination violated well-established, fundamental public policies that are embodied in constitutional or statutory provisions and inure to the benefit of the public, including but not limited to:

a.   The public policy protecting whistleblowers who report suspected violations of state and federal law, as embodied in California Labor Code § 1102.5;

b.   The public policy protecting employees who oppose unlawful employment practices, as embodied in California Government Code § 12940(h);

c.   The public policy promoting corporate transparency and protecting investors from securities fraud, as embodied in the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a et seq.);

d.   The public policy establishing fiduciary duties for investment advisers and prohibiting fraud in investment advisory relationships, as embodied in the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.);

e.   The public policy prohibiting retaliation against employees who report suspected violations of securities laws, as embodied in the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A);

f.   The public policy prohibiting fraud in the offer and sale of securities, as embodied in the Securities Act of 1933 (15 U.S.C. §§ 77a et seq.);

g.   The public policy against illegal non-compete agreements, as embodied in California Business and Professions Code §§ 16600 and 16600.5;

h.   California's strong public policy of fair business competition and honest corporate governance.

147.   Plaintiff engaged in protected activities in furtherance of these public policies, including:

-51-
COMPLAINT

a.     Reporting Defendants' violations of federal securities laws to Pagaya's Chief Compliance Officer and Chief Legal Officer;

b.     Filing a formal whistleblower complaint with the Securities and Exchange Commission;

c.     Refusing to purchase underperforming Pagaya-originated loans and bonds when doing so would have violated his fiduciary duties to fund investors;

d.     Declining Defendants' offer to modify his deferred compensation in exchange for directing fund investments into Pagaya products regardless of performance;

e.     Objecting to Defendants' imposition of illegal employment agreements on California employees;

f.     Fulfilling his fiduciary duties by returning excess capital to fund investors when it could not be deployed consistent with fund objectives due to Defendants' restrictions.

148.    Defendants were aware of Plaintiff's protected activities, and these activities were substantial motivating factors in Defendants' decision to terminate his employment, as evidenced by:

a.     The temporal proximity between his protected activities and his termination;

b.     The pattern of increasingly hostile treatment following his protected disclosures;

c.     The fabrication of pretextual reasons for termination related directly to his protected activities;

d.     Direct statements by Defendants' executives demonstrating animus toward Plaintiff for his refusal to compromise his fiduciary duties.

149.    No legitimate business reason existed for Plaintiff's termination. Defendants' claimed basis for termination—that Plaintiff improperly authorized the return of capital to investors—was pretextual, as Plaintiff had full authority to execute these transactions as the Chair of the Theorem IC and Chief Investment Officer, and was acting in accordance with his fiduciary duties to fund investors.

150.    As a direct and proximate result of Defendants' wrongful termination in violation of public policy, Plaintiff has suffered substantial harm, including:

a.    Loss of past and future income and employment benefits;

b.    Loss of earn-out consideration that he would have received but for Defendants' manipulation of fund NAV;

c.    Severe damage to his professional reputation in the investment industry;

d.    Emotional distress, including anxiety, humiliation, and mental suffering.

151.    Defendants' conduct in wrongfully terminating Plaintiff was willful, malicious, fraudulent, and oppressive, and carried out with conscious disregard of his protected rights under California law. Specifically, Defendants knew that terminating Plaintiff for his whistleblowing activities violated California law, yet proceeded with the termination and attempted to disguise their retaliatory motive through false accusations of misconduct. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

**Fifth Cause of Action:**
**Aiding and Abetting Wrongful Termination**
(Against Pagaya)

152.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

153.    Under California law, a defendant who knowingly provides substantial assistance to another person or entity in wrongfully terminating an employee in violation of public policy may be held liable for aiding and abetting that wrongful termination.

154.    Pagaya, as the parent company and controlling entity of Theorem following the merger, knowingly provided substantial assistance to and directed, authorized, and participated in the wrongful termination of Plaintiff's employment in violation of fundamental public policies.

155.    Theorem, acting under the direction and control of Pagaya after the merger, executed Plaintiff's wrongful termination while knowing that such termination violated California public policy prohibiting termination of employees for whistleblowing activities and refusing to engage in unlawful conduct.

-53-
COMPLAINT

156. Each Defendant substantially assisted the other Defendants in the wrongful termination by:

a. Pagaya executives, including CEO Gal Krubiner, making the ultimate decision to terminate Plaintiff's employment and communicating this decision to Theorem for implementation;

b. Pagaya creating the pretextual justification for termination based on Plaintiff's lawful return of capital to fund investors;

c. Pagaya drafting the termination notice and dictating the false "for cause" designation to deny Plaintiff his contractual rights to deferred compensation;

d. Theorem implementing the termination decision made by Pagaya despite knowing the true retaliatory motivation;

e. Theorem processing the paperwork and carrying out the administrative actions necessary to effectuate the termination;

f. Pagaya executives directing Theorem personnel to communicate false information about the basis for Plaintiff's termination to investors and others in the industry.

157. Each Defendant knew that terminating Plaintiff for his protected whistleblowing activities and refusal to violate his fiduciary duties violated fundamental public policies established by California and federal law, yet each provided substantial assistance to the other Defendants in carrying out this unlawful termination.

158. Email communications, meeting minutes, and other documentary evidence demonstrate that executives from Pagaya deliberately circumvented proper corporate channels, bypassed established termination procedures, and directed Theorem to terminate Plaintiff with the explicit knowledge that the termination was retaliatory.

159. The termination process required the coordinated action of all Defendants, with Pagaya providing the directive and justification, while Theorem, as Plaintiff's nominal employer, executed the formal termination, processed the necessary documentation, and communicated the termination decision.

COMPLAINT

160. As a result of Defendants' aiding and abetting of wrongful termination, Plaintiff has suffered the same damages as alleged in the Fourth Cause of Action, including substantial economic loss, denial of earn-out consideration, reputational damage, and emotional distress.

161. Defendants' conduct in aiding and abetting the wrongful termination of Plaintiff was willful, malicious, and carried out in conscious disregard of California's fundamental public policies protecting employees. The coordinated nature of their actions, involving senior executives across all Defendant entities, demonstrates the intentional and calculated nature of their wrongful conduct. Plaintiff therefore seeks punitive damages under California Civil Code § 3294.

**Sixth Cause of Action:**
**Breach of Contract (Employment Agreement)**
(Against Theorem Defendants)

162. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

163. Plaintiff was a party to a valid and enforceable Employment Agreement with the Theorem Defendants.

164. Plaintiff performed all conditions, covenants, and promises required on his part to be performed under these agreements, including fulfilling his duties as Chief Investment Officer and Chairman of the Theorem IC, applying his professional expertise to evaluate investment opportunities, and making investment decisions in the best interests of Theorem fund investors.

165. Under the terms of the Employment Agreement, the Theorem Defendants made the following binding commitments to Plaintiff:

a. Plaintiff would serve as Chief Investment Officer of Theorem with the authority to oversee investment decisions;

b. Plaintiff could only be terminated "for Cause" as specifically defined in the Employment Agreement, which required both specific misconduct falling within enumerated categories and, for certain categories, written notice describing the events "in reasonable detail" with "not less than thirty (30) days to cure."

166. The Theorem Defendants materially breached these contractual obligations in multiple ways, including but not limited to:

-55-
COMPLAINT

a.      Theorem Defendants terminated Plaintiff purportedly "for cause" without identifying any policy violations that would constitute "Cause" under the applicable agreements, without providing the required written notice describing the alleged basis for Cause in reasonable detail, and without affording Plaintiff the opportunity to cure as required.

b.      Terminating Plaintiff purportedly "for cause" when his return of capital to fund investors, as Chair of the Theorem IC, did not constitute "Cause" as defined in the Employment Agreement;

c.      Failing to provide written notice describing the alleged basis for Cause "in reasonable detail" and failing to afford Plaintiff the required 30-day opportunity to cure as explicitly required in the Employment Agreement;

d.      Stripping Plaintiff of his authority as Chief Investment Officer by restricting his investment authority and ultimately revoking his access to all Theorem systems, preventing him from performing his duties;

e.      Materially breaching the Employment Agreement by placing Plaintiff on administrative leave without proper cause and restricting his ability to perform his contractual duties;

f.      Failing to pay Plaintiff the compensation and benefits he would have been entitled to had he been properly terminated without cause.

167.    Theorem Defendants' wrongful termination of Plaintiff "for cause" was pretextual and done in bad faith, as the conduct cited by Defendants—Plaintiff's authorized return of capital to fund investors in the exercise of his fiduciary duties—did not meet any of the enumerated grounds constituting "Cause" under the applicable agreements.

168.    Theorem Defendants' intentional interference with Plaintiff's ability to perform his contractual duties—by restricting his investment authority, limiting fund options, and ultimately revoking his system access—constitutes prevention of performance, which excuses any alleged nonperformance by Plaintiff.

169.    Theorem Defendants' breaches were willful, deliberate, and undertaken in bad faith with the intent to deprive Plaintiff of the benefits of his contractual rights, particularly the substantial

earn-out payments that would have been due had Defendants not artificially depressed fund performance.

170. As a direct and proximate result of Theorem Defendants' breaches of the Employment Agreement, Plaintiff has suffered substantial economic harm, including:

      a.    Lost compensation and benefits to which he would have been entitled but for Theorem Defendants' breach;

      b.    Loss of equity interests that would have vested had his employment continued; and

      c.    Other consequential damages to be proven at trial.

171. Plaintiff has been required to retain attorneys to prosecute this action and is entitled to recover reasonable attorneys' fees and costs incurred in this action.

**Seventh Cause of Action:**
**Breach of Implied Covenant of Good Faith and Fair Dealing (Employment Agreement)**
**(Against Theorem Defendants)**

172. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

173. Under California law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

174. Plaintiff entered into a valid and enforceable Employment Agreement with the Theorem Defendants. This Employment Agreement contained an implied covenant of good faith and fair dealing.

175. The implied covenant imposed on the Theorem Defendants a duty to act fairly and in good faith in carrying out their contractual obligations, including an obligation not to engage in conduct that would deprive Plaintiff of the benefits of the Employment Agreement .

176. Theorem Defendants violated the implied covenant of good faith and fair dealing by engaging in a course of conduct designed to frustrate the purpose of the Employment Agreement and deprive Plaintiff of the benefits he reasonably expected to receive, including but not limited to:

-57-
COMPLAINT

a. **Making false representations to induce the Employment Agreement** – Theorem Defendants represented to Plaintiff that he would serve as CIO with meaningful authority and could only be terminated for specific "Cause" reasons with appropriate notice and opportunity to cure, while secretly intending to manufacture pretextual grounds for a "for cause" termination and limit his authority;

b. **Constructively discharging key Theorem personnel** – Theorem Defendants coerced the resignation of essential Theorem staff through unlawful employment agreements while falsely representing to investors that these departures were voluntary, all with the intent to undermine Plaintiff's ability to perform his duties as CIO;

c. **Preventing Plaintiff from performing his duties** – Theorem Defendants systematically obstructed Plaintiff's ability to perform his contractual obligations by restricting his access to information, isolating him from investors, and ultimately revoking his system access, while still holding him responsible for fund performance;

d. **Fabricating pretextual grounds for termination** – Theorem Defendants manufactured allegations of policy violations against Plaintiff for his entirely proper return of capital to investors, in order to create a pretext for terminating him "for cause" and denying him the contractual benefits he would otherwise receive under the Employment Agreement;

e. **Concealing material information** – Theorem Defendants withheld critical information about their intentions and actions that directly impacted Plaintiff's ability to receive the benefits of his Employment Agreement;

f. **Acting with the intent to harm Plaintiff's interests** – Theorem Defendants' coordinated campaign to undermine Plaintiff's authority, reputation, and compensation was carried out with conscious disregard for his contractual rights and with the specific intent to deprive him of the benefits of his Employment Agreement.

177. Theorem Defendants' actions were not only inconsistent with the express terms of the Employment Agreement but were calculated to frustrate the purpose of that agreement and to deprive Plaintiff of the fruits of his bargain.

-58-

COMPLAINT

178.    Theorem Defendants acted in bad faith by presenting a false façade of compliance with contractual terms while simultaneously taking undisclosed actions designed to deprive Plaintiff of the value of those terms, including manufacturing grounds for a "for cause" termination to avoid paying him the benefits he would be entitled to but for Theorem Defendants' wrongful conduct.  As a direct and proximate result of Theorem Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of the benefits of his Employment Agreement, including:

a.    The career continuation and job security he reasonably expected;

b.    The professional authority and autonomy promised in the Employment Agreement;

c.    The financial compensation he would have received had Theorem Defendants acted in good faith;

d.    The continued employment and compensation guaranteed under his Employment Agreement;

e.    Reputational benefits associated with continued successful management of the Theorem funds; and

f.    Other consequential damages to be proven at trial.

179.    Theorem Defendants' conduct in breaching the implied covenant of good faith and fair dealing was willful, malicious, oppressive, and fraudulent, as it was undertaken with the deliberate intent to deprive Plaintiff of his contractual rights and benefits. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

**Eight Cause of Action:**
**Breach of Contract (RSU Award Agreement)**
(Against Pagaya)

180.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

181.    Plaintiff was a party to a valid and enforceable Restricted Stock Unit (RSU) Award Agreement with Pagaya, executed in connection with the merger between Pagaya and Theorem.

-59-
COMPLAINT

182. Plaintiff performed all conditions, covenants, and promises required on his part to be performed under the RSU Award Agreement, including continuing his employment with Theorem post-merger and fulfilling his duties as Chief Investment Officer.

183. Under the terms of the RSU Award Agreement, Pagaya made the following binding commitments to Plaintiff:

    a.    Grant of restricted stock units that would vest according to a specified schedule;

    b.    Accelerated vesting of all unvested RSUs if Plaintiff's employment was terminated without Cause, as specifically defined in the agreement;

    c.    Specific protections against arbitrary termination that would result in forfeiture of RSUs.

184. Pagaya materially breached these contractual obligations in multiple ways, including but not limited to:

    a.    Using its control over Theorem to orchestrate Plaintiff's termination purportedly "for cause" when no "Cause" as defined in the agreement existed;

    b.    Refusing to vest Plaintiff's RSUs following his termination, despite the fact that the termination was without legitimate cause;

    c.    Withholding the release of company stock owed to Plaintiff and other Theorem stakeholders as required under the merger agreement and RSU Award Agreement;

    d.    Failing to honor the terms of the RSU Award Agreement by improperly classifying Plaintiff's termination to avoid contractual obligations to vest his equity.

185. Pagaya's breach of the RSU Award Agreement was a calculated effort to deprive Plaintiff of his substantial equity compensation, which represented a significant portion of the consideration he would receive for the merger.

186. Pagaya's wrongful classification of Plaintiff's termination as being "for cause" was pretextual and done in bad faith, as the conduct cited—Plaintiff's authorized return of capital to fund investors in the exercise of his fiduciary duties—did not meet any of the enumerated grounds constituting "Cause" under the applicable agreements.

-60-
COMPLAINT

187.    As a direct and proximate result of Pagaya's breaches of the RSU Award Agreement, Plaintiff has suffered substantial economic harm, including:

a.    Loss of valuable equity compensation that should have vested upon his termination;

b.    Loss of future appreciation of Pagaya stock that would have accrued to his benefit had his RSUs properly vested; and

c.    Other consequential damages to be proven at trial.

188.    Plaintiff has been required to retain attorneys to prosecute this action and is entitled to recover reasonable attorneys' fees and costs incurred in this action.

## Ninth Cause of Action:
### Breach of Implied Covenant of Good Faith and Fair Dealing (RSU Award Agreement
(Against Pagaya)

189.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

190.    Under California law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

191.    Plaintiff entered into a valid and enforceable RSU Award Agreement with Pagaya. This RSU Award Agreement contained an implied covenant of good faith and fair dealing.

192.    The implied covenant imposed on Pagaya a duty to act fairly and in good faith in carrying out its obligations under the RSU Award Agreement, including an obligation not to engage in conduct that would deprive Plaintiff of the benefits of the RSU Award Agreement.

193.    Pagaya violated the implied covenant of good faith and fair dealing by engaging in a course of conduct designed to frustrate the purpose of the RSU Award Agreement and deprive Plaintiff of the benefits he reasonably expected to receive, including but not limited to:

a.    Using its control over Theorem to engineer a pretextual "for cause" termination specifically designed to trigger forfeiture provisions in the RSU Award Agreement;

b.    Coordinating with Theorem to create a false narrative of policy violations to justify denying Plaintiff his earned equity compensation;

-61-
COMPLAINT

c.    Manipulating corporate governance to manufacture a basis for avoiding its obligations under the RSU Award Agreement;

d.    Deliberately mischaracterizing Plaintiff's proper return of capital to fund investors as misconduct to create a pretext for denying his vested and unvested equity compensation;

e.    Acting with the specific intent to deprive Plaintiff of the substantial equity compensation he had earned as part of the merger transaction.

194.    Pagaya's actions were not only inconsistent with the express terms of the RSU Award Agreement but were calculated to frustrate the purposes of that agreement and to deprive Plaintiff of the fruits of his bargain.

195.    Pagaya acted in bad faith by presenting a false façade of compliance with contractual terms while simultaneously taking undisclosed actions designed to deprive Plaintiff of the value of those terms, including manufacturing grounds for a "for cause" termination to avoid vesting his RSUs.

196.    As a direct and proximate result of Pagaya's breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of the benefits of the RSU Award Agreement, including:

a.    The equity compensation that would have vested upon proper classification of his termination;

b.    The appreciation of Pagaya stock value over time that would have accrued to his benefit;

c.    The security and financial benefits associated with the equity component of his merger compensation; and

d.    Other consequential damages to be proven at trial.

197.    Pagaya's conduct in breaching the implied covenant of good faith and fair dealing was willful, malicious, oppressive, and fraudulent, as it was undertaken with the deliberate intent to deprive Plaintiff of his contractual rights and benefits. Plaintiff therefore seeks punitive damages pursuant to California Civil Code § 3294.

**Tenth Cause of Action:**
**Violation of California Business & Professions Code § 17200 (Unfair Competition Law)**
(Against all Defendants)

198. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

199. California Business & Professions Code § 17200, et seq. (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair, or fraudulent business acts or practices. The UCL establishes three separate and distinct theories of liability: (1) unlawful business acts or practices, (2) unfair business acts or practices, and (3) fraudulent business acts or practices.

200. Defendants have violated the "unlawful" prong of the UCL by engaging in numerous business practices that violate specific statutory provisions, including but not limited to:

  a.    Violating California Labor Code § 1102.5 by retaliating against Plaintiff for reporting violations of state and federal securities laws;

  b.    Violating California Labor Code § 432.5 by requiring employees to agree to terms and conditions of employment that they knew were prohibited by law;

  c.    Violating California Business & Professions Code §§ 16600 and 16600.5 by imposing and attempting to enforce illegal non-compete and non-solicitation provisions in employment agreements with California employees;

  d.    Violating Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 by engaging in fraudulent, deceptive, and manipulative practices as investment advisers;

  e.    Violating Rule 206(4)-8 of the Investment Advisers Act by making false and misleading statements to investors regarding fund investment independence and performance;

  f.    Violating Section 10(b) of the Securities Exchange Act and Rule 10b-5 by making material misrepresentations in connection with the purchase or sale of securities.

  g.    Violating Section 17(a) of the Securities Act by making misrepresentations in the offer or sale of securities.

201. Defendants have violated the "unfair" prong of the UCL by engaging in business practices that offend established public policies, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to market participants, including but not limited to:

-63-
COMPLAINT

a.    Deliberately undermining Theorem's promised investment independence after making contrary representations to secure investor consent to the merger;

b.    Using illegal employment practices to drive away Theorem's skilled team members, undermining the firm's capabilities while maintaining the public facade that Theorem remained fully operational;

c.    Manipulating fund performance to artificially suppress earn-out payments owed to Plaintiff and other Theorem executives, while simultaneously withholding this material information from investors and the market;

d.    Leveraging their market power to force smaller partners and service providers to redirect business from competitive market channels to Pagaya-controlled channels, harming market competition;

e.    Charging management fees on uninvested capital while simultaneously preventing the capital from being properly invested or returned to investors.

202.    Defendants have violated the "fraudulent" prong of the UCL by engaging in business practices that were likely to deceive investors, market participants, and the public, including but not limited to:

a.    Misrepresenting to Theorem fund investors that the Theorem IC would maintain independence and investment discretion post-merger, when Defendants had no intention of honoring these commitments;

b.    Making material misrepresentations in SEC filings regarding the maintenance of Theorem's investment independence following the merger;

c.    Falsely representing to investors that Theorem would have expanded investment options post-merger, while secretly planning to restrict investment opportunities;

d.    Misrepresenting the value of assets in Pagaya-sponsored funds through improper valuation practices, inflating NAV calculations and enabling excessive management fees;

e.    Manipulating discount rates used for valuation of securities to create the false appearance of compliance with regulatory requirements.

-64-
COMPLAINT

203.    These unfair, unlawful, and fraudulent business practices have harmed Plaintiff in his capacity as an employee, a fund manager, and as a marketplace participant, and have distorted competition in the investment management marketplace. These harmful impacts include but are not limited to:

a.    Economic injury to Plaintiff through lost compensation, lost earn-out payments, and damaged career prospects;

b.    Harm to Plaintiff's ability to compete fairly in the investment management marketplace due to Defendants' defamatory statements and unfair business practices;

c.    Harm to competition in the fund management space by Defendants obtaining improper competitive advantages through deception rather than superior products, service, or ethical business operations;

d.    Creation of an unlevel playing field where competitors who operate lawfully are disadvantaged compared to Defendants who use unfair, unlawful, and fraudulent business practices.

204.    Defendants' business practices constitute continuous and ongoing violations of the UCL that threaten future harm to Plaintiff and the competitive marketplace unless enjoined.

205.    As a result of Defendants' violations of the UCL, Plaintiff is entitled to restitution, disgorgement of Defendants' ill-gotten gains, and injunctive relief restraining Defendants from continuing to engage in the unfair, unlawful, and fraudulent business practices described herein.

206.    Plaintiff has suffered injury in fact and has lost money or property as a direct result of Defendants' unfair competition, including but not limited to lost compensation, lost earn-out consideration, and other financial losses, and therefore has standing to bring this claim under Business and Professions Code § 17204.

**Eleventh Cause of Action:**
**Defamation**
(Against all Defendants)

207.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

-65-
COMPLAINT

208. Defendants made false and defamatory statements about Plaintiff to investors, industry peers, financial institutions, and internal stakeholders with the intent to damage his reputation, undermine his credibility, and create a pretext for his termination while deflecting attention from Defendants' own misconduct. These statements were knowingly false or made with reckless disregard for the truth.

209. Defendants' defamatory statements included, but were not limited to:

a. **False Allegations of Unauthorized Fund Transfers** — On or about February 20, 2025, Defendants falsely characterized Plaintiff's return of capital to fund investors as "fraudulent, deceitful and unauthorized," despite Plaintiff acting fully within his fiduciary authority and in accordance with company procedures.

b. **Defamatory Communications to Investors** — On or about February 25, 2025, Defendants sent a communication to Theorem fund investors falsely stating that Plaintiff's return of capital "was not approved internally and did not comply with internal protocols," despite being unable to identify any specific policy violation when repeatedly asked to do so.

c. **False Allegations to Financial Institutions** — Defendants made false allegations to Plaintiff's financial institution that he had engaged in a fraudulent scheme, resulting in the freezing of his personal bank accounts, leaving him without access to essential funds for basic living expenses.

d. **False Allegations of Self-Dealing** — Defendants verbally circulated false and misleading allegations to Theorem fund clients, implying that Plaintiff had authorized the return of capital to improperly access his own investment in the fund and place his interests above those of other investors, when in fact Plaintiff had authorized the return of capital across both relevant funds, including the fund in which he held no personal investment.

e. **False Statements about Risk Management** — Defendants falsely claimed to internal and external audiences that Plaintiff was placed on leave due to inadequate risk management involving a loan originator called Tally, falsely alleging that Plaintiff continued purchasing new Tally loans up until just prior to Tally's bankruptcy, when in fact the Theorem IC had ceased purchasing new Tally loans more than a year before Tally's bankruptcy.

f.      **Defamatory Statements Implying Misconduct** — On or about April 23, 2025, Defendants communicated to investors that Plaintiff's departure was due to "unforeseen circumstances" and assured them that "this situation will not be repeated," falsely implying that Plaintiff engaged in misconduct, impropriety, or fraudulent activity.

g.      **Suggesting Termination for Cause** — Defendants referred to Plaintiff's departure following an "investigation" and in connection with "the matter of return of the capital to investors," falsely suggesting Plaintiff's involvement in improper or criminal conduct warranting termination.

210.    Defendants knew these statements were false when made or acted with reckless disregard for their truth, as evidenced by:

a.      Defendants' inability, when repeatedly asked, to identify any company policy that Plaintiff supposedly violated;

b.      Defendants' own admission that they needed to "determine the facts" surrounding the transfer, while simultaneously making definitive accusations of misconduct;

c.      Defendants' knowledge that Plaintiff had proper authority to authorize the capital return as Chair of the Theorem IC and pursuant to his documented signature authority as Chief Investment Officer;

d.      Defendants' internal knowledge of the true circumstances regarding the Tally situation, contrary to their public statements.

211.    Plaintiff, through counsel, demanded retractions of these defamatory statements in letters sent on February 21, February 26, March 10, and April 25, 2025. Defendants ignored these demands, compounding the harm and demonstrating malice.

212.    Defendants' false statements were communicated to third parties, including Theorem investors, financial institutions, and industry professionals, causing irreparable harm to Plaintiff's professional and personal reputation.

213.    Defendants' defamatory conduct was malicious, oppressive, and despicable, intended to discredit Plaintiff publicly, damage his career and professional relationships, and to

-67-
COMPLAINT

falsely portray his termination as the result of misconduct rather than retaliation for his protected whistleblowing activities.

214. As a direct and proximate result of Defendants' defamation, Plaintiff has suffered substantial damages, including:

a. Severe damage to his professional reputation in the investment management industry, impeding future employment, investment opportunities, and business relationships;

b. Loss of trust and confidence among Theorem investors, clients, and other industry stakeholders;

c. Economic damages from the immediate freezing of his personal bank accounts based on Defendants' false statements;

d. Emotional distress, humiliation, and anxiety caused by Defendants' deliberate public smear campaign targeting his professional integrity and ethical conduct.

215. Defendants made defamatory statements with actual malice, knowing they were false or with reckless disregard for their truth, as demonstrated by their coordinated campaign to disparage Plaintiff across multiple forums and their refusal to retract statements even when confronted with evidence of their falsity. Plaintiff therefore seeks punitive damages under Civil Code § 3294.

**Twelfth Cause of Action:**
**Intentional Infliction of Emotional Distress (IIED)**
(Against all Defendants)

216. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

217. Defendants engaged in extreme and outrageous conduct with the intent to cause Plaintiff severe emotional distress, or with reckless disregard for the likelihood that such distress would result.

218. Defendants' conduct went far beyond mere workplace disputes or adverse employment actions; it constituted a malicious, coordinated, and retaliatory campaign designed to humiliate, isolate, and destroy Plaintiff both professionally and personally. Defendants' egregious and calculated actions included:

a.    Immediately following Plaintiff's protected whistleblowing activities, systematically isolating him professionally by revoking his access to all Theorem systems, email, calendar, risk systems, portfolio management platforms, and client communications, effectively rendering him unable to perform basic functions of his job;

b.    Falsely accusing Plaintiff of "fraudulent, deceitful and unauthorized" conduct regarding the return of capital to fund investors, despite knowing he was acting within his authority and in fulfillment of his fiduciary duties;

c.    Contacting Plaintiff's financial institution with fabricated claims of fraud that resulted in the freezing of his personal bank accounts, deliberately leaving him without access to essential funds for basic living expenses such as rent, a particularly vindictive action designed to inflict maximum personal hardship;

d.    Sending false communications to Theorem fund investors and other industry professionals specifically designed to destroy Plaintiff's professional reputation and career prospects in the investment management industry;

e.    Conducting a pretextual "investigation" while simultaneously disseminating predetermined conclusions of misconduct to investors before any investigation had even commenced;

f.    Threatening to bring frivolous multi-million dollar claims against Plaintiff based on his proper exercise of fiduciary duties, specifically designed to cause severe anxiety and distress;

g.    Maintaining a campaign of public humiliation spanning months, with escalating actions specifically timed to maximize Plaintiff's emotional suffering;

h.    Attempting to coerce Plaintiff into accepting responsibility for improper conduct he did not commit, including setting unreasonable deadlines and making demands that violated his fiduciary obligations.

219.    Defendants' conduct was deliberate, coordinated at the highest levels of the organization, and specifically designed to inflict maximum emotional distress on Plaintiff as

-69-
COMPLAINT

punishment for his protected whistleblowing activities. Their actions exceeded all bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized society.

220.    As a direct and foreseeable result of Defendants' outrageous and vindictive conduct, Plaintiff has suffered:

a.    Severe emotional distress, including acute anxiety, depression, humiliation, and ongoing psychological trauma;

b.    Physical manifestations of emotional distress, including insomnia, weight loss, and stress-related health issues;

c.    Financial insecurity and acute distress from being unable to access his own funds for basic living expenses;

d.    Social isolation and reputational harm within his professional community;

e.    Significant damage to his professional reputation, severely impairing his ability to work in the investment management industry;

f.    Ongoing fear, anxiety, and emotional trauma stemming from the threatened litigation and false allegations of fraud.

221.    Defendants knew their conduct would cause severe emotional distress to Plaintiff or acted with reckless disregard of this probability. Their deliberate campaign to destroy both his professional standing and personal financial stability demonstrates the intentionally harmful nature of their actions.

222.    Defendants' conduct was intentional, reckless, malicious, and carried out with conscious disregard for Plaintiff's rights and emotional well-being. The coordinated nature of these actions across multiple executives and entities demonstrates the calculated intent to inflict maximum emotional harm. Plaintiff therefore seeks substantial compensatory and punitive damages to deter such behavior in the future, pursuant to California Civil Code § 3294.

**Thirteenth Cause of Action:**
**Declaratory Relief**
(Against all Defendants)

223.    Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

-70-
COMPLAINT

224. An actual and justiciable controversy exists between Plaintiff and Defendants regarding the validity and enforceability of multiple provisions of the merger agreement, Plaintiff's employment terms, and Defendants' post-merger conduct.

225. Plaintiff seeks a judicial determination of his rights and obligations with respect to Defendants under the relevant agreements, including but not limited to:

   a. A declaration that no "cause" existed for Plaintiff's termination as defined under Plaintiff's applicable employment agreement, as Plaintiff's return of capital to fund investors was a proper exercise of his fiduciary duties and authority as Chair of the Theorem IC and Chief Investment Officer;

   b. A declaration that Defendants' unclean hands and retaliation against Plaintiff for protected whistleblowing activities and wrongful termination void any post-employment obligations Plaintiff might otherwise have had under his employment agreement;

   c. A declaration that Defendants had no legal right to terminate, suspend, or revoke Plaintiff's investment authority and access to Theorem systems in retaliation for his protected whistleblowing activity;

   d. A declaration that Defendants' statements regarding Plaintiff—including but not limited to characterizations of his authorized return of capital as "fraudulent, deceitful and unauthorized," claims that his actions were "not approved internally and did not comply with internal protocols," allegations to financial institutions that he engaged in a fraudulent scheme, implications that he engaged in self-dealing, statements regarding his risk management practices relating to Tally, and communications to investors referring to his departure as resulting from "unforeseen circumstances" and assurances that "this situation will not be repeated"—were false, defamatory, and made with actual malice, with knowledge of their falsity or reckless disregard for the truth.

226. A declaratory judgment is necessary and appropriate at this time to clarify and determine Plaintiff's rights under the relevant agreements. Defendants have refused to acknowledge or respond to Plaintiff's demands for recognition of his legal rights, including his written redemption

-71-
COMPLAINT

request for his limited partner interests and election of a liquidating trust, creating an actual controversy requiring judicial resolution.

227.    Defendants have repeatedly ignored Plaintiff's requests regarding his contractual and legal rights, demonstrated shifting justifications for their actions, and failed to provide clarity regarding Plaintiff's status, all while continuing to make defamatory statements about him to third parties and investors.

228.    Without a declaration from this Court, Plaintiff will continue to suffer ongoing harm from uncertainty regarding his legal rights and obligations, particularly given Defendants' continued refusal to honor his contractual rights or acknowledge his legitimate requests.

229.    Plaintiff has no adequate remedy at law to resolve these disputes other than through a judicial declaration of the parties' rights and obligations.

**Fourteenth Cause of Action:**
**Failure to Produce Personnel Records (Cal. Labor Code § 1198.5, and § 432)**
(Against all Defendants)

230.    Plaintiff reasserts and incorporates by reference all preceding paragraphs as if fully set forth here, excepting those allegations that are inconsistent with this cause of action.

231.    California Labor Code §1198.5 provides that upon written request, every former employee, or his representative, has the right to receive a copy of the employee's personnel records that the employer maintained relating to the employee's performance or to any grievance concerning the employee. The employer is required to provide the records to a former employee within thirty (30) calendar days from the date the employer receives written request from the employee or his representative for the records.

232.    California law further provides that if an employer fails to provide the former employee with his personnel records, then the former employee may recover a penalty of $750 from the employer, and bring an action for injunctive relief to obtain compliance with §1198.5, and recover costs and reasonable attorney's fees in such an action. Cal. Labor Code §1198.5(k), (l).

233.    Similarly, California Labor Code §432 requires employers to provide employees copies of any instrument the employee signed relating to the obtaining or holding of employment.

-72-
COMPLAINT

234.    Plaintiff, by and through his authorized representative, made written requests for his personnel records to Defendants on March 7, 2025. Defendants responded on March 27, 2025, with a woefully incomplete production that failed to include, among other things:

    a.    any performance evaluations or reviews conducted during Plaintiff's employment;

    b.    documentation reflecting any grants, vesting schedules, or valuations of equity awards;

    c.    all documents and communications concerning Defendants' decision to place Plaintiff on administrative leave;

    d.    internal communications among HR, legal, or management referencing Plaintiff's status, performance, or separation; and

    e.    documents relating to the calculation or classification of final wages, severance, or other compensation owed.

235.    On April 8, 2025, Plaintiff's counsel renewed the request for complete personnel records, including documents relating to Defendants' March 28, 2025 communication of their intention to terminate Plaintiff. Defendants failed to provide the requested records. 216.

236.    Plaintiff is entitled to recover a $750 penalty from Defendants for their willful violation of Labor Code §1198.5.

237.    Further, Plaintiff hereby seeks injunctive relief and Defendants' compliance with the statute to provide him his personnel records, which Defendants are required by law to maintain.

238.    Plaintiff is further entitled to his costs of suit and reasonable attorney's fees in obtaining such injunctive relief and Defendants' compliance with statute

**Fifteenth Cause of Action:**
**Failure to Produce Wage Records (Cal. Labor Code §226)**
(Against all Defendants)

239.    Plaintiff reasserts and incorporates by reference all preceding paragraphs as if fully set forth here.

240.    California Labor Code § 226(b) requires employers to provide payroll records to a former employee within 21 days of a written or oral request from the former employee. California

-73-
COMPLAINT

Labor Code § 226(c) states, in relevant part: "An employer who receives a written or oral request to inspect or copy records pursuant to subdivision (b) pertaining to a current or former employee shall comply with the request as soon as practicable, but no later than 21 calendar days from the date of the request." Failure to provide the requested copies within the 21-day period entitles the employee to a penalty of $750. (Cal. Labor Code § 226(f).)

241.    Plaintiff requested copies of his employment records by written request dated March 7, 2025. Despite producing limited employment documents on March 27, 2025, Defendants failed to provide complete wage records, including but not limited to records relating to the calculation of equity compensation, bonuses, deferred compensation, and any other forms of compensation beyond basic salary.

242.    Plaintiff, through counsel, reiterated his request for complete wage records on April 8, 2025. Defendants failed to provide the requested records.

243.    Pursuant to California Labor Code § 226(f), Plaintiff is entitled to recover a $750.00 penalty from Defendants.

244.    Further, Plaintiff hereby seeks injunctive relief and compliance from Defendants with Labor Code § 226.

245.    Plaintiff is entitled to recover his reasonable attorney's fees and costs in obtaining injunctive relief and Defendants' compliance under §226. (Cal. Labor Code §226(h).)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Hugh Edmundson respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and grant the following relief:

1.  Reinstatement to his position as Chief Investment Officer of Theorem and Chairman of the Theorem IC, with full restoration of all duties, responsibilities, authority, and access to systems and information necessary to perform his role;

2.  In the alternative to reinstatement, if the Court determines that the relationship between Plaintiff and Defendants has been so damaged by Defendants' conduct that reinstatement is not feasible, then damages in the form of back and front pay in lieu of reinstatement in an amount to be determined at trial;

-74-
COMPLAINT

3. Compensatory damages for lost wages, benefits, bonuses, and other compensation, including the full amount of his lost earn-out consideration;

4. General damages for emotional distress, reputational harm, loss of professional standing, and other non-economic losses;

5. Special damages for costs incurred as a result of Defendants' unlawful conduct;

6. Punitive and exemplary damages in an amount sufficient to punish Defendants for their willful, malicious, and oppressive conduct and to deter similar conduct in the future;

7. Restitution and disgorgement of Defendants' ill-gotten gains resulting from their unfair, unlawful, and fraudulent business practices in violation of Business & Professions Code § 17200 et seq.;

8. Injunctive relief to prevent further retaliation, defamation, unfair competition, and unlawful conduct, including an order requiring Defendants to issue a retraction of their defamatory statements;

9. Pre-judgment and post-judgment interest as provided by law;

10. Reasonable attorneys' fees and costs as permitted by law, including but not limited to Government Code § 12965(b), Labor Code § 1102.5, Labor Code § 1198.5(l), and Labor Code § 226(h);

11. Declaratory relief as set forth in the Eleventh Cause of Action;

12. Penalties under the Labor Code in the amount of $750 for failure to produce personnel records under Labor Code § 1198.5 and $750 for failure to produce wage records under Labor Code § 226;

13. Injunctive relief ordering Defendants to comply with their obligations under California Labor Code §§ 226, 432, and 1198.5 by providing complete copies of all personnel and wage records; and

14. Such other and further relief as the Court deems just and proper.

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial consistent with Section 16 of Article I of the California Constitution and California Code of Civil Procedure section 631.


DATED:  June 4, 2025                                      QUINN EMANUEL URQUHART &
                                                                          SULLIVAN, LLP


By  *Diane M. Doolittle*
       Diane M. Doolittle
       *Attorneys for Plaintiff*

-76-
COMPLAINT

# EXHIBIT A



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

Diane Doolittle
555 Twin Dolphin Drive, 5th Floor
Redwood City, CA 94065

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202505-29623630
Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

Dear Diane Doolittle:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

RE:    **Notice of Filing of Discrimination Complaint**
         CRD Matter Number: 202505-29623630
         Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

                                                                                       KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

May 30, 2025

Hugh Edmundson
573 Banks St.
San Francisco, CA 94110

RE:    **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202505-29623630
Right to Sue: Edmundson / Pagaya Technologies Ltd. et al.

Dear Hugh Edmundson:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective May 30, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Hugh Edmundson                                      CRD No. 202505-29623630

                                    Complainant,

vs.

Pagaya Technologies Ltd.
90 Park Avenue
New York, CA 10016

Theorem Technology Inc.
400 Concar Drive
San Mateo, CA 94402

Theorem Partners, LLC
400 Concar Drive
San Mateo, CA 94402

                                    Respondents

_____

**1.** Respondent **Pagaya Technologies Ltd.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2.**Complainant is naming **Theorem Technology Inc.** business as Co-Respondent(s).
Complainant is naming **Theorem Partners, LLC** business as Co-Respondent(s).

**3.** Complainant **Hugh Edmundson**, resides in the City of **San Francisco,** State of **CA.**

**4.** Complainant alleges that on or about **April 27, 2025**, respondent took the following adverse actions:

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, suspended, denied any employment benefit or privilege, other.

-1-
*Complaint – CRD No. 202505-29623630*

Date Filed: May 30, 2025

CRD-ENF 80 RS (Revised 2025/02)

**Additional Complaint Details:** Hugh Edmundson was the founder and Chief Investment Officer of Theorem Technology, Inc. and Theorem Partners, LLC, which he built from less than $1 million in assets under management in 2014 into a leading consumer credit investment firm managing over $1.7 billion in assets by 2024. Theorem developed sophisticated machine-learning models to analyze consumer loans and managed investments for institutional investors including endowments, sovereign wealth funds, and pension funds.

In July 2024, Pagaya Technologies Ltd. announced its acquisition of Theorem, with the merger completing in October 2024. The merger agreement explicitly promised that Theorem's Investment Committee would maintain control and discretion over the funds' investment strategy for at least the first year.

Immediately following the merger, Pagaya systematically violated these commitments by restricting Theorem from investing in historically successful third-party lending platforms, effectively forcing investments into Pagaya-sponsored programs. Pagaya also imposed illegal non-compete clauses in employment agreements for California employees.

On February 3, 2025, Plaintiff formally reported these violations to Pagaya's compliance and legal teams, documenting breaches of fiduciary duty, violations of federal securities laws regarding misleading investor statements, and California employment law violations. On February 12, 2025, Plaintiff filed a whistleblower complaint with the SEC.

In direct retaliation, and among other retaliatory actions, Pagaya placed Plaintiff on administrative leave in February 2025 under false allegations while refusing to identify specific policies allegedly violated. Pagaya revoked his system access, made false statements to investors and his financial institution claiming he committed fraud, conducted a sham investigation by Pagaya's own counsel, and terminated his employment effective April 27, 2025. The termination claimed to be "for cause" despite failing to meet contractual requirements and not providing the required written notice and cure period. Plaintiff's termination was in direct retaliation for his protected whistleblowing activities in violation of California Labor Code Section 1102.5 and California Government Code Section 12940(h).

-2-
*Complaint – CRD No. 202505-29623630*

Date Filed: May 30, 2025

CRD-ENF 80 RS (Revised 2025/02)

VERIFICATION

I, **Diane Doolittle**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On May 30, 2025, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Redwood City, CA**

-3-
*Complaint – CRD No. 202505-29623630*

Date Filed: May 30, 2025

CRD-ENF 80 RS (Revised 2025/02)

# EXHIBIT C

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Diane Doolittle (CA Bar No. 142046)   Quinn Emanuel Urquhart & Sullivan, LLP<br>555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065<br><br>TELEPHONE NO.: (650) 801-5000        FA NO.: (650) 801-5100<br>EMAIL ADDRESS: dianedoolittle  quinnemanuel.com<br>ATTORNEY FOR *(Name):* Plaintiff, Hugh Edmundson | **Electronically FILED**<br>by Superior Court of California, County of San Mateo<br>ON        6/4/2025<br>By____ /s/ Anthony Berini____<br>**Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA  COUNTY OF  SAN MATEO**
STREET ADDRESS: Hall of Justice, 400 County Center, 1st Floor
MAILING ADDRESS: Hall of Justice, 400 County Center, 1st Floor
CITY AND ZIP CODE: Redwood City, 94063
BRANCH NAME: Southern Branch

CASE NAME:
 Hugh Edmundson v. Pagaya Technologies Ltd., et al.

| CIVIL CASE COVER SHEET<br>[x] U    ed    [ ] L    ed<br>(Amount          (Amount<br>demanded       demanded is<br> e ceeds $35,000)   $35,000 or less) | Co     e Ca e De g a o<br>[ ] Counter    [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>25-CIV-04254<br><br>JUDGE:<br>DEPT.: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **o e bo**  below for the case type that best describes this case:

**A  o Tor**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**O  er PI PD   D Per o al  r Pro er Da age  ro gf Dea   Tor**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI PD WD (23)
**No -PI PD   D O er Tor**
[ ] Business tort unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI PD WD tort (35)
**E  o e**
[x] Wrongful termination (36)
[ ] Other employment (15)

**Co  ra**
[ ] Breach of contract warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Rea Pro er**
[ ] Eminent domain Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**U  a f  De a er**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
** d  a Re e**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other  udicial review (39)

**Pro  o a Co  e C  L ga o  Ca R e of Corre  e  00  0**
[ ] Antitrust Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental To ic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally comple  case types (41)
**E for e e  of  dg e**
[ ] Enforcement of  udgment (20)
**M  e a eo  C  Co  a**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**M  e a eo  C  Pe o**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not     comple  under rule 3.400 of the California Rules of Court. If the case is comple , mark the factors requiring e ceptional  udicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] E tensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial post udgment  udicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or in unctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 15
5. This case [ ] is  [x] is not     a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 4, 2025
Diane M. Doolittle
_____
(TYPE OR PRINT NAME)

▶ *Diane M. Doolittle*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
 Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (e cept small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
 File this cover sheet in addition to any cover sheet required by local court rule.
 If this case is comple  under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
 Unless this is a collections case under rule 3.740 or a comple  case, this cover sheet will be used for statistical purposes only.    **Page 1 of**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400  3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |
|---|---|---|

**INSTRUCTIONS ON HO    TO COMPLETE THE COVER SHEET**    **CM-010**

**To P a  ff a d O er F  g F r  Pa er**   If you are filing a first paper (for e ample, a complaint) in a civil case, you complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1.  This information will be used to compile statistics about the types and numbers of cases filed.  You must complete items 1 through 6 on the sheet.  In item 1, you must check o e bo  for the case type that best describes the case.  If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the bo  that best indicates the  r ar  cause of action. To assist you in completing the sheet, e amples of the cases that belong under each case type in item 1 are provided below.  A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may sub ect a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Par e    R e    0 Co e o  Ca e**   A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, e clusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit.  A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a pre udgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be e empt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading.  A rule 3.740 collections case will be sub ect to the requirements for service and obtaining a  udgment in rule 3.740.

**To Par e    Co  e Ca e**   In comple  cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is comple .  If a plaintiff believes the case is comple  under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate bo es in items 1 and 2. If a plaintiff designates a case as comple , the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a  oinder in the plaintiff's designation, a counter-designation that the case is not comple , or, if the plaintiff has made no designation, a designation that the case is comple .

**CASE TYPES AND E AMPLES**

**A  o Tor**
Auto (22)  Personal In ury Property Damage Wrongful Death
 Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**O er PI PD  D Per o al  r Pro er  Da age  ro gf Dea   Tor**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal In ury Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice Physicians & Surgeons
 Other Professional Health Care Malpractice
Other PI PD WD (23)
 Premises Liability (e.g., slip and fall)
 Intentional Bodily In ury PD WD (e.g., assault, vandalism)
 Intentional Infliction of Emotional Distress
 Negligent Infliction of Emotional Distress
 Other PI PD WD

**No  -PI PD  D O er Tor**
Business Tort Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice *(not medical or legal)*
Other Non-PI PD WD Tort (35)

**E   o  e**
Wrongful Termination (36)
Other Employment (15)

**Co ra**
Breach of Contract Warranty (06)
 Breach of Rental Lease Contract *(not unlawful detainer or wrongful eviction)*
 Contract Warranty Breach  Seller Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract Warranty
 Other Breach of Contract Warranty
Collections (e.g., money owed, open book accounts) (09)
 Collection Case  Seller Plaintiff
 Other Promissory Note Collections Case
Insurance Coverage *(not provisionally complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Rea  Pro er**
Eminent Domain Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**U  a f De a er**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**d  a Re  e**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ  Administrative Mandamus
 Writ  Mandamus on Limited Court Case Matter
 Writ  Other Limited Court Case Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal  Labor Commissioner Appeals

**Pro  o a Co  e C  L ga o  Ca  R  e of Co r R e    00  0**
Antitrust Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental To ic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**E  for e  e of  dg e**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of County)
 Confession of Judgment *(non-domestic relations)*
 Sister State Judgment
 Administrative Agency Award *(not unpaid taxes)*
 Petition Certification of Entry of Judgment on Unpaid Ta es
 Other Enforcement of Judgment Case

**M  e a eo  C  Co  a**
RICO (27)
Other Complaint *(not specified above)* (42)
 Declaratory Relief Only
 In unctive Relief Only *(non-harassment)*
 Mechanics Lien
 Other Commercial Complaint Case *(non-tort/non-complex)*
 Other Civil Complaint *(non-tort/non-complex)*

**M  e a eo  C  Pe  o**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
 Civil Harassment
 Workplace Violence
 Elder Dependent Adult Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late Claim
 Other Civil Petition

CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    **Page  of**

# EXHIBIT D



## SUPERIOR COURT OF SAN MATEO COUNTY
Civil Division
400 County Center, 1st Floor, Room A
Redwood City, CA 94063
(650) 261-5100
www.sanmateo.courts.ca.gov

PETITIONER/PLAINTIFF: **HUGH EDMUNDSON**

RESPONDENT/DEFENDANT: **PAGAYA TECHNOLOGIES LTD.; THEOREM TECHNOLOGY, INC.; THEOREM PARTNERS, LLC; DOES 1 - 100**

### NOTICE OF ASSIGNMENT FOR ALL PURPOSES (CIVIL) AND NOTICE OF CASE MANAGEMENT CONFERENCE

FOR COURT USE ONLY

# FILED
SAN MATEO COUNTY

6/4/2025

**Clerk of the Superior Court**
/s/ Anthony Berini
DEPUTY CLERK

CASE NUMBER:
**25-CIV-04254**

By order of the Presiding Judge pursuant to San Mateo County Superior Court Local Rule 3.200(a) the above entitled matter is assigned for all purposes to: **Judge Jeffrey R. Finigan** in **Department 24**.

**An Initial Case Management Conference is set before the Case Management Judicial Officer (and not with the assigned Judge), as follows:**
**DATE: 12/29/2025**
**TIME: 9:00 AM**

### LOCATION: 800 North Humboldt Street, San Mateo, CA 94401

REMOTE APPEARANCES ARE STRONGLY ENCOURAGED.  Please visit our website for information on remote appearances and use the Case Management Judicial Officer's Credentials:
https://www.sanmateo.courts.ca.gov/divisions/civil/civil-department-judges/civil-commissioner

ZOOM HEARING CREDENTIALS – CASE MANAGEMENT JUDICIAL OFFICER

Direct Zoom Link to Courtroom G can be found on the Case Management Judicial Officer's Webpage above.

**Dial in:**
Phone Number: +1 (669) 254-5252
Meeting ID: 161 964 0802
Password: 734616

CASE MANAGEMENT CONFERENCE INFORMATION

You are hereby given notice of your Initial Case Management Conference.  The date, time and department are noted above.

1. In accordance with applicable California Rules of the Court and Local Rules, you are hereby ordered to:
   a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 3.110(b); Local Rule 3.804).
   b) Serve a copy of this Notice, blank form of the Case Management Statement and ADR Information Package on all named parties in this action (Local Rule 3.804(a)). Documents are available online under the CIVIL CMC Packet section at: www.sanmateo.courts.ca.gov/civil
   c) File and serve a completed Case Management Statement at least 15 days before the Case Management Conference (CRC 3.725; Local Rule 3.805(c)).  Failure to do so may result in monetary sanctions or the continuance of the CMC.

Rev. November 2024

d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than 30 days before the date set for the Case Management Conference (Local Rule 3.805(b)).

2. Parties may proceed to an Appropriate Dispute Resolution process ("ADR") by filing a *Stipulation and Order to ADR* (Local Form ADR-CV-1). File and serve the completed *Stipulation and Order to* ADR form at least 12 days prior to the Case Management Conference (Local Rule 3.805(f)). You may find this form and information regarding the Civil ADR Program online at www.sanmateo.courts.ca.gov/adr/civil/

For additional information, you may visit the Judicial officer's webpage at: www.sanmateo.courts.ca.gov/civiljudges

---

ASSIGNED DEPARTMENT INFORMATION

To schedule a Law and Motion Hearing, please see Local Rule 3.402, or visit the assigned Judicial Officer's webpage at: www.sanmateo.courts.ca.gov/civiljudges.

Contact information for your assigned department is as follows:

| Judicial Officer | Department Phone | Department E-mail |
|---|---|---|
| Jeffrey R. Finigan | 650-261-5124 | Dept24@sanmateocourt.org |

For additional information, you may visit the Judicial officer's webpage at: www.sanmateo.courts.ca.gov/civiljudges

---

**CLERK'S CERTIFICATE OF SERVICE**

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, by electronic service to the parties or their counsel of record at the email addresses set forth below and shown by the records of this court, or, if a physical mailing address is present below, by placing the document(s) in an envelope for collection and mailing, following the Court's ordinary business practices for collecting and processing correspondence for mailing. On the same day the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

Date: 6/4/2025                                   Chad L Peace, Court Executive Officer/Clerk

By:   /s/ Anthony Berini
        Anthony Berini, Deputy Clerk

**Copies served to:**

DIANE M. DOOLITTLE
dianedoolittle@quinnemanuel.com

# EXHIBIT E

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 142046 | FOR COURT USE ONLY |
|---|---|
| NAME: Diane Doolittle | |

ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO: 142046

NAME: Diane Doolittle

FIRM NAME: Quinn Emanuel Urquhart & Sullivan LLP

STREET ADDRESS: 555 Twin Dolphin Dr.

CITY: Redwood Shores    STATE: CA    ZIP CODE: 94065

TELEPHONE NO.: (650) 801-5000    FAX NO. : (650) 801-5100

E-MAIL ADDRESS: dianedoolittle@quinnemanuel.com

ATTORNEY FOR (Name): Hugh Edmundson

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN MATEO

STREET ADDRESS: Hall of Justice, 400 County Center, 1st Floor

MAILING ADDRESS: 400 County Center, 1st Floor

CITY AND ZIP CODE: Redwood City, CA 94063

BRANCH NAME: Southern Branch: Hall of Justice and Records

Plaintiff/Petitioner: Hugh Edmundson

Defendant/Respondent: Pagaya Techs. Ltd., Theorem Tech. Inc., Theorem Partners LLC

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: 25-CIV-04254 |
|---|---|

TO (insert name of party being served): Pagaya Technologies Ltd.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/10/2025

Diane Doolittle

(TYPE OR PRINT NAME)    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. ☒ A copy of the summons and of the complaint.
2. ☒ Other (specify):
   Civil cover sheet

*(To be completed by recipient):*

Date this form is signed: 6/17/2025

Katherine V.A. Smith on behalf of Pagaya Technologies Ltd.

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)    (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure, §§ 415.30, 417.10 www.courtinfo.ca.gov |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

# EXHIBIT F

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 142046 | FOR COURT USE ONLY |
|---|---|
| NAME: Diane Doolittle<br>FIRM NAME: Quinn Emanuel Urquhart & Sullivan LLP<br>STREET ADDRESS: 555 Twin Dolphin Dr.<br>CITY: Redwood Shores   STATE: CA   ZIP CODE: 94065<br>TELEPHONE NO.: (650) 801-5000   FAX NO. : (650) 801-5100<br>E-MAIL ADDRESS: dianedoolittle@quinnemanuel.com<br>ATTORNEY FOR (Name): Hugh Edmundson | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN MATEO
STREET ADDRESS: Hall of Justice, 400 County Center, 1st Floor
MAILING ADDRESS: 400 County Center, 1st Floor
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch: Hall of Justice and Records

Plaintiff/Petitioner: Hugh Edmundson
Defendant/Respondent: Pagaya Techs. Ltd., Theorem Tech. Inc., Theorem Partners LLC

| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>25-CIV-04254 |
|---|---|

TO (insert name of party being served): Theorem Technology Inc.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/10/2025

Diane Doolittle

(TYPE OR PRINT NAME)   (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. ☒ A copy of the summons and of the complaint.
2. ☒ Other (specify):
   Civil cover sheet

(To be completed by recipient):

Date this form is signed: 6/17/2025

Katherine V.A. Smith on behalf of Theorem Technology Inc.

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,   (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)   ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

# EXHIBIT G

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 142046 | *FOR COURT USE ONLY* |
|---|---|
| NAME: Diane Doolittle<br>FIRM NAME: Quinn Emanuel Urquhart & Sullivan LLP<br>STREET ADDRESS: 555 Twin Dolphin Dr.<br>CITY: Redwood Shores  STATE: CA  ZIP CODE: 94065<br>TELEPHONE NO.: (650) 801-5000  FAX NO. : (650) 801-5100<br>E-MAIL ADDRESS: dianedoolittle@quinnemanuel.com<br>ATTORNEY FOR (*Name*): Hugh Edmundson | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO |
|---|
| STREET ADDRESS: Hall of Justice, 400 County Center, 1st Floor |
| MAILING ADDRESS: 400 County Center, 1st Floor |
| CITY AND ZIP CODE: Redwood City, CA 94063 |
| BRANCH NAME: Southern Branch: Hall of Justice and Records |

| Plaintiff/Petitioner: Hugh Edmundson |
|---|
| Defendant/Respondent: Pagaya Techs. Ltd., Theorem Tech. Inc., Theorem Partners LLC |

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>25-CIV-04254 |
|---|---|

TO (*insert name of party being served*): Theorem Partners LLC

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: 6/10/2025

Diane Doolittle

*(TYPE OR PRINT NAME)*  ▶ *Diane M. Doolittle*  *(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)*

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [x] A copy of the summons and of the complaint.
2. [x] Other *(specify)*:
   Civil cover sheet

*(To be completed by recipient):*

Date this form is signed: 6/17/2025

Katherine V.A. Smith on behalf of Theorem Partners LLC

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)  ▶  (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

**Page 1 of 1**

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

GEORGE B. ADAMS III, SBN 321904
    gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Attorneys for Defendants
PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY,
INC., THEOREM PARTNERS, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HUGH EDMUNDSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>Defendants. | CASE NO. 3:25-cv-06029<br><br>**DECLARATION OF NATALIE WILMORE IN SUPPORT OF NOTICE OF REMOVAL**<br><br>(Originally filed in the Superior Court in and for the County of San Mateo, Case No. 25-CIV-04254) |

Gibson, Dunn & Crutcher LLP

I, Natalie Wilmore, declare as follows:

1.      I am the Deputy General Counsel & Corporate Secretary at Pagaya Technologies Ltd. ("Pagaya").  In this position, I have access to the business records and data in this declaration.  Unless otherwise stated, the following facts are within my personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Pagaya is incorporated in Israel.

3.      Pagaya has its principal place of business in New York, New York.  Pagaya's headquarters is located in New York.  Pagaya directs, controls, and manages its business from that headquarters.  Key executives of Pagaya are also based in New York, including its Chief Executive Officer, Gal Krubiner.

4.      Theorem Technology, Inc. is incorporated in Delaware.

5.      Theorem Technology, Inc. has its principal place of business in New York, New York. Theorem Technology, Inc.'s headquarters is located in New York.  Theorem Technology, Inc. directs, controls, and manages its business from that headquarters.  Key executives of Theorem Technology, Inc. are also based in New York, including its Chief Executive Officer, Gal Krubiner.

6.      Theorem Technology, Inc. is the sole member and owner of Theorem Partners, LLC.

7.      The foregoing was and is true as of June 4, 2025 through today.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at 1:46 p.m., eastern time, on this 16th day of July 2025.

_____
Natalie Wilmore

Gibson, Dunn &
Crutcher LLP

2

DECLARATION OF NATALIE WILMORE IN SUPPORT OF NOTICE OF REMOVAL

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
   ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:    213.229.7000
Facsimile:     213.229.7520

GEORGE B. ADAMS III, SBN 321904
gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:    415.393.8200
Facsimile:     415.393.8306

Attorneys for Defendants
PAGAYA TECHNOLOGIES LTD., THEOREM
TECHNOLOGY, INC., THEOREM PARTNERS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HUGH EDMUNDSON, an individual,<br><br>         Plaintiff,<br><br>     v.<br><br>PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100,<br><br>         Defendants. | CASE NO. 3:25-cv-06029<br><br>**DEFENDANTS' CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT**<br><br>(Originally filed in the Superior Court in and for the County of San Mateo, Case No. 25-CIV-04254) |

Pursuant to Local Rule 3-15 and Federal Rule of Civil Procedure 7.1, Defendants Pagaya Technologies Ltd., Theorem Technology, Inc., and Theorem Partners, LLC hereby make the following disclosures:

1.     Pagaya Technologies Ltd. ("Pagaya") is a publicly traded company.

2.     Pagaya is an Israel corporation with its principal place of business in New York, New York.

3.     Pagaya does not have a parent company, and no publicly held corporation owns 10% or more of Pagaya's stock.

4.     Theorem Technology, Inc. is a wholly owned subsidiary of Pagaya US Holding Company LLC, a Delaware limited liability company which is a wholly owned subsidiary of Pagaya.

5.     Theorem Technology, Inc. is a Delaware corporation with its principal place of business in New York, New York.

6.     Theorem Technology, Inc. is the sole member and owner of Theorem Partners, LLC.

7.     Defendants are unaware of any other corporation, unincorporated association, partnership, or business entity not a party to this case that, as a result of Defendants' status as parties to this case, has a financial interest in the outcome of this case.

DATED: July 17, 2025                          Respectfully submitted,

                                              GIBSON, DUNN & CRUTCHER LLP


                                              By: */s/ Katherine V.A. Smith*
                                                    Katherine V.A. Smith

                                              Attorneys for Defendants PAGAYA
                                              TECHNOLOGIES LTD., THEOREM
                                              TECHNOLOGY, INC., THEOREM
                                              PARTNERS, LLC

Gibson, Dunn &
Crutcher LLP

2

GIBSON, DUNN & CRUTCHER LLP
KATHERINE V.A. SMITH, SBN 247866
    ksmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:     213.229.7000
Facsimile:     213.229.7520

GEORGE B. ADAMS III, SBN 321904
    gadams@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, California 94111-3715
Telephone:     415.393.8200
Facsimile:     415.393.8306


Attorneys for Defendants
PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY,
INC., THEOREM PARTNERS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HUGH EDMUNDSON, an individual, | CASE NO. 3:25-cv-06029 |
| Plaintiff, | **PROOF OF SERVICE** |
| v. | |
| PAGAYA TECHNOLOGIES LTD., THEOREM TECHNOLOGY, INC., THEOREM PARTNERS, LLC, and DOES 1-100, | |
| Defendants. | |

Gibson, Dunn &
Crutcher LLP

PROOF OF SERVICE

**PROOF OF SERVICE**

I, Courtney M. Johnson, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Avenue, Los Angeles, California  90071-3197, in said County and State.  On July 17, 2025, I served the following document(s):

**DEFENDANTS' NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT;**

**DECLARATION OF KATHERINE V.A. SMITH IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL AND EXHIBITS A-G;**

**DECLARATION OF NATALIE WILMORE IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL; AND**

**DEFENDANTS' CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT**

on the parties stated below, by the following means of service:

Diane Doolittle
Quinn Emanuel Urquhart & Sullivan LLP
555 Twin Dolphin Dr,
Redwood Shores, CA 94065

☒   **BY UNITED STATES MAIL:**  I caused a true copy to be placed in a sealed envelope or package addressed to the persons as indicated above, on the above-mentioned date, and caused the envelope to be placed for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited with the U.S. Postal Service in the ordinary course of business in a sealed envelope with postage fully prepaid. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing set forth in this declaration.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 17, 2025.

_____
Courtney M. Johnson

Gibson, Dunn &
Crutcher LLP

2

PROOF OF SERVICE

# PROOF OF SERVICE

I, Courtney M. Johnson, declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Avenue, Los Angeles, California 90071-3197, in said County and State. On July 17, 2025, I served the following document(s):

**DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT**

on the parties stated below, by the following means of service:

Diane Doolittle
Quinn Emanuel Urquhart & Sullivan LLP
555 Twin Dolphin Dr,
Redwood Shores, CA 94065

☒ **BY UNITED STATES MAIL:** I caused a true copy to be placed in a sealed envelope or package addressed to the persons as indicated above, on the above-mentioned date, and caused the envelope to be placed for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited with the U.S. Postal Service in the ordinary course of business in a sealed envelope with postage fully prepaid. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing set forth in this declaration.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 17, 2025.

_____
Courtney M. Johnson

Gibson, Dunn & Crutcher LLP

DEFENDANTS' NOTICE OF FILING NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT