# EXHIBIT 10

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100

WRITER'S DIRECT DIAL NO.
**(650) 801-5007**

WRITER'S EMAIL ADDRESS
**dianedoolittle@quinnemanuel.com**

February 3, 2025

**CONFIDENTIAL**
**VIA EMAIL AND U.S. MAIL**

Eric Watson, Chief Legal Officer
Pagaya Technologies Ltd.
Pagaya Investments US LLC
Theorem Partners LLC
Theorem Technology, Inc.
90 Park Ave
New York NY 10016
Email: legal_notices@pagaya.com; eric.watson@pagaya.com

Re:     *Pagaya's Violations of Law and Breaches of Merger Agreement with Theorem*

Dear Mr. Watson:

We represent Hugh Edmundson, Chief Investment Officer of Theorem. We write to address his ongoing concerns, as expressed previously to Theorem and Pagaya, about Pagaya's ongoing and escalating pattern of unlawful conduct, which violates law and public policy, breaches fiduciary duties, and contravenes binding legal obligations under the Merger Agreement with Theorem. By raising these complaints and exercising his right to engage counsel to vindicate his rights that Pagaya has compromised, he is protected under applicable law as a whistleblower. Under no circumstances may Pagaya retaliate against him, by discharging him or otherwise changing the terms and conditions of his employment, such as limiting his right to access to information or the responsibilities and duties attendant to his employment. This includes, but is not limited to, his responsibilities as the Chief Investment Officer of the Theorem Funds and head of the Theorem Investment Committee ("Theorem IC").

Over at least the past several months, Pagaya has engaged in a series of deliberate, illegal acts that are irreparably harmful to Theorem, its funds, and their investors. Pagaya's actions obliterate the foundational promises underpinning the merger, destabilize Theorem at its core, and create substantial and mounting legal, financial, and reputational exposure for Pagaya. The actions taken by Pagaya's management team have also destroyed enormous long-term value for Pagaya

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

in contravention of their duty to Pagaya's shareholders and in contravention to the statements Pagaya made in press releases at the time of the merger concerning its plans for Theorem. What follows below is a non-exhaustive list setting forth many of Mr. Edmundson's principal concerns about the illegal and detrimental actions taken by Pagaya.

**First**, Pagaya, via the Pagaya Capital Deployment Committee ("PCDC"), has improperly prioritized its own financial interests over its fiduciary obligations to the Theorem funds by limiting the Theorem IC's investment options to force it to select less favorable investments that financially benefit Pagaya at the expense of the funds and their investors. These actions violate state and federal law, contradict the representations made to investors about the independence of the Theorem IC to induce their consent to the merger, and have materially harmed the investors in the Theorem funds. These actions have also irreparably harmed the potential value of the Theorem funds, and are contrary to Pagaya's public statements at the time of the merger. These restrictions include, but are not limited to:

(1) *Restriction of 3rd Party Forward Flow Arrangements.* The PCDC has denied the Theorem IC access to materially all personal loan forward flow purchasing programs from Theorem's established loan origination partners that have historically provided favorable returns to Theorem funds. The PCDC's reasons of "model risk" are clearly pretextual. The forward flow programs simply do not present that risk as these loans are purchased well after origination. This is true not just for Theorem, but dozens of institutional investors, including Apollo, Blue Owl, and PIMCO, including those buying forward flow from Pagaya, as Pagaya's management team knows. The ad hoc nature of this objection is further belied as the PCDC has not limited the Theorem IC to invest in forward flows that financially benefit Pagaya directly or to loan origination partners with which Pagaya is pursuing business opportunities, or has expressed interest in pursuing opportunities (e.g., Achieve). These actions have materially hurt Theorem funds and their investors by preventing the Theorem IC from allocating capital to opportunities optimized for the performance of the funds. These actions are also in direct contradiction with item (2) of Schedule 1.1(i) of the Merger Agreement, *Theorem Integration and Operating Principles for the First 12 Months After Closing* ("Operating Principles"), which states, "Deal flow from network platform will be made available in any mix provided by the platform."

(2) *Elimination of Theorem CLIP programs.* The PCDC has also restricted all Theorem CLIP programs (also known as 2nd Look or "Extended Platform") that competed with Pagaya's programs. This decision materially harm Theorem's funds and their investors by preventing the Theorem IC from allocating capital into these opportunities. Pagaya also applied this restriction inconsistently by allowing programs that did not compete with Pagaya's existing programs despite having the same types of risk.

Shockingly, in both the forward flow and the CLIP cases, Pagaya instructed a Theorem employee to lie to these business partners for the forward flow and CLIP programs as to why these programs were shutting down. Pagaya instructed her to say the Theorem IC solely made the decision despite the Theorem IC actually arguing against shutting down those programs. Further, this employee was instructed to say falsely that Pagaya had no influence on the decision, even though the orders for the shutdown came directly from Pagaya.

2

*(3) Illegal Allocation Preferences Favoring Pagaya over Theorem Funds.* In multiple instances, the PCDC has stated to the Theorem IC that Pagaya's restrictions on certain programs, such as Best Egg Forward Flow, Prosper Forward Flow, and Sofi CLIP were due to "concentration risk." In these instances, the Pagaya team claimed to not want the joint Theorem/Pagaya volume to represent more than 20% or 25% of a given partner's origination volume (the exact number has never been shared). In all of these cases where volume exceeded this limit, the PCDC cut Theorem's allocation to zero, and all volume was allocated solely to Pagaya. This is a clear violation of Pagaya's obligations to fairly allocate investment opportunities among client funds.

*(4) Restricting the Theorem IC from issuing debt.* To meet the investment objectives of its funds, the Theorem IC historically utilizes some amount of leverage to enhance returns. This leverage is often derived from issuing THRM securitizations. Immediately after the merger, Pagaya prevented Theorem's team from working on or originating a new THRM deal, materially hurting the returns of the Theorem funds. The Theorem team was instructed that Pagaya would not allow the Theorem team to issue another THRM deal unless and until the team had agreed to purchase loans from Pagaya. This undermined the Theorem IC's independence and directly goes again Operating Principles item (3), which clearly states that "TIC will determine the overall investment strategy for each Theorem fund, including…leverage ratio…"

The numerous limitations on the Theorem IC violate the Merger Agreement and are contrary to the representations made to fund investors to induce them to approve the merger. The Operating Principles provide that the PCDC act "with the objective to make the opportunity set offered to the Theorem funds *as large as possible* and enhance opportunities for future growth." Item (2) (emphasis added). Similarly, the investor letter also repeatedly referred to "expanded" investment opportunities for the Theorem funds. To the contrary, Pagaya and the PCDC have improperly constrained the Theorem IC's investment options. In fact, the speed with which Pagaya acted to limit the Theorem IC's investment options, starting with the very first PCDC meeting on November 11, 2024, indicate this was its plan all along despite the Merger Agreement terms and statements to fund investors to the contrary. Pagaya's stranglehold on the Theorem IC necessitates that Pagaya offer Theorem fund investors the right to withdraw or creating a liquidating trust under item (5) of the Operating Principles, as discussed more below.

**Second**, Pagaya is overcharging Theorem Funds for Pagaya investments in violation of its fiduciary duties, representations made to fund investors, and the terms of the Merger Agreement. Specifically, Pagaya is charging the Theorem funds a 50 bps administrative fee on a Pagaya-sponsored private ABS deal, Pagaya AI Debt Trust 2024-PT1 ("2024-PT1") completed on October 18, 2024. As Mr. Edmundson raised at the time, Pagaya surprisingly added this fee at the end of the process, and the fee negatively impacted the risk/return analysis for the Theorem funds. Pagaya attempted to classify this fee as a securitization expense, even though it generally does not appear elsewhere among other common transactions in the market. In the one previous THRM deal, which did include a similar fee, it was rebated to the funds. For Pagaya to charge this fee to an internally managed fund, despite disclosures stating otherwise, is dismaying. Despite multiple discussions between Pagaya by Mr. Edmundson, as well as Theorem's Chief Compliance Officer, no action has been taken to rebate this fee. *See* Operating Principles item

3

(4) as well as the transmission letter shared with fund investors at the time of the merger, which states that such costs will be rebated.

**Third**, Pagaya has repeatedly violated state law by demanding Theorem employees sign employment contracts containing illegal non-compete and non-solicitation provisions. *See e.g.,* Cal. Bus. & Prof. Code §§ 16600, 16600.5 (as amended by SB 699, effective Jan. 1, 2024) (barring employers from entering into or enforcing non-compete agreements, even if signed and the employment was out of state); Cal. Lab. Code § 432.5 (prohibiting employers from requiring employees to agree to terms they know are unlawful). Mr. Edmundson and others at Theorem alerted Pagaya that the provisions were unlawful, but it proceeded anyway. Pagaya even admitted in writing that the non-compete provision was unenforceable. This unlawful conduct has resulted in the constructive termination of a substantial number of employees and the acquiescence of several employees under duress to signing illegal non-compete agreements, with the fate of the remainder uncertain. Moreover, discharging so many Theorem employees has profoundly and negatively impacted Theorem's ability to serve its clients consistent with past practices, and is contrary to representations made to fund investors to induce their consent to the merger that Theorem would maintain their own research team much as they had operated before the merger. These terminations also violate the merger agreement. Item (8) of Operating Principles prohibits terminations of Theorem employees—except for cause—without Ryan Podolsky's consent. Mr. Podolsky never consented to these terminations. In addition, we have recently come to learn that Pagaya is telling Theorem employees Mr. Edmundson has approved the terms of the separation agreements. This is unequivocally false. Mr. Edmundson vehemently disagrees with these terminations. Pagaya must immediately cease such falsehoods and correct its prior false statements.

**Fourth**, Pagaya has, to date, failed to provide notice of the departure of key persons to Theorem fund investors, violating the LPA and misleading Theorem fund investors. *See* Ninth Amended and Restated Agreement of Limited Partnership § 12.8 (requiring prompt notice of the departure of key persons). On December 31, 2024, Mark Elliot, Theorem's Chief Technology Officer, left Pagaya, which triggered prompt notice under the LPA. Since then, many others have left Theorem, including Nico Salzetta, a member of the Theorem IC, who Pagaya constructively terminated on January 21, and Ryan Podolsky, Theorem's CEO, who signed a severance agreement on January 24. Recognizing that Theorem fund investors will be concerned by these departures, Pagaya has stated its intention to delay notifications, including at least until additional Theorem employees are terminated. Only last week, after Mr. Edmundson again raised the issue and noted investors may start learning of the departures on their own, have there been discussions about issuing the notices before all the terminations are completed.

**Fifth**, Pagaya has failed to provide "notice and an opportunity to withdraw in full" to Theorem fund investors contrary to the representations made to investors to induce them to approve the merger and the terms of the Merger Agreement itself. Under item (5) of the Operating Principles, Pagaya must give Theorem fund investors notice to withdraw where there is a "Material reconstitution or diminution of the scope or authority of the [Theorem IC] (through . . . material changes in responsibilities or otherwise) that results in the legacy members of the [Theorem IC] . . . ceasing collectively to have material control over investment decisions for the Theorem funds." As noted above, Pagaya has placed a stranglehold on the Theorem IC's ability to select

4

investments for the funds. Independent of that, Mr. Salzetta's departure also triggers this provision.

**Sixth**, Pagaya's unlawful conduct also appears designed to prevent Mr. Edmundson and the Theorem team from earning the contingent, deferred compensation in the Merger Agreement in violation of Section 2.3(f) providing that Pagaya "shall not act with the intent to prevent, avoid, hinder or delay the achievement of the maximum amount of Contingent Consideration." By terminating key employees, limiting the ability of the Theorem Investment Committee to make high quality investments, and otherwise charging inappropriate fees and expenses to Theorem, Pagaya is destroying the value against which the deferred compensation will be measured. This is not only a breach of contract, but a breach of the Merger Agreement's covenant of good faith and fair dealing.

***

Despite repeated notice from Mr. Edmundson and others at Theorem, Pagaya has willfully persisted in its illegal conduct, compounding the damage with each passing week. This brazen misconduct, even after being notified of the illegality of its conduct is a significant disappointment to Mr. Edmundson, who devoted years to building Theorem and serving its funds and investors. Mr. Edmundson anticipated that the merger would create synergies to benefit Theorem, its funds, and its employees, including himself. Instead, Pagaya's unlawful and unethical actions have shattered those expectations, eroding employee and investor confidence while jeopardizing the very viability of Theorem.

In light of Pagaya's ongoing misconduct, Mr. Edmundson is placed in an untenable position. However, Mr. Edmundson's primary objective remains the same: to ensure the continued success of Theorem for the benefit of its clients, employees, and Pagaya's shareholders. Despite having "Good Reason" to end his employment under the terms of his employment agreement, Mr. Edmundson's desire is to stay to ensure that he does whatever he can to protect Theorem's remaining employees, funds and fund investors. Indeed, he remains committed to addressing and resolving the disruptions caused by Pagaya's actions. His continued presence ensures stability in fund management and operations, demonstrating his dedication to safeguarding Theorem's long-term success and the interests of all stakeholders. This commitment is not only grounded in Mr. Edmundson's professional dedication, but also reflects the importance of preserving the buyout terms that are owed to him and others who helped build Theorem into a thriving organization.

Nevertheless, Mr. Edmundson cannot and will not allow Pagaya's violations to go unchecked. Pagaya's unlawful and unethical conduct has already undermined the trust and confidence of investors and employees, jeopardized the very viability of Theorem, and irreparably harmed Mr. Edmundson's ability to realize the contingent compensation owed to him and his team under the Merger Agreement. Immediate corrective action is required, to include, but not be limited to an independent investigation of the matters raised in this agreement, recission of all illegal restrictive covenants imposed or sought to be imposed on Theorem's employees, immediate cessation of PCDC's efforts to limit the independence of the TIC and reassignment of the TIC's reporting chain away from the PCDC to prevent such misconduct going forward, immediate notifications to Theorem fund investors of the departure of key persons and their right to withdraw from the fund, and the immediate cessation and reimbursement of the administrative

5

fee Pagaya has been charging the Theorem funds.  Please advise us no later than **Monday, February 10, 2025**, that you will be taking the actions needed to remedy this blatant wrongdoing and the steps that you will be taking to do so.

Absent immediate corrective action, we are prepared to pursue all available remedies to protect Mr. Edmundson's rights and hold Pagaya accountable for its unlawful actions.

Please also be advised that, by this letter, we are also putting Pagaya and Theorem on notice that they must preserve all documents, communications, and other materials consistent with the Document Preservation Demand attached to this letter as **Attachment A**. Please confirm in writing no later than **Friday, February 7, 2025**, that Pagaya and Theorem, as well as the associated individuals outlined herein, have taken the necessary preservation measures. If you disagree with any of the obligations to preserve evidence as set forth below, please immediately notify us so that we can take appropriate action.

Finally, as you must know, Theorem and Pagaya are prohibited by law from retaliating against Mr. Edmundson for exercising his rights to complain about this activity, which is both contrary to law and violates public policy, and his efforts to vindicate his rights by engaging legal counsel. Retaliation would include, but not be limited to, termination, demotion, or any changes in the terms and conditions of Mr. Edmundson's employment, such as his job responsibilities, duties, and scope of information to which he has access. This includes any changes to his role and responsibility as the head of the Theorem IC. Given the unlawful and reckless manner with which Pagaya has exercised past employment decisions, we are putting Pagaya on notice that any action, direct or indirect, will result in an additional legal claim of retaliation against Pagaya.

***

We anticipate your prompt response and a meaningful resolution on each of the issues identified in this non-exhaustive list of unlawful conduct. However, absent immediate corrective action, we will take all necessary steps to safeguard Mr. Edmundson's rights and ensure accountability for Pagaya's misconduct.

Respectfully,

Diane M. Doolittle          C. Dabney O'Riordan

cc:

      Proskauer Rose LLP
      Eleven Times Square
      New York, NY 10036
      Attn: Christopher Wells; Yuval Tal
      Email: cwells@proskauer.com; ytal@proskauer.com

6

**Attachment A**
**Document Preservation Demand**

Pagaya and Theorem, their affiliates, funds, Board of Directors, officers, agents, attorneys, accountants, employees, partners, investors, or other associated individuals or third parties, are hereby on notice that they likely have records, information, documents, other tangible materials, and electronically stored information ("ESI") in their possession, custody, and/or control concerning the merger with Theorem, Mr. Edmundson's employment, the operation of Theorem after the merger, including any efforts and/or directions by Pagaya to direct or influence that operation, the operation of the PCDC, all limitations placed on the Theorem IC and investments for the Theorem funds, the operation of the Theorem IC, all communications and agreements about Theorem employees, all administrative fees charged on investments by any Theorem fund, and any claims that Mr. Edmundson may assert, that they have a legal obligation to preserve.

Pagaya and Theorem and the aforementioned associated entities and individuals must immediately take all necessary steps to preserve any such materials and data existing in any form whatsoever, that are actually or potentially relevant or relate in any way to the merger or claims, including but not limited to the following, which we refer to as the "Preservation Subjects":

- **Mr. Edmundson:**  All documents, communications, and information referring or relating to Mr. Edmundson.

- **PCDC:** All documents, communications, and information referring or relating to the PCDC. This includes all documents, communications, and information referring or relating to any program or investment considered or historically utilized by the Theorem IC for the Theorem funds.

- **Theorem IC:**  All documents, communications, and information referring or relating to the Theorem Investment Committee or its individual members, as well as Pagaya's direct or indirect efforts to direct or influence the investment decisions or composition of the same.

- **Merger:**  All documents, communications, and information concerning the merger between Pagaya and Theorem and Pagaya's compliance or lack of compliance with the Merger Agreement.

- **Employment Records:** Complete employment files Mr. Edmundson and all Theorem employees who have been discharged or resigned since the merger, including applications, performance reviews, complaints, draft and final employment agreements, and disciplinary actions.

- **Employment Terms for Theorem Employees**: All documents, communications, and information referring or relating to any employment terms.

- **Scope of Work:** Documents regarding the roles and responsibilities of employees, representatives, or contractors at Theorem, including employee handbooks, training materials, and organizational charts.

- **Agreements:** Any executed or draft agreements between Pagaya and/or Theorem on the one hand, and employees of Theorem on the other, since the date of the merger.

- **Termination and Severance:** Any documents, communications, and agreements related to workforce reductions, termination, severance agreements, or efforts by Theorem to terminate or modify the terms of employment for its workforce, including communications with investors, Limited Partners (LPs), or the Investment Committee concerning these matters.

- **Compensation to Pagaya for Theorem Fund Investments:** Any documents, communications and agreements as to any compensation Pagaya did or anticipates receiving from Theorem funds' investments, including (but not limited to) administrative fees charged on investments by any Theorem fund.

**Types of Information to Be Preserved**

This notice encompasses all types of information, including internal and external communications, whether confidential or not, and whether created before or after the date of this letter. It includes duplicates with handwritten notations or other markings, hardware and electronic processing systems (even if replaced), emails, internet web activity, and logs. Relevant or potentially relevant information includes:

- Digital communications (e.g., email, texts, voice mail, instant messaging);

- Word-processed documents (e.g., Word documents and drafts);

- Spreadsheets and tables (e.g., Excel worksheets);

- Accounting application data (e.g., QuickBooks, Money);

- Image and facsimile files (e.g., PDF, TIFF, JPG, GIF);

- Databases (e.g., Access, Oracle, SQL Server);

- Contact and relationship management data (e.g., Outlook, ACT!);

- Calendar and diary application data (e.g., Outlook PST);

- Online access data (e.g., temporary internet files, history);

- Presentations (e.g., PowerPoint);

- Network access and server activity logs;

- Project management application data;

- Computer-aided design/drawing files; and

- Backup and archival files (e.g., ZIP files).

8

**Preservation Instructions**

Pagaya and the aforementioned associated entities and individuals must take the following immediate actions:

1. **Suspend Routine Destruction:** Cease any routine document or data destruction policies, including features of any information system that cause the loss of potentially relevant ESI.

2. **Preserve Online Accounts:** Maintain the content of email accounts and services, including Sent, Deleted, and Archived folders.

3. **Halt Backup Tape Disposal:** Refrain from overwriting, erasing, or discarding backup tapes or other media.

4. **Preserve Hardware:** Retain all relevant hardware unless an exact mirror image of the data is made.

5. **Secure Access Credentials:** Preserve passwords, decryption procedures, and other tools necessary for accessing ESI.

6. **Prohibit Deletion:** Refrain from deleting emails or electronic documents and disable automatic deletion systems.

7. **Protect Paper Documents:** Ensure the secure storage of all paper records and refrain from altering or discarding them.

8. **Preserve Electronic Devices:** Avoid discarding or reformatting electronic devices, ensuring data remains intact.

9. **Maintain Access Tools:** Retain all tools and information necessary to access and review potentially relevant ESI.

10. **Log Modifications:** Maintain logs documenting any modifications to relevant documents or systems.

Failure to adhere to these preservation measures may result in spoliation of evidence. As noted in the letter to which this notice is attached, please confirm in writing that these steps have been taken to ensure full compliance with the preservation obligations outlined above.